1                    UNITED STATES DISTRICT COURT

2                   WESTERN DISTRICT OF NEW YORK

3

4   - - - - - - - - - - - - -X
    UNITED STATES OF AMERICA                    19-CR-106(JLS)
5

6   vs.
                                                Buffalo, New York
7   JEFFREY RICHARDS,                           January 27, 2020
                  Defendant.                    10:20 a.m.
8   - - - - - - - - - - - - -X

9

10                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE MICHAEL J. ROEMER
11                UNITED STATES MAGISTRATE JUDGE

12                    JAMES P. KENNEDY, JR., ESQ.
                      United States Attorney
13                    BY: BRENDAN T. CULLINANE, ESQ.
                      Assistant United States Attorney
14                    138 Delaware Avenue
                      Buffalo, New York 14202
15

16                    MICHAEL J. STACHOWSKI, ESQ.
                      2025 Clinton Street
17                    Buffalo, New York 14206
                      Appearing on behalf of the Defendant
18

19
    AUDIO RECORDER:      Rosalie Zavarella
20

21

22   TRANSCRIBER:          Christi A. Macri, FAPR-CRR-RMR-CSR(CA/NY)
                           Kenneth B. Keating Federal Building
23                         100 State Street, Room 2120
                           Rochester, New York 14614
24

25   (Proceedings recorded by electronic sound recording,
     transcript produced by computer).

1                      **I N D E X**

2

**WITNESS FOR THE GOVERNMENT**

3

Thomas Weis

4        Direct examination by Mr. Cullinane        Page    4
         Cross-examination by Mr. Stachowski        Page   77

5        Redirect examination by Mr. Cullinane      Page   96
         Recross-examination by Mr. Stachowski      Page  101

6

7

Mark Schirching

8        Direct examination by Mr. Cullinane        Page  105
         Cross-examination by Mr. Stachowski        Page  129

9        Redirect examination by Mr. Cullinane      Page  142

10

11

12

13

14

15

16      **EXHIBIT**              **RECEIVED**

        Government 1            29

17
        Government 2            36

18
        Government 3            55

19
        Government 4            73

20

21

22

23

24

25

<u>**P R O C E E D I N G S**</u>

\*   \*   \*

1

2

3      **(WHEREUPON,** the defendant is present).

4         **THE CLERK:** United States District Court for the

5   Western District of New York is now in session, the Honorable

6   Michael J. Roemer presiding.

7         We're here in the matter of U.S.A. vs. Jeffrey

8   Richards, case No. 19-CR-106, for an evidentiary hearing.

9         Counsel, please state your name for the record.

10        **MR. CULLINANE:** Good morning, Your Honor.  Brendan

11  Cullinane and Charles Watkins on behalf of the United States.

12        **MR. STACHOWSKI:** Michael Stachowski on behalf of

13  Mr. Richards.

14        **MAGISTRATE JUDGE ROEMER:** Good morning, counsel.

15  We're here for an evidentiary hearing regarding, I think, the

16  traffic stop, the arrest of the defendant and a search of the

17  defendant's automobile?

18        **MR. CULLINANE:** That's correct, Your Honor.  And I

19  had an opportunity to speak with Mr. Stachowski last week and

20  we agree that it's limited to the stop of the vehicle in which

21  the defendant was in, and the recovery of the firearm at that

22  point.

23        **MR. STACHOWSKI:** Right.  And we -- we're looking at

24  a separate hearing on the breadth of the search warrant.

25        **MAGISTRATE JUDGE ROEMER:** The breadth of the -- of

1    the house?

2         **MR. STACHOWSKI:** Yeah, of the house.

3         **MAGISTRATE JUDGE ROEMER:** Well, we can discuss that.

4    I guess I don't see a need for a hearing on it.

5         **MR. STACHOWSKI:** Well, Judge, there's a search

6    warrant and -- and the seized items that were in a safe, and

7    the safe's not mentioned in the search warrant.

8         **MAGISTRATE JUDGE ROEMER:** Okay.  Well, we can

9    discuss that later.

10        Are you ready to start?

11        **MR. CULLINANE:** I am, Judge.  Just one other issue

12   in the spirit of suppression issues today.  I have a bit of a

13   cough and I don't want the Court to think I'm chewing gum

14   here, but I have cough drops that I'm using to help prevent

15   the cough.

16        **MAGISTRATE JUDGE ROEMER:** I will consider that.

17        **MR. CULLINANE:** Thank you, Judge.  I appreciate

18   that.

19        **MAGISTRATE JUDGE ROEMER:** All right, do you want to

20   call your first witness?

21        **MR. CULLINANE:** Thank you, Judge.  Yeah, the

22   Government will call at this time FBI Special Agent Thomas

23   Weis.

24        **GOVERNMENT'S WITNESS, THOMAS WEIS, SWORN**

25                   **DIRECT EXAMINATION**

1          **THE CLERK:** Have a seat.  When seated, please state

2     your name and spell it for the record.  And also (inaudible).

3          **THE WITNESS:** Thomas Weis, W-E-I-S.

4     **BY MR. CULLINANE:**

5     Q.    Good morning.

6     A.    Good morning, sir.

7     Q.    Where are you currently employed?

8     A.    I'm currently employed with the Federal Bureau of

9     Investigation.

10    Q.    What is your title?

11    A.    Special agent.

12    Q.    Agent Weis, how long have you been with the FBI?

13    A.    I've been with the FBI since March of 2017.

14    Q.    And in what city or cities have you been assigned to the

15    FBI following your graduation from the FBI's training academy?

16    A.    I've been assigned to Buffalo.

17    Q.    So since March of 2017?

18    A.    That's correct.

19    Q.    All right.  Prior to working as an FBI special agent,

20    where did you work?

21    A.    Prior to this I worked as a government contractor down in

22    Virginia.  Prior to that I was in the Secret Service.  And

23    prior to that I was nine years in the U.S. Army.

24    Q.    Can you please describe the training you completed in

25    order to become an FBI special agent?

1  A.    It was a basic special agent course down in Quantico,

2  Virginia, which is approximately six months, followed with a

3  two year probationary time and on-the-job training here in

4  Buffalo, New York.

5  Q.    And generally what kind of training do you complete at the

6  FBI's training academy?

7  A.    Basic investigation training, firearms training, tactics,

8  arrest procedures, anything along those lines.

9  Q.    What are your current job responsibilities as a special

10 agent here in Buffalo?

11 A.    As a special agent here in Buffalo I've been assigned to

12 the Safe Streets Gang Task Force currently where I conduct

13 investigations into violent crime, violent gang and then

14 drugs.

15 Q.    When did you start working with the Safe Streets Task

16 Force?

17 A.    I was first assigned to Safe Streets Task Force in July of

18 2017 when I came to Buffalo right out of the academy.

19 Q.    Have you always worked with the Safe Streets Task Force?

20 A.    No, sir.  I -- after about a year and a half I was

21 transferred to the Joint Terrorism Task Force here in FBI

22 Buffalo.

23 Q.    Approximately when was that?

24 A.    That was approximately August of 2018.

25 Q.    And were you reassigned back to the Safe Streets Task

1  Force?

2  A.    I was.

3  Q.    Generally what does the Joint Terrorism Task Force have

4  responsibilities for?

5  A.    The task force is involved here in the Buffalo area of

6  responsibility for international and domestic terrorism.

7  Q.    When you say "international" terrorism --

8  A.    Yes.

9  Q.    -- that would involve issues outside the United States

10 that threaten the United States?

11 A.    Yes, sir.

12 Q.    What would domestic terrorism consist of?

13 A.    Domestic terrorism can consist of anything from home grown

14 extremists, anything along the lines where it is -- there's no

15 foreign influence.

16 Q.    In your training and experience what are some of the

17 behaviors or behavior that persons who are involved in

18 domestic terrorism exhibit?

19 A.    Typically there could be bomb making associated with --

20 with the domestic terrorism, threats of violence with

21 firearms.   Then typically there's been narcotics trafficking

22 as well.

23 Q.    How about race-based issues?

24 A.    Yes, sir.

25 Q.    For example, what do you mean?

1   A.   So specifically there could be white supremacists, could

2   there be black separatists.  It's pretty common for domestic

3   terrorism.

4   Q.   But those issues fall under the domestic terrorism area of

5   concern for the FBI?

6   A.   Yes, they do.

7   Q.   All right.  Now, you mentioned bomb making; is that

8   correct?

9   A.   I did.

10  Q.   Have you received training regarding bomb making?

11  A.   I have.

12  Q.   All right.  And what is your understanding of persons and

13  how they're able to use bombs or detonate bombs?

14  A.   So bombs could be detonated by different methods.  One of

15  them could just be a simple fuse that's lit.  Another means

16  for detonation could be remotely via cell phone, any type of

17  blue -- bluetooth signal or radio signal.

18  Q.   And generally can you explain for the Court what you mean

19  by "remotely" using a cell phone or bluetooth?

20  A.   A signal can be sent from the cell phone to the actual

21  device and then it would cause the detonation.

22  Q.   And is this something that you're familiar with that

23  people manufacture?

24  A.   It is.

25  Q.   Now, are you also a member of the FBI's SWAT team?

1  A.    I am.

2  Q.    How long have you been a member of the SWAT team for?

3  A.    Since April of 2019.

4  Q.    All right.  What is the SWAT team?

5  A.    SWAT team is a group of special agents that receive

6  further training who volunteered and it consists of -- well,

7  the name actually is special weapons and tactics.  So the job

8  of SWAT trained officers is to respond and participate in

9  arrests and search warrants that are typically deemed high

10  risk to law enforcement.

11  Q.    Okay.  I have a couple questions following up on that.

12  You said there's additional training that's required to be a

13  member of the SWAT team?

14  A.    Yes, sir.

15  Q.    Can you please explain that?

16  A.    Each operator in order to be certified and to actually

17  conduct operations has to go through a three week basic course

18  down in Quantico, Virginia.  Followed up by that every month

19  SWAT operators have to conduct training.

20  Q.    What's the purpose of this additional training?

21  A.    It's to keep all of our tactics up-to-date as well as

22  being familiar with all of our weapons systems, with all of

23  our special equipment.

24  Q.    Now, you also mentioned the SWAT team is used in high-risk

25  situations?

1  A.    Yes, sir.

2  Q.    Can you please explain that?

3  A.    One example would be for gang members, typically with gang

4  members there's violence associated, which would present a

5  higher risk for law enforcement officers or agents when

6  conducting the arrest or conducting a search warrant.

7  Q.    And why is that?

8  A.    Just because typically with gang members there could be --

9  there's violence associated, criminal histories, any sort of

10  violent tendencies that -- or in this case for bomb making,

11  weapons, anything like that.

12  Q.    What is your role as a SWAT team member?

13  A.    My role is as an operator, it's to conduct the operation

14  within -- with inside the -- wherever the arrest takes place

15  so...

16  Q.    And you joined the SWAT team again in 2019?

17  A.    I did.

18  Q.    Prior to that date were you familiar with the SWAT team?

19  A.    I was.

20  Q.    How so?

21  A.    We used them for different arrests when I was on Safe

22  Streets Task Force as well as on the Joint Terrorism Task

23  Force.

24  Q.    Now, what makes a person or a place -- and you can explain

25  to the Court -- a high-risk target?

1  A.   High risk could be a felon who has a violent history; it

2  could be a person who is known to carry firearms; a person

3  that's known to carry knives could be considered violent in

4  certain nature; as well as bomb makers, anything along those

5  lines.

6  Q.   Does the person necessarily have to have a felony

7  conviction in order to be high risk?

8  A.   No, sir.

9  Q.   Is there any sort of mandatory finding in order to make

10  someone deemed a high risk?

11  A.   Can you repeat the question, sir?

12  Q.   Is there a certain mandatory or certain threshold issue or

13  finding that makes someone a high risk?

14  A.   Yes, sir.

15  Q.   Or could it just be, Agent, a collection of factors about

16  the person that makes them a high risk?

17  A.   It could be a collection.

18  Q.   Okay.  So it doesn't have to be one thing or the other?

19  A.   No.

20  Q.   Okay.  And I should be clearer when I asked that question,

21  so thank you.  Now, during the course of working in Buffalo as

22  an FBI special agent, you've become familiar with gangs you

23  said; is that correct?

24  A.   That's correct.

25  Q.   Have you become familiar with motorcycle clubs?

1  A.   I have.

2  Q.   In particular outlaw motorcycle clubs?

3  A.   Yes.

4  Q.   Which ones have you become familiar with?

5  A.   With the Outlaw Motorcycle Club as well as the Kingsmen

6  Motorcycle Club.

7  Q.   How is it you became familiar with the Kingsmen Motorcycle

8  Club?

9  A.   I participated in some of the investigation for -- on Safe

10 Streets for the Kingsmen Motorcycle Club in 2017.

11 Q.   And what is your understanding of what occurred during

12 that investigation or why the investigation occurred regarding

13 the Kingsmen Motorcycle Club?

14          **MR. STACHOWSKI:** Well, Your Honor, I don't know that

15 that's relevant to this proceeding because this gentleman

16 didn't even join the Kingsmen until well after that whole

17 thing --

18          **THE CLERK:** Mr. Stachowski, you need to speak into

19 the microphone.  Thank you.

20          **MR. STACHOWSKI:** I know.  Until well after that

21 investigation and indictment was completed.

22          **MAGISTRATE JUDGE ROEMER:** Mr. Cullinane?

23          **MR. CULLINANE:** Judge, I appreciate Mr. Stachowski's

24 saying, but the fact is this defendant was known as a Kingsmen

25 member even after-the-fact of this investigation and the

1   murders that were involved there.  That information --

2              **MAGISTRATE JUDGE ROEMER:** What you're looking for

3   now is just background?

4              **MR. CULLINANE:** That's correct.

5              **MAGISTRATE JUDGE ROEMER:** Correct?

6              **MR. CULLINANE:** That's correct.

7              **MAGISTRATE JUDGE ROEMER:** I'll overrule the

8   objection.  You can ask your question again.

9   **BY MR. CULLINANE:**

10  Q.   If you can again, Agent, can you please state what your

11  understanding is of why the investigation occurred regarding

12  the Kingsmen Motorcycle Club?

13  A.   It was my understanding that there was two individuals

14  that were murdered by members of the Kingsmen Motorcycle Club.

15  Q.   Is there any other information about the Kingsmen that you

16  became aware of?

17  A.   Yes, that they were involved with narcotics trafficking as

18  well as other violent tendencies.

19  Q.   Agent Weis, have you been involved in the execution and

20  planning of search warrants?

21  A.   I have.

22  Q.   Approximately how many?

23  A.   Approximately -- approximately 50.

24  Q.   And as part of executing and planning of search warrants,

25  do you work with other law enforcement officers?

1  A.    Yes, I do.

2  Q.    For what purpose?

3  A.    For their training and their knowledge as well as to

4  facilitate the actual arrest or search warrant, any type of

5  special -- specialty that's needed, we consult with them and

6  then we'll work together.

7  Q.    Now, you mentioned any sort of specialty or specialties

8  that are needed.  What, for example, may that be?

9  A.    So, for example, you could request a SWAT team, that would

10  be one; also our bomb technicians that the FBI Buffalo here

11  has.

12  Q.    And generally can you describe how someone becomes a bomb

13  technician?

14  A.    After a certain amount of time as a special agent they're

15  eligible to go through special training.  Then I know -- I'm

16  not sure of the exact specifics of it, but they have to

17  maintain their certification I believe quarterly.

18  Q.    Generally, though, it is a certification process and it

19  becomes a specialty of an agent; is that correct?

20  A.    That's correct.

21  Q.    Okay.  Are you certified as a bomb technician?

22  A.    I am not.

23  Q.    Are there others, though, in this office who are?

24  A.    Yes, there is.

25  Q.    And who were in December of 2018?

1   A.    That's correct.

2   Q.    Now, you stated that you could call upon persons with a

3   specialty such as being a bomb technician.  Is there also

4   special equipment that these individuals can employ at the

5   time when needed?

6   A.    Yes, sir.

7   Q.    What kind of equipment?

8   A.    There's robots that are available; it lessens the risk to

9   the actual special agent or to other individuals that could be

10  in the area.

11  Q.    And, generally speaking, how does the robot operate for

12  bomb technicians?

13  A.    The robot has an arm and a camera system and can

14  essentially move up to the suspected device and manipulate it

15  as needed.

16  Q.    Now, are bomb technicians and bomb robots used during the

17  course of every search warrant?

18  A.    No.

19  Q.    How and when would they be used?

20  A.    Only if there is a potential threat for one via source

21  reporting or known history.

22  Q.    Now, what other sort of factors come into play when

23  executing a search warrant at a residence?

24  A.    Individuals that could be in the residence itself, whether

25  it's family, whether it's -- if it's an apartment, connecting

1   apartments, as well as --

2           **MR. STACHOWSKI:** Your Honor, Your Honor, I'm going

3   to have to object again because now we're going into the

4   search warrant and we're here for the car theft.

5           **MAGISTRATE JUDGE ROEMER:** Mr. Cullinane?

6           **MR. CULLINANE:** Well, Your Honor, this information

7   is important because it demonstrates for law enforcement

8   purposes what information they needed to know at the time they

9   arrested Mr. Richards in order to become safe and remain safe

10  at that time.

11          **MAGISTRATE JUDGE ROEMER:** I believe it's the

12  Government's position, is it not, Mr. Cullinane, that this

13  search was the impetus for the traffic stop and the ultimate

14  arrest of the defendant?

15          **MR. CULLINANE:** That's correct.

16          **MR. STACHOWSKI:** And, Judge, I think chronologically

17  they arrested -- they did the traffic stop before they

18  executed the search warrant.

19          **MR. CULLINANE:** That is true.  And I don't want to

20  take the words out of Agent Weis' mouth, but I think what

21  we'll hear is that because of safety concerns regarding the

22  residence and the defendant, the FBI wanted to put in custody

23  Mr. Richards first before executing the search warrant at the

24  residence.

25          **MAGISTRATE JUDGE ROEMER:** Okay, overruled.

1  BY MR. CULLINANE:

2  Q.   Agent Weis, if you could please continue talking about the

3  factors that come into play regarding the execution of a

4  search warrant at a residence?

5  A.   As I stated before, anybody that could be in the

6  apartments or in the residence; any neighbors could be a

7  factor depending on how close it is; there's also other

8  factors as well -- if the person has any type of weapons that

9  are known or suspected; and if the individual's in the

10  residence; time of day is considered; and the pattern of life

11  of the targeted individual.

12  Q.   Agent, how about whether or not law enforcement has

13  information about the presence of drugs?

14  A.   That's correct.

15  Q.   How can that come into play?

16  A.   Because typically with drug houses there are guns there

17  and as well as the actual drug itself could be considered a

18  higher risk to law enforcement.

19  Q.   Can you please explain that?

20  A.   So specifically with fentanyl, there's been cases --

21  there's series of trainings that are provided to law

22  enforcement about the dangers of it for when it's airborne,

23  how extreme small amounts of the opioid itself, whether it's

24  on skin contact or if it's inhaled, could cause overdoses or

25  seriously impair law enforcement.

1    Q.    And, Agent, you've discussed this already, but how about

2    the presence or at least the information regarding the

3    presence of a bomb?

4    A.    Yes.

5    Q.    How does that become a factor?

6    A.    Because immediately the thought is how is the device

7    detonated and does the target actually have the device in his

8    or her possession.

9    Q.    All right.  Agent, I'd like to direct your attention to

10   the fall and winter of 2018.  At that time were you working as

11   a FBI special agent?

12   A.    I was.

13   Q.    And at that time did you become familiar with the person

14   named Jeffrey Richards?

15   A.    I was.

16   Q.    How did you become familiar with Jeffrey Richards?

17   A.    As a member of the Joint Terrorism Task Force I worked --

18   I participated in the case for Mr. Richards.  Our information

19   that we had on him was that he was a white supremacist who was

20   a member of the Kingsmen Motorcycle Club as well as a bomb

21   maker.

22   Q.    Was there other information that you had regarding

23   Mr. Richards?

24   A.    Yes.  That he was a -- also a drug distributor.

25   Q.    Okay.  Was there also information regarding firearms?

1  A.    Yes.

2  Q.    What information did you learn about Mr. Richards and

3  firearms?

4  A.    We learned that he typically carries a pistol on his

5  person whenever he leaves his house.

6  Q.    Generally speaking, how did you learn this information?

7  A.    Through multiple sources that we had as part of the

8  investigation.

9  Q.    Did you find out or make a determination of where

10 Mr. Richards lived at that time?

11 A.    Yes, we did.

12 Q.    Where did he live?

13 A.    He lived at 4 Packard Court, Apartment D up in Niagara

14 Falls.

15 Q.    And can you please describe that for the Court?

16 A.    It's a -- an apartment complex, it's set up -- Apartment D

17 was on one of the corners of the building.  The building

18 itself had two floors and then the apartments were joined.

19 Q.    When you say "joined," was Mr. Richards' apartment

20 connected to others?

21 A.    There was a wall that separated, but the actual -- it was

22 one building, though, with multiple apartments.

23 Q.    Okay.  His residence was not a stand alone?

24 A.    No.

25 Q.    Does that become a factor that comes into play for law

1   enforcement in executing a search warrant?

2   A.   Yes, it does.

3   Q.   How so?

4   A.   So in this case if there was a blast radius in case the

5   device actually detonated, that was a factor; or anyone else

6   that could have been in the -- one of the joining apartments

7   that could be holding either drugs or any other devices like

8   that so...

9   Q.   Even if there's a wall present there, does it still become

10  a factor or an issue regarding gunfire?

11  A.   Yes, it does.

12  Q.   How so?

13  A.   Bullets could typically go through walls depending on --

14  depending on the thickness of it and depending on the actual

15  round itself.

16  Q.   Now, at some point in December of 2018, did law

17  enforcement become familiar with this residence being used as

18  a place for distribution of drugs?

19  A.   Yes, sir.

20  Q.   Can you please explain that for the Court?

21  A.   So our source reporting stated that an associate of

22  Mr. Richards, Jeffrey Maikranz -- excuse me, James Maikranz,

23  would store drugs there as well as we had a pole camera, pole

24  surveillance camera that was set up where we could actually

25  observe the residence itself.

1  Q.   Now, do you recall which date Mr. Richards was arrested

2  on?

3  A.   He was arrested on 14 December 2018.

4  Q.   Okay.  Close in time to that date was there actually a

5  controlled buy that was conducted at Mr. Richards' address or

6  residence was used?

7  A.   Yes, sir.

8  Q.   Can you please describe that for the Court?

9  A.   Niagara Falls Police Department, their Narcotics Unit,

10 conducted a controlled purchase for fentanyl into James

11 Maikranz a few days before this.

12 Q.   Now, during the course of that controlled buy from James

13 Maikranz, did law enforcement learn information about the use

14 of Mr. Richards' residence?

15 A.   Yes, sir.

16 Q.   What did they learn at that time?

17 A.   Maikranz essentially told the -- the informant that was

18 working -- that was the Niagara Falls informant, that he had

19 to leave to go pick up his drugs which were stored at another

20 location.

21 Q.   What location was that?

22 A.   It was at 4 Packard Court, Apartment D.

23 Q.   Did law enforcement, in fact, observe Mr. Maikranz enter

24 and leave that apartment?

25 A.   Yes, we did.

1  Q.   Following his departure from Mr. Richards' residence, did

2  Mr. Maikranz --

3          **MR. STACHOWSKI:** Your Honor, I have to object

4  because --

5          **MAGISTRATE JUDGE ROEMER:** He didn't even get the

6  whole question out.  Let me hear the whole question and then

7  I'll hear you.

8  **BY MR. CULLINANE:**

9  Q.   Following Mr. Maikranz's departure from that residence,

10 did law enforcement come into possession of suspected

11 controlled substances that they believed were in Mr. Richards'

12 residence?

13          **MR. STACHOWSKI:** Your Honor, that's the problem,

14 because if you listen to what he just said, he said he went to

15 some place and before that he testified generally that people

16 could have drugs stored in different apartments and that this

17 is an apartment complex, 4 Packard Court, and that there are

18 many residences in there.

19          So we -- this is a leap of faith that it was --

20 from what he just testified that it's Mr. Richards' apartment.

21          **MAGISTRATE JUDGE ROEMER:** Mr. Cullinane?

22          **MR. CULLINANE:** Judge, I can clarify.  I can ask

23 some additional questions.

24          **MAGISTRATE JUDGE ROEMER:** Rephrase your question.

25          **MR. CULLINANE:** Yes.  If I may, let me ask a

1  previous question and rephrase the question I asked, if that's

2  okay?

3            **MAGISTRATE JUDGE ROEMER:** I'm sorry?

4            **MR. CULLINANE:** If I can, if I could ask an

5  additional question, then rephrase the question I asked him?

6            **MAGISTRATE JUDGE ROEMER:** Sure, sure.

7  **BY MR. CULLINANE:**

8  Q.   Mr. Weis, have you now been to the residence of

9  Mr. Richards?

10  A.   I have.

11  Q.   If law enforcement is conducting surveillance from the

12  street near Packard Court, can law enforcement see a person

13  enter and exit Apartment D which is Mr. Richards' residence?

14  A.   That's correct.

15  Q.   Does that -- does Apartment D have a door that can be seen

16  from the outside?

17  A.   Yes, it does.

18  Q.   And, therefore, is not within a building of many

19  apartments?

20  A.   Correct.

21  Q.   So prior to December 14th, 2018, did law enforcement

22  observe Mr. Maikranz directly enter Mr. Richards' residence

23  and depart Mr. Richards' residence?

24  A.   Yes, we did.

25  Q.   And following that did law enforcement come into

1  possession of suspected controlled substances sold by Mr.

2  Maikranz following his departure from Mr. Richards' apartment?

3  A.    Yes, sir.

4  Q.    Did law enforcement perform any tests on those drugs?

5  A.    Yes, sir.

6  Q.    What did law enforcement find as a result of their test of

7  those drugs?

8  A.    As a result of the test, the drugs tested positive for the

9  presence of fentanyl.

10  Q.    And you stated earlier that fentanyl is a dangerous drug?

11  A.    It is.

12  Q.    Now, you've talked about the fact that there's been

13  fentanyl sold following someone's departure from Mr. Richards'

14  residence; is that correct?

15  A.    Yes.

16  Q.    And additional information regarding Mr. Richards,

17  correct?

18  A.    Yes.

19  Q.    What did you start to do with all this information you

20  were gathering about Mr. Richards?

21  A.    From this point we began to draft the affidavit for the

22  search warrant for 4 Packard Court.

23  Q.    Okay.  And, generally speaking, what sort of items did you

24  believe could be located at Mr. Richards' residence?

25  A.    We believed that there was drugs there to include

1  fentanyl; we believed that there was firearms in the

2  residence; and that there was potentially a explosive device.

3  Q.   Now, you started to work on the draft of an affidavit; is

4  that correct?

5  A.   Yes, sir.

6  Q.   Did law enforcement also conduct surveillance?

7  A.   Yes, sir.

8  Q.   How so?

9  A.   Aside from the pole camera that was set up, agents and

10 other task force officers, part of our task force deployed to

11 that area and set up physical surveillance of the house.

12 Q.   And what is the purpose of the physical surveillance of

13 the house?

14 A.   It was to see if Mr. Richards was inside the residence or

15 if he was leaving.

16 Q.   Why is that important?

17 A.   It was important for us because we wanted to further

18 establish a pattern of life; also to see if he was in the

19 residence, which would have been a greater threat for the

20 general public or for law enforcement if the -- if we were to

21 execute the search warrant.

22 Q.   And why would that have been a greater threat?

23 A.   Because he could have had access to the firearms and to

24 the explosive device.

25 Q.   Now, are these the same types of concerns you have for

1  every search warrant?

2  A.   This was greater due to the explosive device presence, but

3  typically, yes, we do see -- we are concerned with firearms

4  inside of a residence or anything else that could be harmful.

5  Q.   Did his background also heighten law enforcement's

6  concerns?

7  A.   From source reporting, yes.

8          **MR. STACHOWSKI:** You know, Your Honor, I'm going to

9  have to object again because we seem to jump and leave out big

10  important paragraphs because he's talking about the presence

11  of an explosive device, yet Mr. Maikranz's involvement in the

12  confidential source only talks about Mr. Maikranz getting

13  drugs from another place and that they have drugs in that

14  place.

15          I didn't hear anything about an explosive device.

16          **MAGISTRATE JUDGE ROEMER:** To be honest with you,

17  Mr. Cullinane, I had that same thought when that testimony was

18  solicited.  I assume they had some information there was an

19  explosive device, but we seem to jump right to that there was

20  an explosive device.

21          **MR. CULLINANE:** And I think Mr. Stachowski beat me

22  to the punch.  Let me ask some additional questions about

23  explosive device and the reasons for the belief.

24  **BY MR. CULLINANE:**

25  Q.   Agent Weis, you discussed the fact that there potentially

1  could have been a bomb or explosive device at Mr. Richards'

2  residence; is that correct?

3  A.   That's correct.

4  Q.   What was the basis for law enforcement's belief on

5  December 14th, 2018, that Mr. Richards was in possession of

6  some sort of explosive device?

7  A.   Multiple sources informed us, the FBI, that he was in

8  possession of an explosive device.

9  Q.   And you said this was multiple sources?

10  A.   That's correct.

11  Q.   Independent from each other?

12  A.   Independent.

13  Q.   And did these persons have a sense of -- strike that.

14          Did law enforcement deem these persons to be

15  reliable?

16  A.   Yes, sir.

17  Q.   And based on generally what?

18  A.   Generally based on corroboration, whether -- by any means

19  that we would receive through the investigation.

20  Q.   Now, on December 14th, 2018, did you present an

21  application and affidavit to this Court for a search warrant

22  for Mr. Richards' residence?

23  A.   I did.

24  Q.   Were you the affiant on that search warrant?

25  A.   I was.

1  Q.   And did the Court grant the search warrant?

2  A.   Yes, he did.

3            **MR. CULLINANE:** Your Honor, permission to approach

4  the witness?

5            **MAGISTRATE JUDGE ROEMER:** Sure.

6  **BY MR. CULLINANE:**

7  Q.   I'm showing you -- I'm showing what's been marked as

8  Government Exhibit No. 1.  Are you familiar with this

9  document?

10  A.   I am.

11  Q.   What is this?

12  A.   This is the search warrant that was signed authorizing the

13  execution for the search warrant at 4 Packard Court,

14  Apartment D.

15  Q.   And what date was this signed?

16  A.   This was signed on December 14th, 2018.

17  Q.   And is there a time stamp on there as well?

18  A.   Time was 3:02 p.m..

19  Q.   All right.  And do you know who wrote that in?

20  A.   That was done by Judge Roemer.

21            **MR. CULLINANE:** Your Honor, the Government offers

22  Government Exhibit No. 1 for admission.

23            **MR. STACHOWSKI:** I have no objection.

24            **MAGISTRATE JUDGE ROEMER:** Government Exhibit 1 shall

25  be admitted into evidence.

1          (**WHEREUPON**, Government Exhibit 1 was received into

2    evidence).

3    **BY MR. CULLINANE:**

4    Q.   Now, separately, Agent, in anticipation of today's

5    suppression hearing, did you review the accompanying search

6    warrant application and affidavit?

7    A.   Yes, I did.

8    Q.   Are you familiar with the information contained therein?

9    A.   I am.

10   Q.   Is it your understanding that both the application and the

11   affidavit remain under seal today?

12   A.   Yes.

13   Q.   But you've reviewed those?

14   A.   I have.

15   Q.   Now, following the granting of the search warrant by this

16   Court, what did law enforcement start to do?

17   A.   At that point we began to plan for the -- for the actual

18   search and potential probable cause arrest for Mr. Richards.

19   Q.   How did you do that?

20   A.   We alerted the SWAT team and notified them that we had an

21   arrest that was coming up so that they could begin their

22   planning, as well as notifying our bomb techs and our evidence

23   technicians within their office.

24   Q.   And, generally speaking, what does the SWAT team do to

25   become prepared for the execution of a search warrant?

1  A.    So they will look at the general area of where the target

2  residence is; they will also conduct -- they will actually

3  just look to see any criminal history or any reporting from

4  the case agents that would be useful for them for their

5  execution.

6  Q.    Now, separate from the SWAT team's preparation, did law

7  enforcement also conduct surveillance of Mr. Richards?

8  A.    That's correct.

9  Q.    How was that accomplished?

10 A.    Members of our task force were set up outside of the

11 residence as well as having a pole camera that was set up that

12 could view the residence as well.

13 Q.    And I should ask, too, and I'll ask you questions about

14 the conducting of the surveillance, but you mentioned that the

15 SWAT team also started to speak with bomb technicians; is that

16 correct?

17 A.    That's correct.

18 Q.    Did the bomb technicians also start to gather any sort of

19 machines that they may need?

20 A.    Yes, sir.

21 Q.    What types of machines?

22 A.    One would be one of the robots --

23 Q.    Okay.

24 A.    -- that they would use.

25 Q.    Are those the same robots you discussed earlier?

1   A.   Yes.

2   Q.   Okay.  All right.  Now, back to the surveillance at

3   Mr. Richards' residence.  What did law enforcement observe at

4   that time?

5   A.   At the time that they observed it Mr. Richards was inside

6   of the residence and they observed a -- another vehicle show

7   up and a man exit that vehicle and enter the residence.

8   Q.   And what happened then?

9   A.   From that point the SWAT team was notified, they were set

10  up in a separate location and ready to deploy if Mr. Richards

11  left the residence.

12  Q.   Now, at some point did law enforcement observe

13  Mr. Richards leave the residence?

14  A.   Yes, he did.

15  Q.   And did he leave with anyone else?

16  A.   He left with the other individual that was -- that was in

17  that vehicle that showed up.

18  Q.   Now, I should ask this question as well: You spoke about

19  cooperating sources providing information regarding

20  Mr. Richards?

21  A.   Yes.

22  Q.   Specifically what information did they provide about

23  Mr. Richards being in possession of a firearm?

24  A.   All the reporting they gave us is that any time he left,

25  he typically carried a .45 on him, on his person.

1  Q.   Any time he left meaning --

2  A.   The residence.

3  Q.   So if he was not in the residence and he's outside of the

4  residence, your understanding was he was in possession of a

5  firearm?

6  A.   Yes.

7  Q.   So at this time law enforcement observed Mr. Richards

8  leave the residence; is that correct?

9  A.   That's correct.

10 Q.   And what happened then?

11 A.   From that point they observed Mr. Richards enter the

12 driver's seat of a white Dodge Durango, then the other male

13 entered the passenger -- the front passenger seat of the

14 Dodge Durango, then they left the area of the residence.

15 Q.   Approximately what time is this on December 14th, 2018?

16 A.   Approximately -- I'm not actually sure to tell you the

17 truth.  I believe it was around 6 p.m..

18 Q.   Let me ask you this: Was it light out still?

19 A.   The sun was going down, sir.

20 Q.   So it was becoming dark?

21 A.   Yes, sir.

22 Q.   Okay.  And he and this other individual are in a Dodge

23 Durango?

24 A.   Yes, sir.

25 Q.   Okay.  All right.  What is the Dodge Durango doing now

1  that the two have entered into the car?

2  A.   It leaves the residence and starts driving down the street

3  towards -- what we realized was going towards a bar.

4  Q.   Where are you at the time when he has -- when Mr. Richards

5  has now entered the car and began driving away?

6  A.   My vehicle was directly behind the white Dodge Durango.

7  Q.   So you were close by the area?

8  A.   That's correct.

9  Q.   Did you see him enter into the car?

10  A.   I did not.

11  Q.   All right.  Were you made aware of this from someone else?

12  A.   I was.

13  Q.   All right.  And is that from another law enforcement

14  officer?

15  A.   It was.

16  Q.   Okay.  Now, what happened as the vehicle was driving?

17  A.   As the vehicle was driving, my vehicle as well as several

18  other SWAT team vehicles that had operators in it followed in

19  behind us.  Then a Niagara Falls -- or a Niagara County

20  Sheriff's Office marked unit directly came behind

21  Mr. Richards' vehicle.

22  Q.   Okay.  So previously you were in a vehicle that was behind

23  him and then another vehicle got in front of you and got

24  behind Mr. Richards' vehicle?

25  A.   That's correct.

1    Q.    Okay.  While you're directly behind Mr. Richards' vehicle,

2    what observations are you making about the vehicle and any

3    occupants in the vehicle?

4    A.    I could see that there was at least two people inside of

5    the vehicle.  The back of the -- of the Durango itself

6    appeared to be tinted, but I could see that there was two

7    people up in the front of it, a driver and a passenger.

8    Q.    Now, you said you could see at least two people?

9    A.    That's correct.

10   Q.    Do you know how many people were total in the car?

11   A.    At that point, no.

12   Q.    How is it that you couldn't tell?

13   A.    There could have been a person laying down in the back

14   seat; also the windows were tinted enough that I couldn't see

15   into it.

16   Q.    Now, ultimately was the car stopped?

17   A.    It was.

18   Q.    Was the car stopped or did the car come to a stop?

19   A.    The car came to a stop within the parking lot of Dave's

20   Last Chance.

21   Q.    And what is Dave's Last Chance?

22   A.    It's a bar and grill up in Niagara Falls.

23   Q.    Agent, were you present when the car stopped?

24   A.    Yes, I was.

25   Q.    To be clear, the car containing -- that ultimately

1  contained Mr. Richards?

2  A.   Yes, sir.

3  Q.   All right.  And at that time did other law enforcement

4  personnel arrive in their vehicles?

5  A.   Yes, they did.

6  Q.   And what happened then?

7  A.   At that point our SWAT team conducted the traffic stop of

8  Mr. Richards and the other individual that was inside of the

9  vehicle.

10 Q.   Now, you stated that there was a Niagara County sheriff's

11 deputy who began driving behind Mr. Richards' car?

12 A.   That's correct.

13 Q.   Did that vehicle have a recording device in the car?

14 A.   It did.

15 Q.   And did it record this encounter?

16 A.   It did.

17 Q.   Have you had an opportunity to watch that video?

18 A.   I have.

19 Q.   I'm showing you what's marked for today's purposes as

20 Government's Exhibit No. 2.  Agent Weis, are you familiar with

21 what this is?

22 A.   I am.

23 Q.   What are you looking at right now?

24 A.   This is the CD that contains the recording from the marked

25 unit the night of the traffic stop.

1  Q.    Is there also a post-it on there?

2  A.    There is.

3  Q.    Is that the password for the disk?

4  A.    That's correct.

5  Q.    Okay.  And have you had an opportunity to watch this disk?

6  A.    I have.

7  Q.    And is this disk a true and accurate copy of the recording

8  of the arrest of Mr. Richards on December 14th, 2018?

9  A.    It is.

10          **MR. CULLINANE:** Your Honor, the Government at this

11  time offers Government Exhibit No. 2 for admission.

12          **MAGISTRATE JUDGE ROEMER:** Mr. Stachowski?

13          **MR. STACHOWSKI:** Is that the video that we're

14  talking about?

15          **MAGISTRATE JUDGE ROEMER:** I think it's the video

16  from the deputy sheriff's car of the actual stop of the

17  vehicle and the removal of Mr. Richards.

18          **MR. STACHOWSKI:** Even though we don't have the

19  deputy sheriff here, I won't object for purposes of this --

20          **MAGISTRATE JUDGE ROEMER:** Okay, this is No. 2?

21          **MR. CULLINANE:** No. 2, yes.

22          **MAGISTRATE JUDGE ROEMER:** Government Exhibit No. 2

23  is admitted into evidence.

24          **MR. CULLINANE:** Thank you.

25          (**WHEREUPON**, Government Exhibit 2 was received into

1  evidence).

2          **MR. CULLINANE:** For the record, these are copies

3  that the Court and defense counsel have received.  I've

4  already placed it in the laptop.  And I'll open the laptop now

5  and play the disk.

6          Your Honor, I'm going to play Government

7  Exhibit No. 2 from the beginning.

8  **BY MR. CULLINANE:**

9  Q.   All right, I've stopped it at the five second stamp, time

10 stamp mark.  Agent Weis, can you please describe what we're

11 seeing at this time?

12 A.   At this point the view is coming from the Niagara County

13 Sheriff officer's marked unit.  Immediately in front of him is

14 the white Dodge Durango with Mr. Richards in it.

15 Q.   And this is the one you just previously described?

16 A.   This is.

17 Q.   Specifically the white Dodge Durango?

18 A.   Correct.

19 Q.   I'm going to continue playing from the 5 second mark.

20          Agent, while this is playing, generally speaking,

21 what road or what area is -- is this depicting right now?

22 A.   This is in the vicinity of Niagara Falls.

23          **MR. STACHOWSKI:** Objection, Your Honor.  He didn't

24 respond to the question.  He just said -- he asked what road

25 and he answered the City of Niagara Falls.

1          **MAGISTRATE JUDGE ROEMER:** Do you want to rephrase

2     your question?

3     **BY MR. CULLINANE:**

4     Q.   Agent, generally speaking, what area or town is this video

5     depicting?

6     A.   It's depicting Niagara Falls area, County Road that was

7     right near there where Dave's Last Chance bar is.

8     Q.   I'm going to continue from the 28 second mark.

9              (**WHEREUPON**, the video was played).

10    **BY MR. CULLINANE:**

11    Q.   I've stopped now at the 34 second mark.  Can you please

12    describe what just happened?

13    A.   The white Dodge Durango pulled into the parking lot and

14    the marked unit came up directly behind it.

15    Q.   And pulled into the parking lot of what?

16    A.   Of the bar, of Dave's Last Chance.

17    Q.   I'll continue from the 34 second mark.

18              (**WHEREUPON**, the video was played).

19    **BY MR. CULLINANE:**

20    Q.   I've now stopped at the 47 second mark.  What's happening

21    now?

22    A.   At this point members of the FBI Buffalo SWAT team

23    deployed and are right outside of the white Dodge Durango.

24    Q.   Agent, what is the purpose of everyone arriving now from

25    the SWAT team?

1  A.   It's to secure Mr. Richards and to -- to facilitate an

2  arrest.

3  Q.   And to secure him for what purpose?

4  A.   Because we believe that he had a gun on him, a .45

5  caliber.

6  Q.   And following the custody of him, would the SWAT team then

7  execute the search warrant?

8  A.   Yes.

9  Q.   You wanted to accomplish this first?

10 A.   That's correct.

11 Q.   For what reason?

12 A.   We wanted to secure him as well as his cell phone.  Again,

13 we weren't sure what the type of detonation device would have

14 been for the -- for the potential bomb, whether it was a cell

15 phone.  So we immediately wanted to secure him as well as the

16 cell phone.

17 Q.   I'm going to continue from the 47 second mark.

18             (**WHEREUPON**, the video was played).

19 **BY MR. CULLINANE:**

20 Q.   I've stopped it at the one minute 30 second mark.  Agent,

21 is there a reason that law enforcement is providing commands

22 to the defendant in certain manners?

23 A.   Yes.

24 Q.   Why is that?

25 A.   It's to put him in a position of -- it's essentially --

1   it's to gain the advantage over him, to make sure it was safe,

2   that he couldn't have access and couldn't reach for a pistol.

3   Q.   And to be clear, I should ask this question, it appears --

4   it sounds like there are commands being given to him; is that

5   correct?

6   A.   There are.

7   Q.   Are those are from a law enforcement personnel officer?

8   A.   Yes.

9   Q.   Let me continue from the minute 30 second mark.

10              (**WHEREUPON**, the video was played).

11  **BY MR. CULLINANE:**

12  Q.   I've stopped at the minute and 55 second mark.  Agent, who

13  are we observing at this time who just exited the vehicle?

14  A.   That's Mr. Richards that exited the vehicle.

15  Q.   And does it appear to be the same person who began driving

16  the vehicle after exiting Mr. Richards' residence?

17  A.   Yes, sir.

18  Q.   Let me continue from the minute 55 second mark.

19              **MR. STACHOWSKI:** Your Honor, I have to object

20  because how would he know that?  Because -- because how would

21  he know that because his original testimony was that he did

22  not see Mr. Richards enter the vehicle.  So he's doing that on

23  an assumption as opposed to knowing that it's the same person.

24              **MAGISTRATE JUDGE ROEMER:** I don't recall that being

25  his testimony, that he didn't know it was Mr. Richards getting

1   into the vehicle.

2           Mr. Cullinane?

3           **MR. STACHOWSKI:** No, he would -- he didn't see him.

4           **MR. CULLINANE:** I can ask follow-up questions to

5   clarify this.

6           **MAGISTRATE JUDGE ROEMER:** Okay.

7   BY MR. CULLINANE:

8   Q.   Agent Weis, did you see Mr. Richards enter the vehicle

9   from the home?

10  A.   No, I did not.

11  Q.   Were you aware that other law enforcement officers saw

12  Mr. Richards enter the vehicle?

13  A.   I was.

14  Q.   Prior to this time, to this encounter with Mr. Richards,

15  had you seen a picture of Mr. Richards?

16  A.   I have.

17  Q.   Were other law enforcement officers also aware of what

18  Mr. Richards looked like based on a picture?

19  A.   Yes, they were.

20  Q.   At this time when Mr. Richards entered the -- exited the

21  car, were you with other law enforcement officers who had

22  observed Mr. Richards leave the residence and enter the car?

23  A.   Yes.

24  Q.   And specifically those who said that he entered the

25  driver's seat?

1  A.   That's correct.

2  Q.   Were you made aware that he had entered the driver's seat

3  at the time when he did?

4  A.   Yes.

5  Q.   How was that?

6  A.   Via one of our radios inside of our vehicle; a description

7  of him was also put out over the radio.

8  Q.   And that's prior to the encounter that we have on the

9  video right now at the one minute 55 second mark?

10  A.   That's correct.

11  Q.   All right.   I'll continue from this point.

12         (**WHEREUPON**, the video was played).

13  **BY MR. CULLINANE:**

14  Q.   I stopped it at the two minute 43 second mark.   What did

15  we just watch?

16  A.   We just watched Mr. Richards go down to his knees, be put

17  in handcuffs by a SWAT operator.

18  Q.   For what purpose was he placed in handcuffs at that time?

19  A.   To -- because he was under arrest at that point and to

20  ensure that he didn't reach for anything that could have been

21  in his waistband.

22  Q.   Now, was there a command just given as well to someone

23  else in the vehicle?

24  A.   Yes, there was.

25  Q.   For what purpose was that?

1    A.   It was to also ensure that that individual didn't reach

2    for any type of weapon or anything like that, to keep his

3    hands outside the vehicle.

4    Q.   Let me continue playing from the two minute 43 second

5    mark.

6              (**WHEREUPON**, the video was played).

7    **BY MR. CULLINANE:**

8    Q.   I've stopped it at the three minute and 26 second mark.

9    Agent, Mr. Richards has now gone off screen; is that correct?

10   A.   That's correct.

11   Q.   What's occurring or about to occur with him at that time?

12   A.   At that point he's searched for any weapons or anything

13   that could be harmful.

14   Q.   What could be harmful?

15   A.   Knives, syringes, anything that can stab, poke, anything

16   -- any type of firearm, anything like that.

17   Q.   Was there also concern about any cell phones?

18   A.   Yes.

19   Q.   For what reason?

20   A.   In order to detonate any device.

21   Q.   Now, Mr. Richards has just been taken into custody, he's

22   off screen now.  And I should ask: Was he considered a

23   high-risk person?

24   A.   He was.

25   Q.   Or a high-risk target I should say?

1  A.    Yes, sir.

2  Q.    Why is that?

3  A.    Because he was known to carry guns, because he was a

4  narcotics trafficker, and also because he was known as a bomb

5  maker.

6  Q.    Let me continue from the three minute 26 second mark.

7              (**WHEREUPON**, the video was played).

8  **BY MR. CULLINANE:**

9  Q.    I've stopped at the four minute 26 second mark.  Agent

10 Weis, this passenger, this individual, has similarly received

11 instructions; is that correct?

12 A.    That's correct.

13 Q.    From law enforcement?

14 A.    Yes.

15 Q.    Why was he treated in the same manner?

16 A.    Because we were unsure who he actually was and any

17 relation he could have had.  He might have had a firearm on

18 him as well.  It's all -- anybody that's inside the vehicle is

19 treated the exact same way.

20 Q.    So Mr. Richards was identified initially as the person at

21 the residence whose residence was going to be searched; is

22 that correct?

23 A.    That's correct.

24 Q.    But this person was in the car with him and, therefore,

25 became someone also law enforcement needed to be suspicious

1  of?

2  A.   Yes.

3  Q.   Let me continue from the four minute 26 second mark.

4          (**WHEREUPON**, the video was played).

5  **BY MR. CULLINANE:**

6  Q.   All right, I've stopped it now at the six minute and 14

7  second mark.  What did we just observe?

8  A.   We just observed the passenger being taken into custody

9  and moved off screen.

10 Q.   Ultimately was his -- did you learn his identity?

11 A.   Law enforcement did.  I am unaware of what his identity

12 is.

13 Q.   Similarly he's now off screen and what -- what is going --

14 or what will happen with him at this point following his being

15 taken into custody?

16 A.   He'll be questioned for who he is, his identity will be

17 established, they will check for his ID, and then typically

18 what happens is they will check for any warrants or wants for

19 that individual.

20 Q.   Will he also be searched for anything unlawful or

21 dangerous on him?

22 A.   That's correct.

23 Q.   Let me continue from the six minute 14 second mark.

24          (**WHEREUPON**, the video was played).

25 **BY MR. CULLINANE:**

1   Q.   I stopped it at the six minute and 22 second mark.  Was

2   there a command that was just given?

3   A.   There was.

4   Q.   What was that command?

5   A.   The command was for anyone else that was inside of the

6   vehicle to move their hands outside of it.

7   Q.   Did law enforcement know there was anyone else in the

8   vehicle?

9   A.   They were unaware 100% if there was anyone else inside of

10  the vehicle.

11  Q.   And why is that?

12  A.   Because we couldn't see inside of the vehicle.

13  Q.   And so why are these commands given?

14  A.   These commands are given in preparation that there is

15  someone there.

16  Q.   So is there an assumption that there could be someone else

17  in the car?

18  A.   Yes.

19  Q.   Why is there -- why does law enforcement make that

20  assumption?

21  A.   Based off of prior experiences that law enforcement -- of

22  law enforcement encounters.

23  Q.   Is that to be safe?

24  A.   Yes.

25  Q.   Let me continue from the six minute 22 second mark.

1              (**WHEREUPON**, the video was played).

2 **BY MR. CULLINANE:**

3 Q.    Now, I've stopped at the six minute and 49 second mark.

4 Has any other person in the vehicle raised their hands?

5 A.    No.

6 Q.    As a result of that not occurring, what does law

7 enforcement presume?

8 A.    They presume that there still could be someone up in that

9 part of the vehicle.

10 Q.    Someone who has just not responded yet?

11 A.    Correct.

12 Q.    Let me continue from the six minute 49 second mark.

13              (**WHEREUPON**, the video was played).

14 **BY MR. CULLINANE:**

15 Q.    All right, I've stopped at the seven minute and three

16 second mark.  What did we just see?

17 A.    We just observed three SWAT operators move up to the

18 vehicle to visually check.  Then two of the operators -- one

19 of them opened up the door, the rear passenger door, and the

20 other one visually checked it.

21 Q.    And for what purpose?

22 A.    Purpose is to see if there's anyone else inside of the

23 vehicle.

24 Q.    All right.  Now, you said to see if there's someone else

25 inside the vehicle?

1  A.   Yes.

2  Q.   Are they looking for any evidence, non-human evidence in

3  the car?

4  A.   They're not looking for it, but it's been observed

5  previously based off prior law enforcement encounters in

6  traffic stops, yes.

7  Q.   But at this time the purpose is to do what?

8  A.   It's just to check for if there's anyone else inside of

9  the vehicle.

10  Q.   And let me ask it this way: Are you stating that if

11  there's something in plain view, they may see it?

12  A.   Yes.

13  Q.   But right now the purpose is for what?

14  A.   The purpose is to make sure that there was no one else

15  inside of the vehicle.

16  Q.   Let me continue from the seven minute and three second

17  mark.

18          (**WHEREUPON**, the video was played).

19  **BY MR. CULLINANE:**

20  Q.   Agent, I've stopped it at the seven minute and 22 second

21  mark.  And I should ask: Where are you at this time?

22  A.   At this point I was to the passenger side of this marked

23  unit.

24  Q.   So you are off screen?

25  A.   I am.

1  Q.    And you have remained -- you have been off screen the

2  whole time?

3  A.    That's correct.

4  Q.    Were you able to observe all this from your vantage point?

5  A.    Yes, I am.

6  Q.    What did we just see here at the seven minute 22 second

7  mark?

8  A.    At this point two SWAT operators moved to the rear hatch

9  and begin to open it to see if there's anyone in the rear of

10 the vehicle.

11 Q.    Now, there's a third SWAT team member at the car; is that

12 correct?

13 A.    There is.

14 Q.    And where is that person?

15 A.    He is up still near the driver's side of the vehicle.

16 Q.    Did you become aware at that time if that person observed

17 anything?

18 A.    I was not at that point, but I did notice that he was

19 holding on that area.

20 Q.    Okay.  Do you know who that is?

21 A.    Yes, I am.

22 Q.    Who is that?

23 A.    Special Agent Mark Schirching.

24 Q.    Okay.  Is that someone you've worked with?

25 A.    Yes.

1  Q.   And you're familiar with him?

2  A.   Yes.

3  Q.   Let me continue from the seven minute 22 second mark.

4              (**WHEREUPON**, the video was played).

5  **BY MR. CULLINANE:**

6  Q.   I've stopped it now at the seven minute and 48 second

7  mark.  Can you please describe what we just saw and heard?

8  A.   At this point the rear hatch was opened, the vehicle was

9  visually cleared for any individuals that could have been in

10 the car.

11 Q.   Did you hear anything on the audio part of this?

12 A.   Yes.

13 Q.   All right.  What did you hear?

14 A.   I stated to -- I stated something to Chris Fiorito, who is

15 one of the -- who is a SWAT team leader at the time.

16 Q.   And what was that?

17 A.   I just said his name, Chris.

18 Q.   Let me continue from the seven minute 48 second mark.

19             (**WHEREUPON**, the video was played).

20 **BY MR. CULLINANE:**

21 Q.   I'm just stopping it at the seven minute and 55 second

22 mark.  Did you see a SWAT team member at the rear hatch of the

23 vehicle?

24 A.   Yes.

25 Q.   What did that person do?

1  A.   He just popped open, I believe, a compartment that's in

2  the back hatch area.

3  Q.   What was the purpose of opening up the back compartment?

4  A.   To also ensure that there was no one inside of that

5  because that was not checked at that point.

6  Q.   Okay.  And that was to check for what?

7  A.   Another person.

8  Q.   Who could be hiding in that part?

9  A.   Yes.

10  Q.   Based on your training and experience as well as your

11  other law enforcement officers, is it possible someone could

12  be hiding in that type of compartment in a vehicle like this?

13  A.   Yes.

14  Q.   Let me continue from the seven minute 55 second mark.

15              (**WHEREUPON**, the video was played).

16  **BY MR. CULLINANE:**

17  Q.   All right, I'm stopping it at the eight minute and 12

18  second mark.  What did we just see here?

19  A.   One of the SWAT team members said something to me and I'm

20  starting to approach the vehicle.

21  Q.   Do you recall what was said generally?

22  A.   Generally I was told that there was a firearm under the

23  driver's seat of the Dodge Durango.

24  Q.   You said the driver's seat; is that correct?

25  A.   Yes.

1  Q.   Is that where Mr. Richards was in the vehicle prior to

2  being ordered to get out of the vehicle?

3  A.   Yes.

4  Q.   Now, at this point have you observed any law enforcement,

5  SWAT team member enter that part of the vehicle?

6  A.   No.

7  Q.   Let me continue from the eight minute and 12 second mark.

8              (**WHEREUPON**, the video was played).

9              **MR. STACHOWSKI:** Judge, are we saying that he

10  observed anyone enter it or did he see a head go in there just

11  a few seconds before that?  Is that what you're talking about,

12  did he see that person put his head in the car?

13             **MAGISTRATE JUDGE ROEMER:** Mr. Cullinane, do you want

14  to clarify?

15             **MR. CULLINANE:** Absolutely.

16  **BY MR. CULLINANE:**

17  Q.   Agent Weis, from your vantage point did it appear to you

18  that anyone had entered the car and searched the car?

19  A.   From my view, no.

20  Q.   Okay.  In fact, at that time how did you have an

21  understanding that someone had observed or noted a gun?

22  A.   It was said from the SWAT operators that were up by the

23  front, Mark Schirching was one of the SWAT operators that let

24  everybody know that there was a firearm up in the front.

25  Q.   Let me continue playing from the eight minute 13 second

1    mark.

2              (**WHEREUPON**, the video was played).

3    **BY MR. CULLINANE:**

4    Q.   Now, I've stopped it at the eight minute and 20 second

5    mark.  Can you describe what we're just seeing here?

6    A.   At this point I moved up to the driver's side of the

7    vehicle and I'm trying to look to see where this firearm is.

8    Q.   And did that require you to insert your head closer into

9    the vehicle?

10   A.   Yes, it did.

11   Q.   Okay.  And what were you doing at that time?

12   A.   At that time I was listening to the other SWAT operators

13   that were next to me describing what it was.

14   Q.   Let me continue playing from the eight minute 20 second

15   mark.

16             (**WHEREUPON**, the video was played).

17   **BY MR. CULLINANE:**

18   Q.   I've stopped it at the nine minute 15 second mark.  What

19   have we just observed?

20   A.   I took a photo at that point of the firearm inside --

21   underneath the driver's seat.

22   Q.   Why did you take a photo of the firearm?

23   A.   As evidence.

24   Q.   I'm showing you what's been marked for today's purposes

25   only as (inaudible).  Are you familiar with this document?

1 A.    I am.

2 Q.    What is this?

3 A.    This is the photo that I took of the -- underneath the

4 driver's seat with the pistol in plain view.

5 Q.    And is this a true and accurate copy of that photograph?

6 A.    This is.

7           **MR. CULLINANE:** And maybe I'll use the ELMO if

8 that's okay, Rosalie?

9           **THE CLERK:** It should be on.

10           **MR. STACHOWSKI:** Judge --

11           **MAGISTRATE JUDGE ROEMER:** Hang on a second.

12 Mr. Stachowski?

13           **MR. STACHOWSKI:** My client needs a short break for

14 the bathroom.

15           **MAGISTRATE JUDGE ROEMER:** Okay, we're going to break

16 then, Mr. Cullinane, because I have a matter on I've got to

17 handle anyways.  So we'll break in this case, we'll hear the

18 other matter, and then we'll come right back.

19           **MR. CULLINANE:** Thank you.

20           (**WHEREUPON**, there was a pause in the proceeding.)

21           **THE CLERK:** We are back on the record in U.S.A.

22 vs. Jeffrey Richards, evidentiary hearing.

23           **MAGISTRATE JUDGE ROEMER:** Agent Weis, just a

24 reminder, you're still under oath, sir.

25           **THE WITNESS:** Yes, Judge.

1          **MR. CULLINANE:** Judge, at this time the Government

2   offers Government Exhibit No. 3 for admission.

3          **MAGISTRATE JUDGE ROEMER:** What is Government 3?

4          **MR. CULLINANE:** It's a picture that Agent Weis --

5          **MAGISTRATE JUDGE ROEMER:** Oh, the picture?

6          **MR. CULLINANE:** Yes, thank you.

7          **MAGISTRATE JUDGE ROEMER:** Mr. Stachowski?

8          **MR. STACHOWSKI:** I have no objection for purposes

9   of --

10          **MAGISTRATE JUDGE ROEMER:** Government Exhibit 3 shall

11   be admitted into evidence.

12          (**WHEREUPON**, Government Exhibit 3 was received into

13   evidence).

14          **MR. CULLINANE:** Judge, I'll place Government

15   Exhibit No. 3 on the ELMO.

16   **BY MR. CULLINANE:**

17   Q.   Agent Weis, can you see Government Exhibit No. 3 on the

18   ELMO?

19   A.   Yes, I can.

20   Q.   And what does Government Exhibit No. 3 show?

21   A.   This is a photo from the driver's -- underneath the

22   driver's seat of a pistol that's in plain view.

23   Q.   For the record, can you please circle on your screen where

24   the pistol is?

25          **MR. STACHOWSKI:** I don't think that's working.

1          **MR. CULLINANE:** Yeah, I don't believe it's showing

2   up.

3          **MR. STACHOWSKI:** He said that he disconnected that

4   because he couldn't get that to work.

5          **MR. CULLINANE:** Oh, okay.

6          **MAGISTRATE JUDGE ROEMER:** Agent Weis, why don't you

7   step down and you point on the ELMO where the pistol is?

8          **THE WITNESS:** Yes, Your Honor.

9          **MAGISTRATE JUDGE ROEMER:** Okay.  Okay,

10  Mr. Stachowski, you see where he's pointing?

11         **MR. STACHOWSKI:** I do.

12         **MAGISTRATE JUDGE ROEMER:** Okay.  You can retake the

13  stand.

14         **MR. CULLINANE:** Judge, if it's okay if he stays here

15  just so I can ask him another question?

16         **MAGISTRATE JUDGE ROEMER:** Okay.

17         **MR. CULLINANE:** I think that's a good idea.  Thanks

18  for letting him step down.

19         **MAGISTRATE JUDGE ROEMER:** Okay.

20  **BY MR. CULLINANE:**

21  Q.   Agent Weis, you've just with your finger indicated where

22  the pistol is; is that correct?

23  A.   Yes.

24  Q.   This is underneath the car seat?

25  A.   The car seat is actually (inaudible).

1   Q.   So you were there and you saw this firearm?

2   A.   Yes.

3               **THE CLERK:** Can you just --

4   **BY MR. CULLINANE:**

5   Q.   You were there and you saw the firearm; is that correct?

6   A.   That's correct.

7   Q.   Was part of the firearm underneath the vehicle -- the

8   seat?

9   A.   Part of it was, yes.

10  Q.   And the other part was where?

11  A.   Exposed out in plain view.

12  Q.   Of --

13              **MAGISTRATE JUDGE ROEMER:** That appears to be the

14  handle of the firearm; is that correct?

15              **THE WITNESS:** Yes, Judge.

16              **MAGISTRATE JUDGE ROEMER:** That you can see?  And is

17  that the -- to the right, that's the front of the seat?

18              **THE WITNESS:** Yes, it is, Judge.  I'll point to it.

19  This is the front of the seat right here.

20              **MAGISTRATE JUDGE ROEMER:** Okay.  And then to the

21  left is the actual floor of the vehicle?

22              **THE WITNESS:** This is -- this is the floor of the

23  vehicle, Your Honor.

24              **MAGISTRATE JUDGE ROEMER:** Up at the top there --

25  there seems to be some kind of object right there.  Yeah, what

1  is that?

2          **THE WITNESS:** That's just part of the actual

3  flooring --

4          **MAGISTRATE JUDGE ROEMER:** Okay.

5          **THE WITNESS:** -- Your Honor, I believe it's just

6  standard in most vehicles.

7          **MAGISTRATE JUDGE ROEMER:** Okay.

8  **BY MR. CULLINANE:**

9  Q.   Is that even part of maybe the body of the vehicle being

10 exposed through what looks likes carpet of some kind?

11 A.   Yes, I believe so.

12 Q.   All right.  And, generally speaking, what direction is the

13 steering wheel in from where the gun is?

14 A.   The steering wheel would be to the left of the gun.  So it

15 would be over on this side.

16 Q.   Okay.  So can you draw -- well, with your finger can you

17 direct the Court like a straight line from the car seat to the

18 steering wheel?  So that gives us an orientation of where this

19 gun was?

20 A.   Yes.

21 Q.   Okay.  Thank you, Agent.

22          **MAGISTRATE JUDGE ROEMER:** Before you leave, did you

23 take this picture?

24          **THE WITNESS:** I did.

25          **MAGISTRATE JUDGE ROEMER:** Okay.  And you were

1  standing outside the vehicle?

2            **THE WITNESS:** I was standing outside the vehicle.

3            **MAGISTRATE JUDGE ROEMER:** You had a camera in your

4  hand?

5            **THE WITNESS:** I did.

6            **MAGISTRATE JUDGE ROEMER:** And you were looking down

7  into the vehicle?

8            **THE WITNESS:** That's correct, Your Honor.

9            **MAGISTRATE JUDGE ROEMER:** Okay.  Mr. Stachowski, is

10  there anymore questions you want to ask about this picture or

11  do you want to wait?  It's up to you.

12            **MR. STACHOWSKI:** I'll wait, Judge.

13            **MAGISTRATE JUDGE ROEMER:** Okay.  You can retake the

14  stand.

15  **BY MR. CULLINANE:**

16  Q.  Agent, to be clear, did you use your --

17            **MR. STACHOWSKI:** Wait a minute, I do have a couple

18  *voir dire* on this picture.

19            **MAGISTRATE JUDGE ROEMER:** Okay.

20            **MR. STACHOWSKI:** Sir, you say you took this picture

21  from the outside of the vehicle?

22            **THE WITNESS:** I was standing outside of the vehicle,

23  yes, sir.

24            **MR. STACHOWSKI:** Where outside?

25            **THE WITNESS:** Outside of the driver's side of the

1    door.

2              **MR. STACHOWSKI:** Did you -- what did you take this

3    picture with?

4              **THE WITNESS:** I took it with my Bureau issued cell

5    phone.

6              **MR. STACHOWSKI:** Now, did you enlarge it?

7              **THE WITNESS:** I don't believe I did, sir.  I don't

8    remember.

9              **MR. STACHOWSKI:** Now, if you were outside the

10   vehicle and you were looking in, why isn't the steering wheel

11   in this?

12             **THE WITNESS:** Just because I moved my phone closer

13   to it.

14             **MR. STACHOWSKI:** So you took it from the outside,

15   and put your phone inside the vehicle?

16             **THE WITNESS:** I did.

17             **MR. STACHOWSKI:** Okay.

18             **MAGISTRATE JUDGE ROEMER:** Anything else,

19   Mr. Stachowski?

20             **MR. STACHOWSKI:** No.

21             **MAGISTRATE JUDGE ROEMER:** Okay.  Mr. Cullinane.

22   **BY MR. CULLINANE:**

23   Q.   Agent Weis, to be clear, you remained standing outside the

24   vehicle?

25   A.   That's correct.

1  Q.   Did your arm enter the vehicle in order to take this

2  picture?

3  A.   Yes.

4  Q.   Did your head enter the vehicle in order to take the

5  picture?

6  A.   I don't believe so.

7  Q.   But your arm entered the vehicle because that would be the

8  way to take the picture?

9  A.   Yes.

10 Q.   Did you touch the firearm?

11 A.   At this point, no, I did not.

12 Q.   And why is that?

13 A.   For FBI policy the pistol or any type of firearm has to be

14 cleared by either a SWAT operator or a firearms instructor.

15 Q.   And you were neither?

16 A.   I was neither at the time.

17 Q.   Okay.  We'll get to it, but ultimately was there a person

18 on-site who was qualified or certified to take possession of

19 the gun at that time?

20 A.   Yes, there was.

21 Q.   Who was that?

22 A.   It was Special Agent Mark Schirching.

23 Q.   Is that the same agent who actually observed the firearm

24 initially?

25 A.   It was.

1      **MR. CULLINANE:** Rosalie, at this time if I could

2  switch back to the laptop?

3      **THE CLERK:** Mm-hmm.

4      **MR. CULLINANE:** Thank you very much.

5  BY MR. CULLINANE:

6  Q.   I'm going to continue playing from the nine minute and 15

7  second mark on Government Exhibit No. 2.

8      (**WHEREUPON**, the video was played).

9  BY MR. CULLINANE:

10 Q.   All right, I've stopped it at the ten minute and 11 second

11 mark.  Can you please tell us what we just observed?

12 A.   I moved away from the vehicle and now I'm talking -- I

13 don't know what I was actually discussing at the time, but I

14 was speaking with Mark Schirching.

15 Q.   And what did Mark Schirching just do?

16 A.   Mark Schirching, I believe he secured the actual pistol

17 itself and then cleared it.

18 Q.   Let me continue playing from the ten minute and 11 second

19 mark.

20      (**WHEREUPON**, the video was played).

21 BY MR. CULLINANE:

22 Q.   I've stopped it at the ten minute and 20 second mark.

23 Were you able to observe Agent Schirching in the last few

24 seconds?

25 A.   Yes, I was.

1   Q.    And did you see him holding anything?

2   A.    Yes, he's holding the pistol in his right hand.

3   Q.    And is he holding something in his left hand?

4   A.    I believe it's a magazine from that pistol.

5   Q.    Prior to them being in each of his hands, was the magazine

6   in the pistol?

7   A.    Yes, it was.

8              MR. STACHOWSKI: Can we see who is Mark -- I don't

9   know who is Mark Schirching.  They all look alike.

10              MR. CULLINANE: Sure.

11  BY MR. CULLINANE:

12  Q.   Agent, can you please describe or --

13              MAGISTRATE JUDGE ROEMER: Why don't you just step

14  down and point to him.

15              MR. CULLINANE: Thank you.

16              MAGISTRATE JUDGE ROEMER: I don't know, will that

17  show up?

18              MR. CULLINANE: It won't, but I can --

19              THE WITNESS: I can point.

20              MR. CULLINANE: Can he point to each monitor for

21  everyone?

22              MAGISTRATE JUDGE ROEMER: Yup, go over and point for

23  Mr. Stachowski who --

24              MR. STACHOWSKI: Okay, which is why?  Okay.  You

25  were here?  All right.

1       **MAGISTRATE JUDGE ROEMER:** Okay?  So let the record

2  reflect that Agent Weis has identified Agent Schirching is

3  that -- yep.  And himself -- and you identified yourself in

4  the freeze frame of the video, okay.

5  **BY MR. CULLINANE:**

6  Q.   And, Agent, for the record I've stopped it at the ten

7  minute and 20 second mark.  Looking at the video, where is

8  Mark Schirching from the observers' vantage point?

9  A.   Currently he's up at the -- as you look at him, he's on

10  the right-hand side of the front of this vehicle.

11  Q.   Walking away from Mr. Richards' vehicle; is that correct?

12  A.   That's correct.

13  Q.   And back towards the dash cam video recording?

14  A.   Correct.

15  Q.   Okay.  Let me continue playing from this point 10:20.

16       (**WHEREUPON**, the video was played).

17  **BY MR. CULLINANE:**

18  Q.   I've now stopped it at the 11 minute and 25 second mark.

19  Agent, have you had an opportunity to watch and listen to this

20  video?

21  A.   I have.

22  Q.   And where and when did you do that?

23  A.   I did it approximately a week ago from -- just to watch

24  this at the U.S. Attorney's Office.

25  Q.   And that was actually at my office at the U.S. Attorney's

1    Office?

2    A.   Yes, it was.

3    Q.   All right.  Did you have an opportunity to hear some of

4    the conversations that are going on in this video as well?

5    A.   Yes.

6    Q.   All right.  Are they a little bit difficult to hear?

7    A.   They are.

8    Q.   As a result did you watch this a couple times?

9    A.   I have.

10   Q.   All right.  What is your recollection of what you heard on

11   the video here regarding the recovery of this firearm?

12   A.    In the video, I'm not sure at what point, but it was a few

13   seconds before this, possibly a minute, I could hear Special

14   Agent Mark Schirching say that they did not search the

15   vehicle, he saw -- he saw it in plain view.

16           **MR. STACHOWSKI:** I'm going to object to that, Your

17   Honor.  We -- we need either Mark Schirching here or --

18           **MR. CULLINANE:** Your Honor, Agent Schirching is

19   waiting outside.

20           **MAGISTRATE JUDGE ROEMER:** He's, I think, going to

21   testify next, Mr. Stachowski.

22           **MR. CULLINANE:** He'll testify next and that's

23   certainly for the weight of the evidence for the Court to

24   examine as well.

25   **BY MR. CULLINANE:**

1  Q.   Agent Weis, to be clear, this is a conversation that you

2  were able to hear from the video recording; is that correct?

3  A.   That's correct.

4  Q.   Did you see the person speak those words?

5  A.   In this video?

6  Q.   Yes.

7  A.   No, you can't see him.

8  Q.   Are you familiar with Mark Schirching?

9  A.   I am.

10 Q.   And have you spoken with him on the phone before?

11 A.   I have.

12 Q.   How many times?

13 A.   More than I can count.  We were on the same squad

14 together, and then he's currently the SWAT team leader.

15 Q.   So you're familiar with him?

16 A.   I am.

17 Q.   And his voice?

18 A.   Yes.

19 Q.   And it's your belief that that was him speaking about the

20 recovery of the gun?

21 A.   It is my belief, yes.

22 Q.   And, in fact, you were there that day?

23 A.   I was.

24 Q.   And who recovered the firearm?

25 A.   Mark Schirching.

1  Q.   Let me continue from the 11 minute and 25 second mark.

2           (**WHEREUPON**, the video was played).

3  **BY MR. CULLINANE:**

4  Q.   Agent, I've turned the volume down as this video continues

5  playing.  At this time what's going on at the scene?

6  A.   At this point SWAT operators are going back to their

7  vehicles.  Mr. Richards was in custody off screen.  And then

8  the other individual that was -- the passenger inside of the

9  vehicle was being questioned by other members of the SWAT

10 team.

11 Q.   Since the recovery of the firearm by Agent Schirching and

12 the picture that you took at that time, did anyone conduct a

13 search of the car?

14 A.   To my knowledge, no.

15 Q.   And up to this point?

16 A.   No, they have not.

17 Q.   Okay.  The video has continued playing and we'll allow it

18 to continue playing.  And I'll turn the volume back up.

19           (**WHEREUPON**, the video was played).

20 **BY MR. CULLINANE:**

21 Q.   I've stopped it at the 15 minute and 24 second mark.  Can

22 you please describe what we just saw there?

23 A.   What happened was a task force officer, Jeffrey Pitlick,

24 as well as the Niagara County Sheriff, deputy sheriff, they

25 had a evidence bag that they then placed the property that was

1  seized from Mr. Richards into that bag on camera.

2  Q.   Let me continue from the 15 minute and 24 second mark.

3             (**WHEREUPON**, the video was played).

4  **BY MR. CULLINANE:**

5  Q.   I've stopped it at the 17 minute and 1 second mark.   Did

6  you just observe a partial blocking of the view of the Dodge

7  Durango just then?

8  A.   I did.

9  Q.   You were at the scene at that time, though; is that

10  correct?

11  A.   I was.

12  Q.   Did you observe anyone go into the vehicle and conduct a

13  search?

14  A.   No.

15  Q.   Let me continue playing from the 17 minute and 1 second

16  mark.

17             (**WHEREUPON**, the video was played).

18             **MAGISTRATE JUDGE ROEMER:** Mr. Cullinane, are we just

19  gonna watch the video the whole time or -- was there a point

20  where something happens?

21             **MR. CULLINANE:** Yes, and that will happen

22  momentarily.

23             **MAGISTRATE JUDGE ROEMER:** Okay.

24             **MR. CULLINANE:** Yes.

25             (**WHEREUPON**, the video was played).

1  BY MR. CULLINANE:

2  Q.   All right, Agent, I've stopped at the 21 minute and 16

3  second mark.  What have we just observed?

4  A.   We just saw all the SWAT vehicles exit the parking lot or

5  at least exit the view of the camera.

6  Q.   Since the last time I asked you, has anyone entered the

7  vehicle and conducted any sort of search of the vehicle?

8  A.   No.

9  Q.   All right.  I'm going to continue playing and if it's okay

10 with the Court and counsel, I'll fast forward it to help with

11 efficiency of time?

12            **MR. STACHOWSKI:** Yeah, that makes sense.

13            **MAGISTRATE JUDGE ROEMER:** Mr. Stachowski?

14            **MR. STACHOWSKI:** That would make sense.

15            **MAGISTRATE JUDGE ROEMER:** You're fine with that?

16            **MR. STACHOWSKI:** Yes.

17            **MR. CULLINANE:** Okay, thank you.

18            **MR. STACHOWSKI:** I have the video, Your Honor, so I

19 can, you know --

20            (**WHEREUPON**, the video was played).

21 BY MR. CULLINANE:

22 Q.   Okay.  I've now stopped it at the 21 minute and 44 second

23 mark.  What have we just observed?

24 A.   We just observed this vehicle back out of the -- back out

25 of the vicinity of the white Dodge Durango and it looked like

1 another vehicle was pulling in to try to make a turn -- it

2 came into view real quick.

3 Q.   Now, that was the Dodge Durango in which Mr. Richards was

4 found; is that correct?

5 A.   That's correct.

6 Q.   And do you know what's going on with this patrol car right

7 now that is recording or recorded the encounter?

8 A.   Yes.  This was the vehicle that had Mr. Richards in the

9 back of it and it's leaving the parking lot now and heading

10 directly to Niagara County Sheriff's Office.

11 Q.   Okay.  So it had stopped recording obviously the encounter

12 and any issues at the bar and is now going to record the drive

13 back to the jail?

14 A.   That's correct.

15 Q.   Okay.  Now, the last thing we saw of the Dodge Durango is

16 that it was sitting there; is that correct?

17 A.   That's correct.

18 Q.   Are you aware of any search that was conducted of that car

19 following the recovery of the gun on the driver's side floor?

20 A.   I'm not aware of any search that was taking place

21 afterwards.

22 Q.   Okay.  And what happened to that vehicle after the

23 encounter with Mr. Richards?

24 A.   I was traveling back to Niagara County so I believe that

25 the vehicle was given back to the passenger of the vehicle,

1  who was also released from our custody.

2  Q.   Okay.  You stated earlier that law enforcement had

3  determined it was a rental vehicle?

4  A.   Yes.

5  Q.   Do you know who it had been rented to?

6  A.   It had been rented to the passenger's wife.

7  Q.   And is that why he was given the vehicle back?

8  A.   Yes.

9  Q.   All right.  Now, Agent, are you familiar, are you aware of

10 the other evidence recovered from the encounter with

11 Mr. Richards?

12 A.   I am.

13 Q.   What else was recovered from Mr. Richards?

14 A.   We recovered a cell phone, an LG cell phone, and then the

15 pistol; and then I believe it was $449 United States currency.

16 Q.   Where was the currency recovered from?

17 A.   It was recovered from his person.

18 Q.   From his person?

19 A.   Yes.

20 Q.   And that was after he was removed from the car?

21 A.   Yes.

22 Q.   Where was the phone recovered from?

23 A.   From his person.

24 Q.   After he was removed from the car?

25 A.   Yes.

1  Q.   All right.  Was that documented?

2  A.   It was.

3  Q.   All right.  How is that documented?

4  A.   In a FBI evidence log.

5  Q.   Agent, I'm showing you what's marked for today's purposes

6  as Government Exhibit No. 4.  Agent, are you familiar with

7  this document?

8  A.   I am.

9  Q.   And what is this?

10 A.   This is a FD-886, which is the evidence recovery log that

11 we use for the FBI.

12 Q.   And it appears to be a form template?

13 A.   Yes.

14 Q.   But it contains handwriting?

15 A.   Yes, it does.

16 Q.   Is this your handwriting?

17 A.   This is not my handwriting, no.

18 Q.   All right.  But are you familiar -- were you familiar with

19 this document at the time it was drafted?

20 A.   Yes.

21 Q.   You had an opportunity to review this?

22 A.   I did.

23 Q.   And is this a true and accurate copy of this document?

24 A.   Yes.

25           **MR. CULLINANE:** Your Honor, at this time the

1 | Government offers for admission Government Exhibit No. 4.

2 |         **MAGISTRATE JUDGE ROEMER:** Mr. Stachowski?

3 |         **MR. STACHOWSKI:** I have no objection as a business

4 | record.

5 |         **MAGISTRATE JUDGE ROEMER:** Government Exhibit No. 4

6 | is admitted into evidence.

7 |         (**WHEREUPON**, Government Exhibit 4 was received into

8 | evidence).

9 | **BY MR. CULLINANE:**

10 | Q.   Agent Weis, it appears there contains a date on this

11 | document; is that correct?

12 | A.   Yes.

13 | Q.   And what is the date?

14 | A.   The date is 12/14/18.

15 | Q.   All right.  And what is the significance of that date?

16 | A.   This is the day of the arrest.

17 | Q.   And there's a case ID?

18 | A.   There is.

19 | Q.   Is that unique to each case?

20 | A.   It is.

21 | Q.   All right.  Now, there is handwriting regarding the

22 | location.  What does that state?

23 | A.   It states -- it's in parentheses and it says taken off

24 | subject.

25 | Q.   All right.  And there's information regarding the

1  preparer/assistance.  What names are listed there?

2  A.   Special Agent Seth Fleitman and Special Agent Tom Weis.

3  Q.   Now, was Special Agent Fleitman at the scene?

4  A.   He was not.

5  Q.   Okay.  You're listed there; is that correct?

6  A.   Yes.

7  Q.   And you were at the scene?

8  A.   I was.

9  Q.   As you testified?

10 A.   Yes.

11 Q.   Now, there are four items listed under the recovery log

12 section.  Can you please read those into the record?

13 A.   Yes.  Item 1: AMT cal .45 8 CP back up, serial number DA 3

14  -- I believe it's 660, and magazine.

15          Item No. 2: Five rounds .45 caliber -- I can't see

16 what's in the arrow above it, and then in parens taken from

17 magazine -- I can't make out the last word.  Next to that it

18 says in magazine from item 1.

19          Item 3: $449 U.S. currency.

20          Item 4: LG cell phone model, I believe that's LG

21 M3271-FCC ID-ZNFL63 -- I believe that's 8L.

22          **MR. CULLINANE:** And, Your Honor, for the record I

23 have Government Exhibit 4 in hand and I think it's clearer in

24 the paper copy rather than the monitor.  So if the record

25 could reflect that?

1              **MAGISTRATE JUDGE ROEMER:** Okay.

2              **MR. CULLINANE:** To distinguish it from Agent Weis'

3    reading from the screen.

4    **BY MR. CULLINANE:**

5    Q.   Agent, there are four entries here regarding items that

6    were recovered from Mr. Richards; is that correct?

7    A.   That's correct.

8    Q.   To be clear, where were items 1 and 2 recovered from?

9    A.   Those were recovered from the vehicle, the white Dodge

10   Durango.

11   Q.   And are they referencing the firearm you described Agent

12   Schirching seeing under the car seat?

13   A.   Yes.

14   Q.   The driver's seat to be clear?

15   A.   Yes.

16   Q.   Item 3 is $449?

17   A.   Yes.

18   Q.   Where was that found?

19   A.   That was found on Mr. Richards' person.

20   Q.   And the phone is listed as item 4.  Where was that found?

21   A.   It was found on Mr. Richards' person.

22   Q.   So apart from the gun and rounds found in the car, were

23   any other items taken from the vehicle following the stop of

24   the vehicle of Mr. Richards?

25   A.   No.

1  Q.   And was a search conducted of the car prior to being given

2  back to the passenger?

3  A.   No.

4            **MR. CULLINANE:** One second, please.

5  **BY MR. CULLINANE:**

6  Q.   Now, Agent, to be clear, was Mr. Richards arrested and

7  taken into custody that evening?

8  A.   He was.

9  Q.   And subsequently was the search warrant executed?

10  A.   It was.

11  Q.   And was that part of the plan to have him in custody first

12  before executing the search warrant?

13  A.   Yes, it was.

14  Q.   Now, I'm not going to get into the particulars of that

15  search warrant, but the next day was a criminal complaint

16  drafted and submitted to this Court for this Court's review

17  regarding Mr. Richards?

18  A.   Yes, it was.

19  Q.   And was that signed by yourself as the affiant?

20  A.   Yes.

21  Q.   And did the Court sign the criminal complaint?

22  A.   Yes.

23  Q.   And, Agent Weis, to be clear for the record, have you

24  testified in any other proceedings regarding Mr. Richards?

25  A.   I have not.

1          **MR. CULLINANE:** Judge, no other further questions at

2    this time.   Thank you.

3          **MAGISTRATE JUDGE ROEMER:** Thank you.

4    Mr. Stachowski?

5          **MR. STACHOWSKI:** Judge, I'll try.   I actually need a

6    bathroom break, but I'll try to work through it.

7          **MAGISTRATE JUDGE ROEMER:** Okay, let me know when

8    you --

9          **MR. STACHOWSKI:** Yeah.

10                       **CROSS-EXAMINATION**

11   **BY MR. STACHOWSKI:**

12   Q.   Okay.   Sir, you say that there was an arrest warrant?

13   A.   Yes, sir.

14   Q.   Who issued that arrest warrant?

15   A.   It was issued from this court, sir, the day after the

16   execution of the search warrant.

17   Q.   So there was no arrest warrant at the time of the stop of

18   the car?

19   A.   No, there was not.

20   Q.   Now, the Niagara County sheriff assisted in this action?

21   A.   He did.

22   Q.   And when -- when you traveled into the Last Chance bar

23   parking lot, had you been following the Niagara County sheriff

24   for some time?

25   A.   No.   The Niagara County sheriff less than a mile hopped in

1    front of my vehicle.

2    Q.    Okay.  So for a mile the Niagara County sheriff was

3    immediately behind this vehicle?

4    A.    That's correct.

5    Q.    And in that video we were able to observe the vehicle

6    travel in a straight line; is that right?

7    A.    I believe so, yes.

8    Q.    It didn't make any wavers between lanes, did it?

9    A.    No, it did not.

10   Q.    And when it came to the Last Chance bar, he engaged a turn

11   signal to turn into that parking lot, did he not?

12   A.    I would have to watch the video again just to make sure,

13   but I believe he might have, yes.

14   Q.    If the video would show that, then he did do that, right?

15   A.    That's correct.

16   Q.    And he pulled into the parking lot and then stopped?

17   A.    Correct.

18   Q.    Was he in a parking place?

19   A.    I believe he was in a parking spot, yes.

20   Q.    Okay.  And the Niagara County sheriff stopped behind it?

21   A.    He did.

22   Q.    Now, at that point did the Niagara County sheriff issue

23   any traffic tickets?

24   A.    No, he did not.

25   Q.    Now, they were stopped in a parking spot and at that point

1  the FBI gave them some orders?

2  A.   Yes.  Once the FBI vehicles moved into place.

3  Q.   And did they not say that there was a warrant for his

4  arrest?

5  A.   I believe he did, yes.

6  Q.   Okay.  And, in fact, there was not a warrant?

7  A.   No, we made a probable cause arrest.

8  Q.   When you say you "made a probable cause arrest," he wasn't

9  violating the -- the vehicle and traffic laws, was he?

10  A.   No, he was not.

11  Q.   And to -- in your own view, you could not determine that

12  he was violating any laws of the State of New York or the

13  United States of America at that time, did you?

14  A.   During this stop --

15  Q.   Yes.

16  A.   -- are you referencing?

17  Q.   Yes.

18  A.   No.

19  Q.   Yet you placed him under arrest and ordered him out of the

20  car?

21  A.   Yes.

22  Q.   Now, you also ordered the other individual out of the car?

23  A.   That's correct.

24  Q.   And that individual you later discovered was the actual

25  renter -- not the actual.  Was the husband of the actual

1  renter of the vehicle?

2  A.   Yes.

3  Q.   And --

4           **MAGISTRATE JUDGE ROEMER:** I just want to clarify.

5  You say "renter" for the vehicle.

6           **MR. STACHOWSKI:** Well, it was a rental car.

7           **MAGISTRATE JUDGE ROEMER:** Okay.  Because earlier I

8  thought there might have been testimony that she was the owner

9  of the car, but that's not true?  She was the renter?

10          **MR. STACHOWSKI:** In the end Mr. Cullinane asked him

11  if this was a rental vehicle.

12          **MAGISTRATE JUDGE ROEMER:** Okay, I missed that.

13  Sorry.  Was that a rental vehicle?

14          **THE WITNESS:** It was, Your Honor.

15          **MAGISTRATE JUDGE ROEMER:** Okay.

16  **BY MR. STACHOWSKI:**

17  Q.   And Mr. Todd Biro's -- Biro's wife rented the vehicle?

18  A.   I believe so, yes.

19  Q.   And that was discovered during conversations with Mr.

20  Biro?

21  A.   I was not speaking with him, so I'm not sure if that did

22  come up.

23  Q.   But, nevertheless, during the course of this the vehicle

24  possession was turned over to Mr. Biro?

25  A.   After this, yes.

1  Q.   Now, did you pat-down Mr. Richards?

2  A.   He was pat-down, yes.  I did not, but law enforcement

3  officers did.

4  Q.   And there was no weapons found on his person?

5  A.   Not on his person, no.

6  Q.   By the way, what crime was Mr. Richards committing when he

7  walked out of the car?

8  A.   When he walked out of the car?

9  Q.   Yes.

10  A.   None.

11  Q.   And at that point in time there was no criminal complaint

12  that was issued, was there?

13  A.   Not for his arrest, no.

14  Q.   Now, was Mr. Biro patted down?

15  A.   I believe he was.

16  Q.   Did he have any weapons or contraband?

17  A.   Not to my knowledge.

18  Q.   Now, you say that when the door -- that the door was

19  opened to the back seat because there was belief that there

20  was a person in there?

21  A.   So it's based off of law enforcement previous experiences,

22  not necessarily with Mr. Richards, but just in general.  It's

23  part of the procedure for our SWAT team and most SWAT teams

24  will check rear areas of the car just to make sure there's no

25  other individuals.

1   Q.   Now, even though there were -- it was tinted, did someone
2   go right up to the window and look inside?
3   A.   Are you talking about -- at what point, sir?
4   Q.   The SWAT team before they opened the door.
5   A.   Yes, there was somebody up in the front, but you could not
6   clearly see into it.
7   Q.   But when you go right next to even tinted windows you're
8   able to see what's inside of the vehicle?
9   A.   Depends on the tint, sir.
10  Q.   Well, did -- did Niagara County say that there was a
11  violation of the New York State tinted window code?
12  A.   I'm not aware that they have.
13  Q.   You know if -- are you aware if there's a regulation and
14  actually a Vehicle and Traffic Law in place as to the legality
15  of tinted window?
16  A.   I believe there is, sir, but I don't -- I can't testify to
17  the state or their laws.
18  Q.   Now, nevertheless, someone opened the door and looked
19  inside?
20  A.   That's correct.
21  Q.   Well, when someone --
22             **MAGISTRATE JUDGE ROEMER:** Let's clarify,
23  Mr. Stachowski.  You say "the door."  Which door?
24             **MR. STACHOWSKI:** I'm sorry.
25  **BY MR. STACHOWSKI:**

1  Q.   The rear driver's side door?

2  A.   Yes, that door was opened.

3           **MAGISTRATE JUDGE ROEMER:** When you say the "rear

4  driver's side," do you mean the -- the door on the back of the

5  vehicle?

6           **MR. STACHOWSKI:** Correct.

7           **MAGISTRATE JUDGE ROEMER:** Okay.  So it's not on the

8  driver's side or the passenger's side, it's just the door --

9           **MR. STACHOWSKI:** No, no, no, I'm not talking about

10 the hatch.  I'm talking about the rear passenger's --

11          **MAGISTRATE JUDGE ROEMER:** Okay, you're talking about

12 the passenger's side -- this is a four door?

13          **MR. STACHOWSKI:** Yes.

14          **MAGISTRATE JUDGE ROEMER:** I don't even know if we

15 established that.

16 **BY MR. STACHOWSKI:**

17 Q.   I'm sorry, are there four doors to this vehicle?

18 A.   Four passenger doors and then the rear hatch.

19 Q.   All right.  And so the door behind the driver's door, that

20 was the one that was opened?

21 A.   Yes, it was.

22 Q.   And they looked inside and there was nobody in there?

23 A.   That's correct.

24 Q.   Now, when they opened the door, isn't that a search?

25 A.   No.  He was not searching the vehicle.

1   Q.   So he wasn't searching for passengers?

2   A.   He was visually searching for passengers.  He did not

3   enter, nor did anyone enter the vehicle --

4   Q.   Well, when they opened the door they -- they entered with

5   their eyes?

6   A.   Is that a question, sir?

7   Q.   Yes.

8   A.   He looked inside the vehicle, yes, sir.

9   Q.   And later in that video you see -- strike that.

10          Do you know who the person in the SWAT team was

11   with the flak jacket on or whatever that is?  The jacket,

12   safety jacket and the red shirt underneath?

13   A.   I don't know, sir.

14   Q.   Do you know if he bent down to his knees for some purpose?

15   A.   I would have to watch the video again, sir.

16   Q.   And do you know if he reached into the car when he was on

17   his knees and -- and reached underneath the driver's seat?

18   A.   I would have to see the video, sir.

19   Q.   If the video showed that he was on his knees and reached

20   in with his arm underneath the driver's seat, wouldn't that be

21   a search?

22          **MR. CULLINANE:** Objection, speculation.

23          **MAGISTRATE JUDGE ROEMER:** Well, it calls for a legal

24   conclusion on the witness's part.

25          **MR. STACHOWSKI:** Okay.

1        **MAGISTRATE JUDGE ROEMER:** We're trying to establish

2   the fact, did he, in fact, reach under the seat or did he not

3   reach under the seat.

4        **MR. STACHOWSKI:** All right.

5   **BY MR. STACHOWSKI:**

6   Q.   But if the video shows that someone -- someone reached in

7   and -- and put their hand under the driver's seat, was that

8   part of the protocol?

9        **MR. CULLINANE:** Objection.  Mr. Stachowski is saying

10  "if."  I mean, we can play the video.  I'm happy to que it up

11  for --

12       **MR. STACHOWSKI:** Well, let's play the video.

13       **MR. CULLINANE:** -- Mr. Stachowski if he wants.

14       **MAGISTRATE JUDGE ROEMER:** Mr. Stachowski?

15       **MR. STACHOWSKI:** Yeah, we need to play the video.  I

16  think it's somewhere around -- between seven and nine, I

17  think, I can't recollect where.  Oh, no, here, I think it's

18  12:11 because I wrote down SWAT person in red shirt so that

19  must mean that I saw it at 10:11.

20       **MR. CULLINANE:** Okay.  I'm sorry, Mike, 12:11?

21       **MR. STACHOWSKI:** 10.  10.  10.

22       **MR. CULLINANE:** 10:11?

23       **MR. STACHOWSKI:** 10.  I don't know where I got 12

24  from.  Stop right there.

25  **BY MR. STACHOWSKI:**

1   Q.   Do you know who that fellow is in the jeans, the red shirt

2   coming out in the camouflage jacket?

3   A.   Directly in front of the camera, sir?

4   Q.   Yes.

5   A.   I don't know who that is.

6   Q.   He's a member of the FBI SWAT team?

7   A.   He is.

8   Q.   Okay.  Okay.  You can go.  You can start it again.  Maybe

9   that's past it.  It's before -- it's before that.  Because it

10  looks like that's when he -- I put it down at that time,

11  but -- because I saw the red shirt.  I think the incident I'm

12  looking for is prior to that.

13          **MR. CULLINANE:** What time stamp would you like me to

14  go back to?

15          **MR. STACHOWSKI:** You know, I wrote down 7:48 and I

16  wrote --

17          **MAGISTRATE JUDGE ROEMER:** Let's go back to the five

18  minute mark.

19          **MR. STACHOWSKI:** Yeah, that's probably the best

20  idea.  Because I wrote down three, four different times and

21  the 12:11 is when I saw the red coming out of his shirt.

22          **MR. CULLINANE:** It's at the 4:56 second mark.  Mike,

23  you just tell me when you want me to stop.

24          **MR. STACHOWSKI:** Okay.  Why don't we stop it there

25  for a second?

1  BY MR. STACHOWSKI:

2  Q.   Now, sir, this guy in the red, he's reaching his hand

3  into -- into the back of the vehicle.  Why is he doing that?

4  A.   I can't testify for what his thoughts were, but what I

5  believe he was doing was checking to see because he noticed

6  that compartment there.

7  Q.   Well, how -- what's the size of the compartment?

8  A.   I don't actually know, sir.  I didn't go up to it, but he

9  would have only done it to see if there was a human being

10 inside of it.

11 Q.   Well, aren't -- aren't those in the back of those SUV

12 vehicles netting and -- and things that carry stuff?

13 A.   I'm not sure, sir.

14 Q.   Did -- did you see him open any -- in this video did you

15 see him open any compartment?

16 A.   He lifted up the -- whatever the compartment is in the

17 back, sir, and visually checked it.

18 Q.   Where the spare tire is kept?

19 A.   Typically, yes.

20 Q.   Now, what kind of person could fit in where the spare tire

21 is kept?

22 A.   I don't know, sir.

23 Q.   Were you looking for a midget?

24 A.   I don't know, sir.

25 Q.   Did you know if Mr. Richards hung around with midgets?

1          **MR. CULLINANE:** Objection.

2          **MAGISTRATE JUDGE ROEMER:** Mr. Stachowski, this is a

3  serious thing here.  We're not fooling around.

4          **MR. STACHOWSKI:** Okay.  I am, Judge, but the -- the

5  testimony to me is incredible.

6          **MAGISTRATE JUDGE ROEMER:** Maybe you can phrase it in

7  a different way.

8          **MR. STACHOWSKI:** Okay.

9  **BY MR. STACHOWSKI:**

10 Q.   Did you expect a small person to be there?

11 A.   So I did not check that, sir, but he checked it to ensure

12 the safety of the other officers.

13 Q.   That's the person in the red that -- that I was talking

14 about, correct?

15 A.   With the red part of the shirt, sir?

16 Q.   Yes.

17 A.   If that's the one you're referencing, yes, that's who it

18 was before.

19 Q.   But you don't know who that is?

20 A.   Not from -- without being there right now.

21 Q.   Did you recollect who -- who was part of the SWAT team

22 that was there?

23 A.   I don't exactly know who was there, but I know who was on

24 the SWAT team in general at the time, sir.

25 Q.   Okay.  So you can't by -- by knowing that -- telling us

1  who this person is?

2  A.   Not being 100%, no.

3  Q.   Okay.  Let it go.

4          **MAGISTRATE JUDGE ROEMER:** Just one question.  The

5  way the vehicle is now, the doors that are open, it's the --

6  both the driver's door, the passenger's door and then the back

7  driver's door is open?

8          **THE WITNESS:** I don't believe the back passenger

9  door is, sir.

10          **MAGISTRATE JUDGE ROEMER:** Yeah, back passenger

11  isn't, but the back driver's side --

12          **THE WITNESS:** Yes, that is open, sir.

13          **MAGISTRATE JUDGE ROEMER:** Okay.  And, of course, the

14  hatchback in the back?

15          **THE WITNESS:** That's correct.

16          **MAGISTRATE JUDGE ROEMER:** Okay.

17  BY MR. STACHOWSKI:

18  Q.   Sir, is that what you just saw, that was the opening of

19  that -- of that compartment?

20  A.   Yes, it was.  He lifted it open.

21  Q.   And now that's you in the baseball hat?

22  A.   It is.

23  Q.   Now, who is that right up against the vehicle (inaudible)?

24  A.   Where, sir?  Which vehicle?

25  Q.   The white vehicle.  You can see by the door tan boots and

1   you're right behind the guy (inaudible)?

2           **THE CLERK:** Mr. Stachowski, you need to speak into

3   the microphone.

4   **BY MR. STACHOWSKI:**

5   Q.   Assumedly Mr. Schirching.

6   A.   Mr. Schirching is in the khakis right there.  He's the

7   taller.

8   Q.   And that's you walking back?

9   A.   Yes, it is.

10  Q.   And then there's the guy in the khakis there now inside of

11  the vehicle?

12  A.   He's not inside the vehicle, sir.  He's standing outside

13  of it.  I can see his feet.

14  Q.   Now -- now, there's this guy here on his knees?

15  A.   Yes.

16  Q.   And that's the guy in the red again?

17  A.   That's correct.

18  Q.   Okay.  You can run it.

19          (**WHEREUPON**, the video was played).

20  **BY MR. STACHOWSKI:**

21  Q.   What was he doing on his knees looking in that

22  compartment?

23  A.   I don't know what -- exactly where he was looking at, sir.

24  It's unclear, and based off the video he could have been

25  looking inside the video (sic) to see if there's anything

1  underneath the seat, I'm not sure.

2  Q.   And at this point you still didn't photograph this gun?

3  A.   By this point I have in the video, yes.

4        **MR. STACHOWSKI:** I have -- I'm done with this part,

5  Your Honor.

6        **MAGISTRATE JUDGE ROEMER:** Okay.

7  **BY MR. STACHOWSKI:**

8  Q.   Now, sir, at the onset you said that you observed -- you

9  were at his -- strike that.

10        You were at the apartment at 4 Packard Road in --

11  in Niagara Falls?

12  A.   At what point, sir?

13  Q.   Before you started tailing this white vehicle.

14  A.   I was in the vicinity of it.  I wasn't directly at the

15  residence.

16  Q.   Okay.  Now, someone told you that Mr. Richards had left

17  the apartment?

18  A.   Yes.

19  Q.   And was he alone?

20  A.   Was who alone, sir?

21  Q.   Mr. Richards.

22  A.   No, he was with another individual.

23  Q.   And what happened to this other individual?

24  A.   That other individual based off of the reporting that I

25  received from the radio entered the passenger side of the

1    white Dodge Durango.

2    Q.    Did they say that they saw him pull up to Mr. Richards'

3    apartment?

4    A.    Yes.

5    Q.    And did they say that he exited the driver's side?

6    A.    I believe that he did, yes.

7    Q.    He wasn't in the passenger side?

8    A.    At what point, sir?

9    Q.    When he first arrived on Packard Road.

10    A.    He was driving, sir.  He was in the driver's seat.

11    Q.    Did anyone else exit the vehicle on Packard Road?

12    A.    No.

13    Q.    So you saw -- you got a dispatch that two individuals

14    entered the vehicle?

15    A.    That's correct.

16    Q.    Did the individual say they saw Mr. Richards with a gun?

17    A.    No, they did not say that.

18    Q.    And now you say that Mr. Richards entered the driver's

19    seat?

20    A.    That's correct.

21    Q.    Did anybody make any observations of him reaching under

22    the seat?

23    A.    Nobody reported anything.

24    Q.    Okay.  And then at some point you started tailing him and

25    the rest is on the video?

A.    Yes, it is.

Q.    The last mile at least?

A.    Yes, approximately last mile.

Q.    Okay.  But how many miles was it from Packard Road to this Last Chance bar?

A.    I'm not sure, sir.

Q.    I want to call it the last chance saloon like in the old westerns.  Okay.  All right.  I was just informed that it is the Last Chance Saloon.  Okay.

        So in any event -- now, did the Niagara County sheriff issue an appearance ticket or -- or place Mr. Biro under arrest for possession of a weapon in violation of Section 265.3 of the New York Penal Code?

A.    To my knowledge, no.

Q.    Did they place Mr. Richards under arrest for 265.3 of the New York Penal Code?

A.    Niagara County did not.

Q.    Are you aware of Section 265.3 of the New York Penal Code?

A.    I don't know New York State code, sir.

Q.    Are you aware that in New York the Penal Code also suggests that all people located in a vehicle are presumed to possess a weapon?

        **MR. CULLINANE:** Objection, Your Honor.

        **MAGISTRATE JUDGE ROEMER:** Sustained.

**BY MR. STACHOWSKI:**

94

1  Q.   All right.  Now, sir, are you sure that this vehicle was a

2  Dodge Durango?

3  A.   Based off the look of it, yes, sir.

4  Q.   Do you know if it was a Jeep?

5  A.   I don't know if it is a Jeep, sir.  I believe it's a Dodge

6  Durango.

7  Q.   Now, some of your other testimony wasn't accurate, was it?

8  A.   I don't know what you're referencing, sir.

9  Q.   Let me -- this evidence recovery log.  Who recovered the

10 cash?

11 A.   The cash was on his person, sir.

12 Q.   Who recovered it?

13 A.   The FBI; I believe that in the paperwork I'm the

14 recovering agent.

15 Q.   Okay.  And you recovered $449 of U.S. currency?

16 A.   That's what's written down on the page, sir.

17 Q.   Are you sure you didn't recover $649 of U.S. currency?

18 A.   If that's what's on the page, sir.  I can only testify to

19 that.

20 Q.   Now, sir, are you aware -- have you ever looked at the

21 indictment?

22 A.   The indictment, no, sir.

23 Q.   Are you aware that in the indictment the paragraph --

24 strike that.

25          The third forfeiture allegation says that

1  approximately $649 of U.S. currency seized from Jeffrey

2  Richards by law enforcement on or about December 14th, 218

3  (sic)?

4  A.   I'm not aware of that, sir.  I haven't looked at the

5  indictment.  However, I believe that there could have been

6  cashed seized from the apartment itself.

7  Q.   Now, sir, you say that -- you said it in the beginning

8  that you were fearful that Mr. Richards might have an

9  explosive device in that vehicle; is that correct?

10 A.   I don't know if I said if it was in the vehicle or not,

11 sir.

12 Q.   Well, did you say that you were fearful that there might

13 be a bomb or explosive device?

14 A.   Of an explosive device, yes, sir.

15 Q.   Okay.  Now, did you see -- did anyone tell you that Mr.

16 Richardson (sic) was carrying any objects to the car?

17 A.   That was not described.

18 Q.   And you later learned that the -- that the vehicle was

19 rented --

20          **MAGISTRATE JUDGE ROEMER:** Mr. Stachowski, you said

21 "Richardson."  I think you met Mr. Richards, correct?

22          **MR. STACHOWSKI:** Richards.  Did I say Richardson?

23          **MAGISTRATE JUDGE ROEMER:** Okay, I'm sorry, I didn't

24 mean to interrupt you.  Go ahead and ask your next question.

25 I just wanted to make it clear.

1          **MR. STACHOWSKI:** Mr. Richards is what I meant.

2    Okay.

3    **BY MR. STACHOWSKI:**

4    Q.   Now, did you -- I have a client named Richardson, so it

5    probably came into my head.   I apologize.

6               So did anybody see him carrying anything to the

7    car?

8    A.   It was not called out over the radio, no.

9    Q.   Now, were you -- you found out later that Mr. Biro's wife

10   rented this vehicle?

11   A.   I found this out later, yes.

12   Q.   Was there any reason to believe that Mr. Biro would have

13   explosive devices?

14   A.   I don't have any source reporting on Mr. Biro.

15   Q.   Mr. Biro wasn't under investigation by the FBI, was he?

16   A.   I can't say whether he was or was not, sir.   He was not

17   part of any investigation that I personally had.

18          **MR. STACHOWSKI:** I have no further questions.

19          **MAGISTRATE JUDGE ROEMER:** Mr. Cullinane?

20          **MR. CULLINANE:** Thank you.

21                   <u>**REDIRECT EXAMINATION**</u>

22   **BY MR. CULLINANE:**

23   Q.   Agent, you stated that you made a probable cause arrest of

24   Mr. Richards; is that correct?

25   A.   That's correct.

1  Q.   What was the probable cause based on?

2  A.   Probable cause was based on that there was narcotics

3  inside of the apartment; that he had a firearm on him at the

4  same time; and that there was also bomb making material as

5  well as other guns inside of the residence.

6  Q.   Now, you stated there's probable cause that he had a gun

7  on him; is that correct?

8  A.   That's correct.

9  Q.   Was there multiple source reporting regarding him with a

10 firearm?

11 A.   Yes, there was.

12 Q.   And, generally speaking, was that information fresh or

13 recent when provided to law enforcement?

14 A.   It was, sir.

15 Q.   So did you have reason to believe he had a firearm on him

16 at that time?

17 A.   I did, sir.

18 Q.   But no other law enforcement officer had reported to you

19 that he or she had seen a firearm on Mr. Richards; is that

20 correct?

21 A.   No one reported that, no.

22 Q.   Now, you were asked if he was -- if he committed a crime

23 when he walked out of the car.  Do you recall that?

24 A.   I do.

25 Q.   Was there an ongoing criminal investigation into

1  Mr. Richards?

2  A.    Yes, there was.

3  Q.    Regarding what?

4  A.    Regarding bomb making.

5  Q.    And drugs?

6  A.    And drugs.

7  Q.    And firearms?

8  A.    Yes, sir.

9  Q.    On the screen it has been stopped at the 10 minute 17

10 second mark.  And the rear hatch is open; is that correct?

11 A.    It is.

12 Q.    And you were asked some questions about a fellow law

13 enforcement officer opening a compartment within that rear

14 hatch?

15 A.    Yes.

16 Q.    Now, are you a car expert?

17 A.    I am not.

18 Q.    All right.  So if it's a Dodge or a Jeep, are you certain

19 of that?

20 A.    I am not certain.  I'm not an expert.

21 Q.    Okay.  Are you aware, though, through your training and

22 experience that vehicles have compartments in them?

23 A.    Yes.

24 Q.    And are you aware that persons can modify compartments in

25 their cars?

1  A.    I am aware of that, yes.

2  Q.    How are you aware of that?

3  A.    Based off my training and experience dealing with

4  narcotics it's common to see compartments or traps inside of

5  vehicles.

6            **MR. STACHOWSKI:** Judge, I'm going to have to object.

7  This is a rental vehicle.

8            **MAGISTRATE JUDGE ROEMER:** I'm not sure he knew that

9  at the time or any law enforcement making the stop knew that.

10           **MR. STACHOWSKI:** Okay.  All right.

11           **MAGISTRATE JUDGE ROEMER:** So I'll overrule the

12  objection.

13  **BY MR. CULLINANE:**

14  Q.    Agent Weis, through your training and experience are you

15  aware that persons involved in criminal activities will modify

16  even a rental vehicle?

17  A.    Yes.

18  Q.    And have you been aware of that occurring in the past?

19  A.    I have.

20  Q.    Whether in this district or elsewhere?

21  A.    That's correct.

22  Q.    So is it possible that a person could be in this

23  compartment area?

24           **MR. STACHOWSKI:** Objection, that calls for pure

25  speculation.

1          **MR. CULLINANE:** I'll rephrase it.

2          **MAGISTRATE JUDGE ROEMER:** Okay.

3   BY MR. CULLINANE:

4   Q.    Is it protocol of the SWAT team and FBI to search

5   compartments in which a person could be located?

6   A.    Yes.

7   Q.    And does that include compartments that could fit a larger

8   person?

9   A.    Yes.

10  Q.    Or even a smaller person?

11  A.    That's correct.

12  Q.    You were asked about the difference between the cash

13  recovered from his person at that time --

14  A.    Mm-hmm.

15  Q.    -- and the indictment?

16  A.    Yes.

17  Q.    Did you draft the indictment?

18  A.    I did not.

19  Q.    All right.  In fact, who drafted it?

20  A.    I believe the U.S. Attorney's Office does.

21  Q.    And the grand jury returned this?

22  A.    Yes, they did.

23  Q.    Okay.  Are you aware that possibly other money was

24  recovered at his home?

25  A.    Yes.

1  Q.   And that's why the aggregate is different than what was

2  found just at the encounter at Dave's Last Chance saloon?

3  A.   That's correct.

4            **MR. CULLINANE:** One second, Your Honor.

5  **BY MR. CULLINANE:**

6  Q.   Agent, just a couple other additional questions.  Why were

7  Mr. Richards and the passenger removed from the car that day?

8  A.   To separate them and to put them into custody.

9  Q.   And is this for the safety of anyone?

10 A.   It is.

11 Q.   Who is it for the safety of?

12 A.   For safety of law enforcement officers and potentially

13 anybody that was back at Packard Court living in the other

14 apartments.

15 Q.   And anyone else who may have been at Dave's Last Chance

16 saloon?

17 A.   That's correct.

18            **MR. CULLINANE:** Agent, those are all my questions

19 for today.  Thank you.

20            **MR. STACHOWSKI:** Judge, I did forget one question

21 earlier.

22            **MAGISTRATE JUDGE ROEMER:** Sure.

23            **MR. STACHOWSKI:** And I apologize.

24                        <u>**RECROSS-EXAMINATION**</u>

25 **BY MR. STACHOWSKI:**

1  Q.   Was this gun tested for DNA?

2  A.   I am not sure, sir.  Someone else submitted it to whatever

3  lab it goes to.

4  Q.   So you're not aware of any DNA tests on -- on the gun

5  itself or the magazine?

6  A.   I wrote the affidavit, sir, and I was present for this

7  arrest.  I don't know what happened afterwards for any part of

8  this investigation.

9          **MR. STACHOWSKI:** Then I have no further questions.

10          **MAGISTRATE JUDGE ROEMER:** I got a couple of

11  questions, Agent.  You say you had information that the

12  defendant when he left his house he would usually carry a .45

13  caliber handgun?

14          **THE WITNESS:** Yes, Your Honor.

15          **MAGISTRATE JUDGE ROEMER:** Did you have any

16  information that it was illegal for him to do that?  Was there

17  any check done to see if he had a registered gun?  Had a

18  permit for carry or anything like that?

19          **THE WITNESS:** I believe that there was checks done,

20  completed by the case agent.

21          **MAGISTRATE JUDGE ROEMER:** And what was the result of

22  those?

23          **THE WITNESS:** I'm not actually sure, Your Honor.  I

24  don't believe he was a felon.  Again, I'm not sure if he

25  actually had a license for it, Your Honor.

1          **MAGISTRATE JUDGE ROEMER:** But it would be illegal I

2 guess in a sense if he was involved in drug dealing, he's not

3 allowed to have a weapon to do that?

4          **THE WITNESS:** That's correct.

5          **MAGISTRATE JUDGE ROEMER:** Okay.  You mentioned that

6 one of the suspicions regarding his home was he was a bomb

7 maker?

8          **THE WITNESS:** Yes, Your Honor.

9          **MAGISTRATE JUDGE ROEMER:** And he did that at this

10 home?  At his home?

11          **THE WITNESS:** Yes, Your Honor.

12          **MAGISTRATE JUDGE ROEMER:** Okay.  And then you talked

13 about the ability to detonate that device?

14          **THE WITNESS:** Yes, sir.

15          **MAGISTRATE JUDGE ROEMER:** Using a cell phone?

16          **THE WITNESS:** Yes, sir.

17          **MAGISTRATE JUDGE ROEMER:** Okay.  I know I couldn't

18 use my cell phone to detonate a device.  How would one know

19 that or how would -- does that require any type of special

20 training or is that information available in the public arena

21 or --

22          **THE WITNESS:** It is available, Your Honor.  There

23 are anarchist cookbooks; there's other material that's been

24 put out by terrorist groups internationally stating how to do

25 such things.

1          **MAGISTRATE JUDGE ROEMER:** And do you have an idea of

2   what type of distance can you be from a bomb in order to set

3   it off remotely with a cell phone?

4          **THE WITNESS:** Not for certain, Your Honor, no.

5          **MAGISTRATE JUDGE ROEMER:** Okay.  Any ballpark guess?

6   Could it be miles away?

7          **THE WITNESS:** It could be miles, Your Honor.  If

8   it's a cell phone, it could be miles.

9          **MAGISTRATE JUDGE ROEMER:** Okay.  And did you

10  testify -- did I hear correctly that one of your concerns was

11  the possibility of a remote detonation of this bomb while

12  executing the search warrant?

13         **THE WITNESS:** Yes, Your Honor.

14         **MAGISTRATE JUDGE ROEMER:** Okay.  Any other

15  questions?

16         **MR. STACHOWSKI:** No, Your Honor.

17         **MR. CULLINANE:** No, Your Honor.  Thank you.

18         **MAGISTRATE JUDGE ROEMER:** You can step down, Agent.

19  Thank you very much.

20         (**WHEREUPON**, the witness was excused).

21         **MAGISTRATE JUDGE ROEMER:** Okay, I have a matter on

22  at 1.  So we'll take a break.  I know, Mr. Stachowski, you

23  said you needed a break.

24         **MR. STACHOWSKI:** I do.

25         **MAGISTRATE JUDGE ROEMER:** Correct?  We'll start

1   again -- Rosalie, what do you think?  1:30?  1:30.  And you

2   have -- your other witness is here?

3                **MR. CULLINANE:** He's outside.  Thank you, Judge.

4                **MAGISTRATE JUDGE ROEMER:** Okay.

5                (**WHEREUPON**, there was a pause in the proceeding.)

6                **THE CLERK:** We are back on the record in U.S.A.

7   vs. Jeffrey Richards, case No. 19-CR-106, evidentiary hearing.

8                **MAGISTRATE JUDGE ROEMER:** Do you want to call your

9   next witness?

10               **MR. CULLINANE:** Yes, thank you very much, Judge.  At

11  this time the Government calls FBI Special Agent Mark

12  Schirching.

13          <u>**GOVERNMENT'S WITNESS, MARK SCHIRCHING, SWORN**</u>

14                       <u>**DIRECT EXAMINATION**</u>

15               **THE WITNESS:** My name is Mark Schirching.  First

16  name, M-A-R-K.  Last name, S-C-H-I-R-C-H-I-N-G.

17               **MR. CULLINANE:** Thank you, Judge.

18  **BY MR. CULLINANE:**

19  Q.   Good afternoon.

20  A.   Good afternoon.

21  Q.   Where are you currently employed?

22  A.   With the FBI.

23  Q.   What is your title?

24  A.   Currently I'm a special agent.

25  Q.   Agent Schirching, how long have you been with the FBI?

1  A.   Just over 14 years.

2  Q.   And prior to beginning work as a FBI special agent, where

3  were you employed?

4  A.   With the U.S. Border Patrol and the U.S. Immigration

5  Service.

6  Q.   And where were you posted for those positions?

7  A.   I had three postings: One in Texas; one in Toronto,

8  Ontario, Canada; and one down in Arizona.

9  Q.   And as an FBI special agent, have you always been in

10 Buffalo?

11 A.   I was in Rochester for approximately five years, but

12 always assigned to the Buffalo office.

13 Q.   Okay.  And always part of the Western District of

14 New York?

15 A.   Correct.

16 Q.   All right.  Can you please describe the training you

17 completed in order to become a special agent?

18 A.   Approximately five months of the FBI Academy where we

19 learned legal training as well as tactical training.

20 Q.   What are your current job responsibilities?

21 A.   Currently I am the senior team leader of the SWAT team for

22 the Buffalo office.  I'm also the principal firearms

23 instructor for the field office.

24 Q.   How long have you been in each of those roles?

25 A.   Since October of 2019.

1  Q.   Prior to that where were you assigned?

2  A.   To the Safe Streets Task Force.

3  Q.   All right.  And what are the responsibilities of the Safe

4  Streets Task Force?

5  A.   To investigate gang crime and violent crime in the Western

6  District of New York.

7  Q.   And how long were you in that group for?

8  A.   Since 2011.

9  Q.   And through that group did you have experience and

10  training regarding narcotics, firearms and gangs?

11  A.   I did.

12  Q.   Now, you're a senior team leader for the SWAT team; is

13  that correct?

14  A.   That's correct.

15  Q.   How long have you been a member of the SWAT team now?

16  A.   Approximately 13 years.

17  Q.   Okay.  And, generally speaking, when is the SWAT team

18  used?

19  A.   In general for high-risk search warrants, high-risk arrest

20  warrants and then emergency situations.

21  Q.   And you're now the senior team leader.  What has been your

22  role on the SWAT team prior to that?

23  A.   For the past several years I was the assistant team leader

24  of the team.

25  Q.   Now, you described the SWAT team being used for high-risk

1  situations; is that correct?

2  A.    That's correct.

3  Q.    Can you talk about how the calculus is made to determine

4  that someone or a place is a high risk?

5  A.    There's a number of calculus.  One is criminal history.

6  Another is the nature and severity of the crime.  Another one

7  would be if they were believed to be armed and dangerous.

8  More recently is the concern over the possession of fentanyl

9  which could cause problems if not handled properly.  So

10 there's a variety of factors that are considered.

11 Q.    And armed and dangerous could include what types of

12 issues?

13 A.    Any -- any type of weapon that might be used against law

14 enforcement or someone else.  So it could be a firearm, it

15 could be an explosive, it could be a vehicle.

16 Q.    Now, during the course of working both in Buffalo and

17 Rochester and particularly the Safe Streets Task Force, did

18 you become familiar with outlaw motorcycle gangs?

19 A.    I did.

20 Q.    Which ones?

21 A.    I had occasion to work an investigation of the Hell's

22 Angels Motorcycle Club, and I also was on the squad when the

23 Kingsmen Motorcycle Club case was being worked.  So I was

24 involved with many of those arrests and search warrants.

25 Q.    All right.  What's your understanding of the investigation

1  regarding the Kingsmen?

2  A.    They were a violent outlaw motorcycle club.

3  Q.    Agent Schirching, have you been involved in the execution

4  and planning of search warrants?

5  A.    I have.

6  Q.    Approximately how many?

7  A.    Dozens and dozens.

8  Q.    Okay.  And when executing a search warrant does law

9  enforcement take into account any factors regarding the

10  presence of a target person at the target residence?

11  A.    Absolutely.

12  Q.    How so?

13  A.    Depending on the nature of the information, if the person

14  has access to weapons or other means of harming themselves,

15  the law enforcement officers entering the residence or others

16  in the vicinity, we would -- we would deal with that

17  accordingly.

18              In a situation where members of the public might be

19  harmed or injured due to the actions or reaction of the target

20  subject at the location, we may not want to arrest them in

21  that particular location.

22  Q.    Why is that?

23  A.    They could -- they could harm innocent members of the

24  public.

25  Q.    And, Agent, does that include a person involved in bomb

1  making?

2  A.   Absolutely.

3  Q.   Do you have some training and experience regarding bomb

4  making?

5  A.   We do.  We regularly receive information on explosives, in

6  particular if there were booby traps, things of that nature to

7  look out for.

8  Q.   Well, Agent, I'd like to direct your attention to December

9  of 2018.  At that time were you working as an FBI special

10  agent here in Buffalo?

11  A.   I was.

12  Q.   And at that time did you become familiar with a person

13  named Jeffrey Richards?

14  A.   I did.

15  Q.   And how is it you became familiar with him?

16  A.   As the assistant team leader of the SWAT team, I was asked

17  to prepare an operations plan and assist with preparing an

18  operations plan to search Mr. Richards' residence.

19  Q.   And what did you learn about Mr. Richards at that time?

20  A.   I learned that the warrant that was being applied for had

21  probable cause in it that Mr. Richards had improvised

22  explosive devices as well as firearms and narcotics.

23  Q.   Did you also learn some information about his background?

24  A.   I did.  I don't remember in particular his criminal

25  history, but I remember he had an arrest record.  I also

1   remember that he had ties to the Kingsmen Motorcycle Club as

2   well as white supremacist type groups.

3   Q.   And are those factors that become important for a SWAT

4   team leader or assistant leader to take into consideration?

5   A.   Absolutely.

6   Q.   And why is that?

7   A.   It goes to their propensity for maybe having an anxiety or

8   a desire to harm law enforcement.

9   Q.   And what do you base that on?

10  A.   History of those organizations, the nature of what they

11  stand for and their actions that they've taken not only here,

12  but nationwide.

13  Q.   So at some point in December of 2018 you were asked to

14  start assisting with preparations for the planning of a search

15  warrant; is that correct?

16  A.   That's correct.

17  Q.   And do you recall if the search warrant was executed on

18  December 14th, 2018?

19  A.   That's correct.

20  Q.   Do you know when you were first approached or talked to

21  about Jeffrey Richards?

22  A.   Some time early that day.

23  Q.   Okay.  And as a result of this request or reaching out to

24  you, what starts to happen in that process?

25  A.   We start to get information on the residence; any

1   information the case squad might have that's relevant to us

2   for preparing; we would look at what the pattern might be of

3   when they come and go, things like that.

4   Q.    Now, as you're preparing for the execution of a search

5   warrant, did you become aware that surveillance was being

6   conducted on Mr. Richards?

7   A.    I did.

8   Q.    What did you learn at that time?

9   A.    I learned that surveillance was being conducted at his

10  residence and they believed that he was at the residence.

11  Q.    And subsequently what did you learn about Mr. Richards

12  being at the residence?

13  A.    That he was there and I believe there were other people

14  present as well.  Also, that the residence was in a -- an

15  apartment like complex, so the residences were very close and

16  even attached in the same buildings.

17  Q.    Now, Agent, at some point did you become aware that

18  Mr. Richards had departed the residence?

19  A.    We did.  We -- we had planned to wait until he left the

20  residence due to our belief that it was more dangerous to

21  approach the residence with him inside.

22              So we had kind of backed off the residence and

23  waited for surveillance to call out that he had departed.

24  Q.    Where are you generally at this time when you said you're

25  sort of waiting for him to leave the residence and depart that

1   area?

2   A.   We were several miles away just waiting for the

3   surveillance to follow him and see which direction he might be

4   heading, and then ultimately we staged ourselves at a location

5   where a vehicle stop was going to be executed.

6   Q.   All right.  So safe to say there's sort of a team

7   conducting surveillance and you and some other people are

8   waiting elsewhere for the word?

9   A.   That's correct.

10  Q.   Whatever that might be?

11  A.   That's correct.

12  Q.   And how are you in communication with the team doing the

13  surveillance?

14  A.   Radio communication.

15  Q.   Okay.  And is that sort of protocol?

16  A.   Yes.

17  Q.   All right.  And, in fact, you are now a senior team member

18  and you've helped teach these things; is that correct?

19  A.   That's correct.

20  Q.   And even during that time were you also helping to teach

21  other members?

22  A.   I was.

23  Q.   All right.  So these are protocols that you're familiar

24  with and, in fact, you helped establish and teach for fellow

25  law enforcement officers?

1  A.    That's correct.

2  Q.    All right.  Now, at some point you receive -- did you

3  receive notice that Mr. Richards had left the residence?

4  A.    We did.

5  Q.    And what happened then?

6  A.    We made plans to effect taking Mr. Richards into custody

7  upon a vehicle stop that was going to be conducted at a

8  predetermined location.

9  Q.    All right.  And what happened then?

10  A.    The vehicle was stopped, we were successful in getting

11  Mr. Richards out of the vehicle and into custody, and we then

12  proceeded to clear the vehicle to make sure there were no more

13  occupants inside.

14  Q.    And to be clear, were you part of the group of -- were you

15  part of a car -- in a car that followed him to -- followed the

16  car that Mr. Richards was in to the stop location?

17  A.    I was at the stop location.  I don't know if we followed,

18  but I was shortly behind.

19  Q.    Okay.  Now, at that time was a firearm recovered from the

20  vehicle?

21  A.    There was.

22  Q.    All right.  How did that happen?

23  A.    I ended up in a position where after Mr. Richards and

24  another occupant were both taken into custody and secured, I

25  then cleared the vehicle, meaning I used the technique that I

1  panned across the door which was left open to get a look

2  inside and then hopefully get the best look you can from a

3  distance to make sure no one else is in the vehicle.

4           Vehicles pose a special problem where there's many

5  hiding spaces; people can hide in very small spaces

6  surprisingly in vehicles.  And as I was panning across to the

7  front of the vehicle I was able to see the handle to a pistol

8  underneath the driver's seat.

9  Q.   Let me ask you a couple questions about that, Agent.

10 Prior to the car being stopped -- the car with Mr. Richards

11 being stopped, had you received any notice or had received any

12 information from other law enforcement officers that

13 Mr. Richards may be in possession of a firearm?

14 A.   Yes, the case squad had put out to the SWAT team members

15 that they had received information that he had a firearm

16 inside the vehicle.

17 Q.   All right.  And was this information -- well, is it your

18 understanding this was information that had come from

19 different sources?

20 A.   Yes, I know the case squad got it from a source of

21 information.  I'm not sure who.

22 Q.   Okay.  You only -- let me ask you this then, Agent : Were

23 you part of the investigation of Mr. Richards?

24 A.   I was not.

25 Q.   All right.  So you received information from whom?

1   A.   The case squad.  I'm not sure exactly which agent, but it

2   was from the case that the -- the squad that was working the

3   investigation.

4   Q.   Okay.  So this is from your fellow officers?

5   A.   Correct.

6   Q.   Regarding Mr. Richards?

7   A.   Correct.

8   Q.   Not from any sources that you were working with?

9   A.   No.

10   Q.   Okay.  All right.  Now, you stated that you found the

11   firearm while clearing the car because people can hide in

12   spaces in cars?

13   A.   Correct.

14   Q.   Do you have some experience with this personally?

15   A.   I do.

16   Q.   Well, I say "personally," but professionally.  What is

17   your experience with this professionally?

18   A.   Numerous SWAT operations as well as my time in the

19   U.S. Border Patrol where vehicles were routinely used to

20   smuggle people.  I've found people hiding in the smallest

21   spaces:  In the back seats of cars, underneath panels of cars

22   that looked like they're supposed to be there, but it turns

23   out they were added.

24          So we take cars very seriously because of their

25   inherent dangerousness because they can be moved.

1  Q.   And you say you found persons in different spots of cars.

2  Were these persons of average height and size?

3  A.   They were.

4  Q.   Some people who were smaller size?

5  A.   Of course.

6  Q.   And some people who were larger size?

7  A.   Some larger people as well, yes.

8  Q.   And you're a fairly tall guy.  How tall are you?

9  A.   About six four.

10 Q.   Have you found people who are not so much shorter than you

11 in small spots in cars?

12 A.   We have.

13 Q.   Okay.  So on this date you recovered a firearm; is that

14 correct?

15 A.   That's correct.

16 Q.   And did you receive some contact from me regarding this

17 case?

18 A.   I did.

19 Q.   And what did you learn about this case?

20 A.   I learned that the -- the -- one of the officers on the

21 scene, either in the patrol car or on his person, had a

22 recording device as part of the standard procedures from -- I

23 believe it was the Niagara County Sheriff's Office, and it

24 recorded the clearing of the car and some audio from me.

25 Q.   All right.  When did you learn this?

1    A.    Last week Thursday.

2    Q.    Okay.  So prior to that date you were not aware that you

3    had been recorded?

4    A.    I had no awareness of it.

5    Q.    Okay.  All right.  Did you have the opportunity to watch

6    that video?

7    A.    I did.

8    Q.    All right.  When did you watch that?

9    A.    On Friday with you.

10   Q.    Okay.  And did you watch the entire video?

11   A.    No, not the entire video.

12   Q.    All right.  Did you watch the portion of it -- well, which

13   portion of the video did you watch?

14   A.    The portion where Mr. Richards is called out of the

15   vehicle, taken into custody, and then us clearing the vehicle

16   making sure there's no additional occupants and me recovering

17   the firearm.

18   Q.    Okay.

19              **MR. CULLINANE:** Your Honor, at this time I'm going

20   to place on the screen Grand Jury Exhibit No. 2, which is in

21   evidence.  And since the Court is familiar with this video,

22   I'm going to start it at approximately the six minute and 12

23   second mark.

24              **THE CLERK:**  Can't do both.

25              **MR. CULLINANE:** Okay, if I can just have the video

1   up?

2          **THE CLERK:** You want the video?

3          **MR. CULLINANE:** Yeah, that would be fine.  Thank

4   you, Rosalie.

5          **THE CLERK:** Mm-hmm.

6   **BY MR. CULLINANE:**

7   Q.   All right, Agent Schirching, can you see the video on your

8   screen?

9   A.   I can.

10  Q.   I'm going to hit play at this point.

11         (**WHEREUPON**, the video was played).

12  **BY MR. CULLINANE:**

13  Q.   Actually, you know what?  I'm gonna back it up just

14  shortly to approximately the six minute mark.  Start it at

15  5:59.

16         (**WHEREUPON**, the video was played).

17  **BY MR. CULLINANE:**

18  Q.   Agent Schirching, I stopped it at the six minute and 10

19  second mark.  Can you tell us what just occurred there?

20  A.   I believe that was the passenger of the vehicle that was

21  secured.

22  Q.   Okay.  And at this point has Mr. Richards already been

23  removed from the vehicle?

24  A.   Yes.

25  Q.   And where are you in relation to the camera and the car

1  that was stopped?

2  A.   I am to the left of the vehicle that's farthest left in

3  this picture.

4  Q.   Okay.  Let me continue playing from the six minute and 10

5  second mark.

6              (**WHEREUPON**, the video was played).

7  **BY MR. CULLINANE:**

8  Q.   Now, I've stopped it at the six minute and 53 second mark.

9  Are you able to observe this?

10  A.   I am.

11  Q.   What are we seeing here?

12  A.   That is me and two other agents clearing the vehicle.  I

13  am the agent that's farthest forward.  I believe my flashlight

14  might be on in that particular image right there.

15  Q.   You're on the other side from this image of the driver's

16  side door?

17  A.   Correct.

18  Q.   All right.  At this point have you helped out at all or

19  assisted at all with the arrest or taking into custody of

20  either Mr. Richards or the passenger?

21  A.   Not -- not physically, no.

22  Q.   What were you doing before that?

23  A.   Covering --

24  Q.   I should say, excuse me, while that was going on?

25  A.   Directing a little bit of traffic.  As an assistant team

1  leader I'm responsible for coordinating, making sure

2  everyone's in the right spot as well as providing some

3  coverage if anything were to go, you know, sideways with the

4  arrest.

5  Q.   Okay.  Let me continue from the six minute 53 second mark.

6          (**WHEREUPON**, the video was played).

7  **BY MR. CULLINANE:**

8  Q.   Now, I've stopped it at the seven minute and 16 second

9  mark.  Can you please describe what we've just observed?

10  A.   The other two agents cleared the back seat ensuring there

11  was no one hiding in the back seat, and I remained up front.

12  My recollection is I knew that firearm was there, I saw it,

13  and I didn't want to take my eyes off it until we were sure

14  there was no one else in that vehicle.

15  Q.   To be clear, you say you knew the firearm was there.  Did

16  you first observe the firearm?

17  A.   Yes, as I cleared across that open door I was able to see

18  that handle of the firearm.

19  Q.   Okay.  All right.  And what is the purpose of clearing --

20  of what the other officers are doing at this time?

21  A.   To make sure there's no one in the vehicle we didn't know

22  about.

23  Q.   Now, at that time did you have any information about how

24  many people were in the vehicle?

25  A.   I believe we received information there was Mr. Richards

1   and another person, but I don't recall specifically.

2   Q.   Even if you received that information, do you still -- do

3   you still act as if there could be others in the vehicle?

4   A.   Absolutely.  It's our standard operating procedure

5   whenever clearing a vehicle we make sure there's no one else

6   left in it.  We don't -- we don't want a surprise of someone

7   laying in wait for us.

8   Q.   Let me continue from the seven minute and 16 second mark.

9            (**WHEREUPON**, the video was played).

10  **BY MR. CULLINANE:**

11  Q.   All right, I stopped it at the seven minute and 46 second

12  mark.  What are we observing now?

13  A.   The remaining two agents cleared the rear hatch of the

14  vehicle, again, because someone could be hiding back there; I

15  relocated my position as I did that as to not be in front if a

16  fire fight were to break out and then I believe I went back

17  because I still knew that firearm was there and didn't want to

18  lose eye contact with it or at least have someone with eye

19  contact on it.

20  Q.   Now, at this point has the car been deemed preliminarily

21  cleared of any persons?

22  A.   Preliminarily, yes.  You know, it's not uncommon for us

23  just to double check to make sure there's nothing that we

24  missed.

25  Q.   Let me continue from the seven minute and 46 second mark.

1          (**WHEREUPON**, the video was played).

2    **BY MR. CULLINANE:**

3    Q.   I stopped it at the seven minute 55 second mark.  Can you

4    please describe what we just observed there?

5    A.   One of the other agents went up, just double checking,

6    making sure that compartment, you know, couldn't contain any

7    people.  You never know, vehicles can be modified.

8              We're not familiar with every single vehicle.  A

9    vehicle could have a deeper compartment than you think it

10   could.  So I would -- I would guess that that agent was just

11   looking.

12   Q.   Could cars also be modified?

13   A.   Absolutely.

14   Q.   Are you familiar with that?

15   A.   Oh, absolutely.

16   Q.   How about rental cars?

17   A.   Any type of car can be modified.

18   Q.   At this point have you provided notice to other law

19   enforcement officers that you recovered a firearm?

20   A.   My recollection is as soon as I saw it I put it out over

21   the radio so that everyone knew that there was a firearm on

22   the floor in the front.

23   Q.   And to be clear, you said you put it over the radio, how

24   does that occur?

25   A.   We -- all the SWAT operators have communications on them,

1  radio attached, and it goes to a headset and push-to-talk and

2  I pushed the button on my vest and relayed it to the entire

3  team.

4  Q.   And you're doing that almost contemporaneously as you're

5  seeing the firearm; is that the case?

6  A.   Probably pretty close.  I probably waited until my clear

7  was done, but once it was done and I was satisfied I didn't

8  have any -- anyone to deal with, then I put it out.

9  Q.   All right.  Let me continue from the seven minute 55

10  second mark.

11              (**WHEREUPON**, the video was played).

12  **BY MR. CULLINANE:**

13  Q.   I'm stopping at the eight minute and 35 second mark.  Can

14  you please describe what we just saw?

15  A.   My recollection is I had called for someone from the

16  search team to come up and take a photo of it before I moved

17  it.  I am a firearms instructor, so before a firearm is turned

18  over to anyone to put into evidence, it's cleared by a

19  firearms instructor to make sure that it's safe.

20              But I did not want to touch it or move it until a

21  photograph was taken.  So a person came up, I'm not sure who

22  it was, and they took a photograph.

23  Q.   Okay.  By -- up to this point have you entered the car at

24  all?

25  A.   No.

1  Q.   Okay.  So it's strictly your observation of the gun from

2  outside the car?

3  A.   Correct.

4  Q.   You've remained outside the car this time?

5  A.   Correct.

6  Q.   Let me continue from the eight minute and 35 second mark.

7          (**WHEREUPON**, the video was played).

8  **BY MR. CULLINANE:**

9  Q.   Okay, I've stopped it at the ten minute and 22 second

10  mark.  Can you please describe what we just watched?

11  A.   After the photos of the firearm were taken, I went into

12  the vehicle, I retrieved the firearm, I made sure it was safe

13  and empty.  My recollection is it didn't have a locking

14  mechanism on it for the slide to lock back, which is a way for

15  everyone to visually see that it's empty, so I remember either

16  asking for something like a pen cap or something to put into

17  the chamber so that whoever took custody of it would know that

18  it had been cleared.

19          And then I walked back with the weapon and the

20  magazine that had ammunition in it that I recovered.

21  Q.   Was the weapon in one hand?

22  A.   Yes.

23  Q.   Was the magazine in your other hand?

24  A.   That's correct.

25  Q.   Is that protocol?

1  A.   Not necessarily, but it's just the way I carried it.

2  Q.   Okay.  And, Agent, were you -- you were certified or

3  qualified to complete that task on scene?

4  A.   That's correct.

5  Q.   And how is it you became qualified for that purpose?

6  A.   Being a firearms instructor in the FBI.

7  Q.   Let me continue playing from the ten minute 22 second

8  mark.

9           (**WHEREUPON**, the video was played).

10 **BY MR. CULLINANE:**

11 Q.   I've stopped it at the 11 minute and 22 second mark.

12 Agent Schirching, can you please describe what we've observed

13 here since we last stopped the video?

14 A.   I went off camera -- you can't see me anymore, I'm not

15 sure where I was standing, but you can hear me, and I hear

16 myself explaining to the person I turned the firearm over to

17 that I put something inside the chamber because it wouldn't

18 lock to the rear, and I explained to them for their report

19 purposes to note that I saw it in plain view, that I did not

20 search the vehicle.

21           I -- at no time did I search the vehicle.  I simply

22 saw it in plain view, and obviously at that point we had to

23 recover that weapon for safety reasons.

24 Q.   And you state that you saw it in plain view?

25 A.   Correct.

1   Q.   While doing what?

2   A.   While clearing the vehicle.

3   Q.   All right.  Agent, did you return to the car again?

4   A.   I did not.

5   Q.   All right.  And why is that?

6   A.   I had no further business with that vehicle.  We ended up

7   going to Mr. Richards' residence and completing the search

8   there.

9   Q.   All right.  So your task or your responsibilities here

10  were completed at the time you cleared the car?

11  A.   Correct.

12  Q.   All right.  What happened to the firearm and the magazine?

13  A.   They were placed into evidence after I turned them over to

14  the search team.

15  Q.   Was that at the scene?

16  A.   Yes.

17  Q.   All right.  So you had possession of the firearm and

18  magazine for how long?

19  A.   A matter of maybe a minute or two.

20  Q.   Okay.  Very quick time?  Very brief?

21  A.   Correct.

22           **MR. CULLINANE:** Rosalie, if I can use the ELMO now?

23           **THE CLERK:** Mm-hmm.

24           **MR. CULLINANE:** Thank you.

25  **BY MR. CULLINANE:**

1    Q.   Agent Schirching, I'm placing on the ELMO what's in

2    evidence as Government's Exhibit 3.   I'll zoom in.   Agent, are

3    you familiar with this document?

4    A.   I am.

5    Q.   And what is this?

6    A.   That's the photo that was taken in my presence of the

7    firearm as it lay underneath the seat of the vehicle.

8    Q.   All right.   And you have reviewed this document, this

9    picture before today?

10   A.   I have.

11   Q.   Okay.   And what does it show?

12   A.   It shows the floor of the vehicle that Mr. Richards was

13   in, and the firearm underneath or partially underneath the

14   seat.

15   Q.   Okay.   And you say "partially."   Part of it is underneath

16   the seat?

17   A.   Correct.

18   Q.   And part of it is where?

19   A.   In plain view.

20   Q.   And is this how you saw it on that date?

21   A.   It is.

22   Q.   Agent, one second please.   Agent Schirching, no further

23   questions right now.   Thank you.

24            **MAGISTRATE JUDGE ROEMER:** Mr. Stachowski?

25            **MR. STACHOWSKI:** Yes.

1                             **CROSS-EXAMINATION**

2   **BY MR. STACHOWSKI:**

3   Q.   Now, you were the team leader?

4   A.   That day I was the assistant team leader.

5   Q.   Okay.  And -- but you were giving instructions to guys and

6   seeing that they were in the right positions?

7   A.   Of course.

8   Q.   Okay.  Now, who opened the front door?

9   A.   I don't recall.

10   Q.   Where were you when the front door was opened?

11   A.   I believe I was in the same spot.  Likely the front door

12   would have been opened by Mr. Richards as he exited the

13   vehicle and it remained open.

14   Q.   Okay.  Now, in -- describe the front compartment.

15   A.   I'm sorry, I'm not sure exactly what you're asking.

16   Q.   What do you see when you look in that vehicle?

17   A.   A vehicle compartment, I have no specific recollection of

18   that vehicle's layout.

19   Q.   Do you know if it had a center console?

20   A.   I can't remember.

21   Q.   You know what kind of vehicle it was?

22   A.   I believe it was a Dodge Durango.

23   Q.   Okay.  Now, do you know if it was a Jeep?

24   A.   I don't.  I'm only basing that off of watching the video.

25   I don't have a recollection of the exact vehicle.

1   Q.    Okay.  Now, were the compartments separate -- strike that.

2               Where was the shifting device?

3   A.    I really have no specific recollection.

4   Q.    Was it on the floor?  In the console?

5   A.    As I sit here right now, I couldn't tell you without

6   reviewing photos.

7   Q.    Other than this photograph here of the interior, did you

8   take any photographs of the interior of the console?

9   A.    I didn't personally take any photos.

10   Q.    Did anybody?

11   A.    I have no idea.  No way of knowing that.

12   Q.    Now, this seat, you can see part of the seat and a flash.

13   Was that the flash that was directed down at the gun?  It

14   seems to be a flash you see in the upper -- (inaudible) upper

15   left-hand side?

16   A.    I couldn't tell you.  We all have flashlights on our

17   rifles.  It may have been a flashlight illuminating the area.

18   I couldn't tell you for certain.

19   Q.    Okay.  So you say that you were clearing the interior.

20   Well, there were two people sitting in the interior and they

21   left.  What were you clearing?

22   A.    For additional people.

23   Q.    Under the seats?

24   A.    I was clearing the vehicle.  I could see in plain view

25   under the seat.  I didn't need to --

1  Q.   Well, when you approached the vehicle you were on the

2  other side of the door and you came around the door?

3  A.   Correct.

4  Q.   Okay.  Because you couldn't see underneath the seat from

5  where you were first situated, could you?

6  A.   I could see under the seat for quite a ways is my

7  recollection.  We go all the way around the door to then see

8  into the passenger compartment --

9  Q.   Okay.

10  A.   -- on the passenger side.

11  Q.   So you -- you didn't see the steering wheel in the way?

12  A.   I'm not sure what you're asking me.  My -- my recollection

13  is I could see the handle of that gun in plain view without

14  looking for it as I cleared that compartment.

15  Q.   Okay.  So what side of the seat was it?

16  A.   I believe it was fairly close to the middle.  I'm not sure

17  exactly.

18  Q.   Now, was there any -- when you look at this photograph,

19  you see the edge of a carpet with some dirt on it about the

20  bottom left-hand corner.  What part of the rug was that?

21  A.   I really -- I have no recollection of what part of the rug

22  it was.  I just know that the handle of that firearm was

23  sticking out from underneath the seat.

24  Q.   Was -- what can you tell me on the right-hand side is this

25  object with the silvery -- with the hole in it?  What is that?

1  A.   On the right-hand side?

2  Q.   On the bottom right-hand side.  The far corner on the

3  right.

4  A.   Bottom right I see the Government Exhibit 3 sticker.  I'm

5  not sure --

6  Q.   Okay.  Do I have the same picture?  Oh, it's turned the

7  other way, okay.  I see, I see, I see, I see, I see.  I had

8  the picture the other way.

9          Do you know what that -- you see the handle of the

10  gun?

11  A.   Correct.

12  Q.   Do you know what that silver thing on the left -- it's on

13  the left side of this picture, what that is?

14  A.   I don't know for sure, no.

15  Q.   Now, do you know if Mr. Richards was left-handed or

16  right-handed?

17  A.   I have no way of knowing that.

18  Q.   Now, this gun is in the far left-hand side of the seat or

19  the middle?

20  A.   I have no way of telling you exactly if it was to the

21  left, to the right.  It looks to me to be about in the middle

22  the way the floor is contoured, but it's hard to say for

23  certain.

24  Q.   When you look at this little silver thing, is that the

25  slide that the seat slides on?

1  A.   It may be.  I'm not certain.

2  Q.   Now, if Mr. Richards was sitting in the driver's seat and

3  he's right-handed, would -- where would he -- would the gun

4  usually be located?

5  A.   There's no way to say that for certain.  People can switch

6  hands very easily.

7  Q.   Okay.  Do you know if Mr. Richards was ambidextrous?

8  A.   I don't, but I train firearms and people can utilize both

9  hands interchangeably.

10  Q.   Okay.  Okay.  Now, where were you located when you first

11  observed that?

12  A.   My recollection is as I was passing that open door and

13  clearing, I could see the handle to the gun.

14  Q.   So when you got to the front or when you first opened --

15  when you first passed it?

16  A.   I can't tell you for certain.  I know it was while I was

17  passing that door.  Which step it was at I couldn't tell you.

18  Q.   Well, did you shine your light inside of it?

19  A.   I was undoubtedly using my flashlight to search for

20  people, yes.

21  Q.   Well, did you search for people after they opened the back

22  door or before?

23  A.   We search for people the entire time until that vehicle

24  was cleared.

25  Q.   I didn't ask that question.  I asked did you search in the

1  front compartment before or after they looked at the back?

2  A.   I was the first one to clear the front compartment, that's

3  correct.

4  Q.   Did you radio anyone that you saw anything right at that

5  moment?

6  A.   As I testified earlier, at some point after I was

7  satisfied I didn't have anything dangerous to deal with, I let

8  the team know that there was a firearm underneath that seat.

9  Q.   Now, in -- in the City of Buffalo when they do radio

10  communication, they have a log that they call the CAD, which

11  outlines every single radio communication that was made.  Is

12  there such a thing in the FBI?

13  A.   There is not that I know of.  And in particular it would

14  be impossible for the SWAT team to operate that way.

15  Q.   So there's no log of anybody making any communications

16  other than what we hear on this video?

17  A.   The system you're referring to requires a repeater and we

18  work in environments where a repeater just isn't possible.

19  Q.   Now, you say when you were walking by, as I said, did you

20  shine the light on the gun first?

21  A.   My recollection is I was looking for people in the vehicle

22  and I saw that gun in plain view.  I was not specifically

23  looking for a gun.

24  Q.   That's not what I asked.  I said did -- did you have to be

25  aided by light to see it?

1  A.   I have no specific recollection if I had to be aided by

2  light.

3  Q.   Well, it's hard to see the handle even with the light;

4  isn't it true?

5  A.   I have no way of knowing that.

6  Q.   Well, look at the photograph.

7  A.   I can see it very clear.  I don't know if there was light

8  there or not or if it was needed or not.

9  Q.   Did you see it when you stuck your head inside of the

10  vehicle?

11  A.   You mean again?

12  Q.   No.  For the first time.

13  A.   I saw it from outside the vehicle the very first time

14  without sticking my head in.

15  Q.   Now, looking at this photograph at the left-hand corner,

16  can you see the silver line that's right adjacent to the gun?

17  A.   The bottom left corner?

18  Q.   Right here --

19          **THE CLERK:** Mr. Stachowski, you have to --

20          **MR. STACHOWSKI:** I'll bring it with me, okay.

21  **BY MR. STACHOWSKI:**

22  Q.   You see the silver thing where the hole and then what

23  looks like a black rail going back to the seat?

24  A.   I see something like that, yes.  I don't know if it's a

25  rail or what it is.

1  Q.    Now, do you see the silver line that's there?  Do you know

2  if that's the track that the seat goes on?

3  A.    I have no way of knowing that by this picture.

4  Q.    Do you know how hot -- do you know how high the rail was

5  next to the seat in that specific automobile?

6  A.    No, I don't.  It appears to me that there's definitely

7  some contour to the floor, but I have no idea how high it was.

8  Q.    Well, don't seats in -- in SUVs usually sit up on a

9  plastic or -- or a metal rail with a plastic cover that --

10 that sits there next to the door?

11 A.    I can't testify as to usually.  I don't know.

12 Q.    Did -- well, can you testify whether you recollect seeing

13 such a thing in this vehicle?

14 A.    I have no specific recollection other than seeing that

15 firearm as I cleared that passenger compartment.

16 Q.    So if -- so you didn't see a railing blocking it when you

17 walked by it?

18 A.    Mr. Stachowski, I saw the firearm from outside the

19 vehicle.  So there was clearly nothing that blocked my view.

20 Q.    And you say that there's no photographs that exist from

21 the outside looking in of the compartment so you could see how

22 the seat is in that particular vehicle?

23 A.    I have no way of knowing what photographs exist or not.

24 Q.    Now, didn't you think it had evidentiary value to

25 photograph the compartment other than just the gun?

1  A.   That was not my role that day.

2  Q.   Well, somebody called out to have photographs.  What did

3  you tell them as the assistant team leader that they should

4  photograph?

5  A.   I called out before I moved the firearm to bring someone

6  up to photograph the firearm.  That was it.  I was not part of

7  the investigative team conducting this investigation.  I was

8  there to secure Mr. Richards and -- safely and go back to the

9  residence to conduct the search warrant at that residence.

10 Q.   So there's no photograph that would depict what could be

11 seen from your first vantage point that you testified about?

12 A.   I can't answer that question.  I have no knowledge.

13 Q.   And you didn't ask for that to be taken?

14 A.   The only thing I asked for was someone to take a picture

15 of it so I could clear the firearm.  Leaving it there

16 uncleared would be dangerous.

17 Q.   And was there a time when you stuck your head in and

18 looked down at it?

19 A.   When I went to retrieve it.

20 Q.   Okay.  Prior to your retrieving it did you stick your head

21 in there?

22 A.   My recollection is I never went in that vehicle until I

23 went in to retrieve the firearm.

24 Q.   Now, when you went to retrieve the firearm, was the

25 firearm loaded?

1  A.    It was.

2  Q.    The magazine was in the gun?

3  A.    That's correct.

4  Q.    And what did you do to clear it?

5  A.    I pulled the slide to the rear and then discovered that it

6  did not have a locking mechanism on it, it was a lower quality

7  firearm, and I utilized an object to place into the chamber to

8  give a visual aid to whoever took it from me that it had been

9  cleared.

10  Q.    And then what did you do?

11  A.    I walked it over to the person that was taking evidence at

12  that time, I'm not sure who that was, and I explained to them

13  the procedure that I had done.

14  Q.    Now, when did you take the magazine out of the gun?

15  A.    When I locked the slide to the rear -- or before to be

16  more accurate, I removed the magazine first, then I locked --

17  well, I couldn't lock the slide to the rear, I attempted to

18  and then I put something in the chamber to prevent the slide

19  from going all the way forward.

20  Q.    How long did that take?

21  A.    Seconds.

22  Q.    And is that depicted on the video?

23  A.    I believe when you see me go into the vehicle that's what

24  I'm doing.  I'm using a safe direction to clear that firearm.

25  I didn't know the state that it was in or if it was in any

1  type of unsafe state.  So I would have without moving it too

2  much done it inside the vehicle.

3  Q.   Now, do you know if there was any request for DNA on that

4  firearm?

5  A.   I have no way of knowing that.

6  Q.   Do you know whose vehicle that was?

7  A.   I do not.

8  Q.   Do you know if the person who owned the vehicle had the

9  firearm underneath?

10  A.   I have no way of knowing any of that.

11  Q.   Do you know if -- if the person who was in the passenger

12  seat of the vehicle was arrested for possession of a firearm?

13  A.   I do not know.

14  Q.   Could you tell me what procedure you used, what exactly

15  did you do to remove the magazine from the pistol?

16  A.   I would have looked for the magazine release.  Every

17  semi-automatic pistol has some type of a magazine release.  I

18  would have pressed it and removed the magazine.

19  Q.   Where was the magazine release on this gun?

20  A.   I can't remember.

21  Q.   Do you know what kind of gun it was?

22  A.   Off the top of my head, I don't.  I would have to review

23  the evidence.

24  Q.   Do you know where the release was located?

25  A.   Again, without reviewing the weapon, off the top of my

1  head I do not.

2  Q.   Well, isn't it a fact that the magazine was actually out

3  of the gun and next to it?

4  A.   That's not my recollection.

5  Q.   Is it the protocol and procedure of the FBI when -- when

6  there's a location of a firearm in a vehicle and not on a

7  person to request DNA on the firearm?

8  A.   I don't necessarily know it's protocol.

9  Q.   How about procedure?

10  A.   That would be up to the case agent investigating the case.

11  Q.   And who is that?

12  A.   I don't know.

13  Q.   Was that Mr. Weis?

14  A.   I don't know at the time who it was.  I don't have any

15  recollection.  I know Mr. Weis was involved in the

16  investigation, but I'm not sure if he was the case agent.

17  Q.   Would the case agent be listed on the evidence recovery

18  log?

19  A.   Not necessarily.

20  Q.   Now, sir, as part of your -- your training and as a

21  firearm instructor, when you recover a firearm isn't it the

22  procedure of the FBI to request DNA to discover who may have

23  possessed that weapon?

24          **MR. CULLINANE:** Objection, relevance.

25          **MAGISTRATE JUDGE ROEMER:** I believe he already

1   answered this question, didn't he, Mr. Stachowski?

2          **MR. STACHOWSKI:** Not quite like that (inaudible).

3          **MAGISTRATE JUDGE ROEMER:** Overruled.  Go ahead.

4   Answer the question.

5          **THE WITNESS:** Again, you're asking me a specific

6   procedure.  Each case agent takes the steps they deem

7   necessary at various points of their investigation to acquire

8   evidence.

9          I don't know what happened in this case.  I don't

10  know if it was requested or not.  And there's nothing that I

11  am aware of that says it has to be done and at what time it

12  has to be done.

13  **BY MR. STACHOWSKI:**

14  Q.   Now, sir, Mr. -- Mr. Richards was taken into custody.

15  What was the purpose of his being taken into custody?

16  A.   We were concerned about the safety of us conducting the

17  search warrant back at his residence where there was probable

18  cause to believe he had explosive devices, so for our safety

19  and the public's safety he was secured until such time that

20  that residence would be cleared.

21         In addition, I'm not 100% sure, but I believe the

22  firearm being located in this vehicle may have had something

23  to do with it as well.

24  Q.   Was he placed under arrest when he was handcuffed?

25  A.   I would say so, yes.

1   Q.    But you didn't place him under arrest?

2   A.    I did not.

3   Q.    He didn't have an arrest warrant, did he?

4   A.    To my knowledge, no.

5             **MR. STACHOWSKI:** I have no further questions.

6             **MAGISTRATE JUDGE ROEMER:** Mr. Cullinane?

7             **MR. CULLINANE:** Thank you, Judge.

8                      <u>**REDIRECT EXAMINATION**</u>

9   **BY MR. CULLINANE:**

10  Q.    Agent Schirching, you were asked a number of questions

11  about photographs taken or not taken that day.  Was that your

12  responsibility?

13  A.    It was not.

14  Q.    All right.  What was your responsibility on December 14th,

15  2018?

16  A.    The safety of both Mr. Richards and all the law

17  enforcement personnel that were dealing with him, as well as

18  clearing that vehicle; and then once the firearm was located,

19  making that firearm safe and secure.

20  Q.    Were there other people who would have been assigned or

21  would have the responsibility if needed to take photographs?

22  A.    There was.

23  Q.    Who would that have been?

24  A.    It would have been agents from the case squad or -- and/or

25  the search team that was sent out to search the residence.

1   Q.   So the search team would worry about photographs?

2   A.   Correct.

3   Q.   And you would not have?

4   A.   Correct.

5   Q.   All right.  Why in that instance did you want a photograph

6   to be taken of the firearm?

7   A.   Because I had seen it in plain view and I didn't want

8   anyone to move it before a photograph was taken.

9   Q.   You were asked about clearing the interior of the car.

10  Does it matter for today's purposes all the parts of the

11  interior?

12  A.   No.

13  Q.   On that date did it matter about all the parts of the

14  interior?

15  A.   No.

16  Q.   What was the most important thing about that date in your

17  observation of the interior of the car?

18  A.   That I saw that firearm underneath the seat.

19  Q.   And that was pursuant to what?

20  A.   Clearing the vehicle for occupants.

21  Q.   Do you recall anything unusual about the interior of this

22  vehicle?

23  A.   No.

24  Q.   Did it seem standard to you?

25  A.   Pretty standard, yes.

1  Q.   You were asked about whether Mr. Richards, the defendant,

2  is left-handed or right-handed.  Did that have any implication

3  on that date when you found this firearm?

4  A.   None.

5  Q.   Does it have any implication today whether he's

6  left-handed or right-handed about you finding this firearm?

7  A.   Not at all.

8  Q.   And observing that in plain view?

9  A.   None.

10 Q.   You were asked about the photograph, Government

11 Exhibit No. 3, and any light that's shining on this.  Do you

12 use a flashlight?

13 A.   Yes.

14 Q.   And on that -- well, you just watched the video, correct?

15 A.   Correct.

16 Q.   At that time was it dark out?

17 A.   It was.

18 Q.   Was a flashlight necessary?

19 A.   Yes.

20 Q.   And did you employ a flashlight on that date?

21 A.   Absolutely.

22 Q.   For what purpose?

23 A.   To have a look into the vehicle to see if there was any

24 people in it.

25 Q.   And consequently what did you find?

1   A.    I saw a firearm.

2   Q.    When you saw the firearm, where were you?

3   A.    Somewhere in the vicinity of the open door as I was

4   clearing across it.

5   Q.    Were you in the vehicle?

6   A.    No.

7   Q.    Was any part of your body in the vehicle?

8   A.    None.

9   Q.    Now, you were asked a number of questions about DNA on the

10  firearm.  At any point in time regarding the investigation of

11  Mr. Richards, was it your job to request a DNA analysis?

12  A.    No.  I was in no way involved in the investigation of

13  Mr. Richards as far as collecting evidence and things like

14  that go.

15  Q.    Were you involved in any investigation of Mr. Richards

16  prior to December 14th, 2018?

17  A.    None.

18  Q.    Have you been involved in any investigation of

19  Mr. Richards subsequent to December 14th, 2018?

20  A.    Other than preparing for this hearing as of last Friday,

21  no.

22  Q.    And that is since December 14th, 2018?

23  A.    Correct.

24  Q.    At the conclusion of turning over the firearm to an

25  evidence tech of some kind, what did you do regarding this

1    case?

2    A.   Went to Mr. Richards' residence and cleared that residence

3    for safety reasons and provided security for the search team.

4    Q.   All right.  And after you completed that did you have any

5    involvement regarding Mr. Richards?

6    A.   None.

7    Q.   Do you need to know about the DNA request of the firearm

8    in this case?

9    A.   From my perspective?

10   Q.   Yes.

11   A.   No.

12   Q.   Does your -- do your managers or supervisors require that

13   you know about the DNA request in this case?

14   A.   Me, no.

15   Q.   Do you have other cases you are involved in as part of

16   that investigation?

17   A.   As my own investigations?

18   Q.   Yes.

19   A.   Since that time, yes, I've had numerous.

20            **MR. CULLINANE:** One second, please.  Your Honor,

21   those are all my questions for Agent Schirching.

22            **MR. STACHOWSKI:** I have no questions, Your Honor.

23            **MAGISTRATE JUDGE ROEMER:** You can step down, Agent.

24   Thank you very much.

25            (**WHEREUPON**, the witness was excused).

1              **MAGISTRATE JUDGE ROEMER:** Mr. Cullinane, do you have
2  any other witnesses?
3              **MR. CULLINANE:** No, Your Honor.  We are not calling
4  any further witnesses today.  Thank you.
5              **MAGISTRATE JUDGE ROEMER:** Mr. Stachowski, any
6  witnesses?
7              **MR. STACHOWSKI:** No, Your Honor.
8              **MAGISTRATE JUDGE ROEMER:** No witnesses?
9              **MR. STACHOWSKI:** No witnesses.
10             **MAGISTRATE JUDGE ROEMER:** Okay, now, Mr. Stachowski,
11 beginning today you mentioned the need for some other hearing.
12 What was that about?
13             **MR. STACHOWSKI:** Yeah, the other hearing is -- if
14 you look at -- oh, you don't have the photographs.  I'm sorry.
15 In the -- in the search warrant it describes looking for
16 certain things.
17             There are safes and -- many safes that were in this
18 particular residence.  These safes were opened and there's
19 nothing in the search warrant that talks about the safes, and
20 including a gun safe that was opened without a warrant for a
21 gun safe.
22             And so -- so it looks like there was -- there were
23 things that were searched and seized that were outside of the
24 scope of the warrant.  So that's what I'm looking for.
25             And -- and more critically, now I hear about some

1   people who may have been reliable informants, that were

2   reliable about bomb making?  You know, it -- it seems to me

3   that I should at least have the ability to -- to see the

4   search warrant application.

5           We have a protective order, I believe, in place.  I

6   won't share it with -- with my client, but I have to know what

7   in the world that -- that they said that talks about bomb

8   making because I -- I don't see anything that -- that connects

9   him to making bombs other than finding something that they're

10  calling a bomb in -- in this apartment.

11          And -- and what it is is some fireworks, but --

12  but, you know, I'm -- I need to find out about the bomb making

13  because there aren't bombs, plural, and it looks like it's

14  some old thing.  Even the fireworks look pretty old that are

15  in the seizure.

16          So what I need to do in order to properly defend

17  this, and -- and more importantly to properly determine

18  whether the scope of the -- that warrant about bomb making

19  materials, bombs, had probable cause is that I have to be able

20  to see that application.

21          Mr. Cullinane said come see it at the

22  U.S. Attorney's Office, but that doesn't allow me to sit down

23  and look at it, do research and determine --

24          **MAGISTRATE JUDGE ROEMER:** So it has been offered for

25  you to see?  You just didn't want to go to the U.S. Attorney's

1  Office?

2          **MR. STACHOWSKI:** No, he was gonna bring it here and

3  he didn't do it.  It's very difficult for me to -- to go to

4  the U.S. Attorney's Office.

5          **MAGISTRATE JUDGE ROEMER:** Okay.

6          **MR. CULLINANE:** Judge, if I might?  This came up

7  last time we were here before you and I sent, I believe, by

8  e-mail the application --

9          **MR. STACHOWSKI:** You did?

10         **MR. CULLINANE:** -- to Mr. Stachowski.  He's had the

11 application.

12         **MR. STACHOWSKI:** I'll --

13         **MR. CULLINANE:** It's not in my possession -- well, I

14 have possession of it.  I also provided him a copy that he has

15 at his disposal at any time.

16         **MR. STACHOWSKI:** Okay.

17         **MAGISTRATE JUDGE ROEMER:** Okay.  And a protective

18 order prevents him from disclosing it to the defendant?

19         **MR. STACHOWSKI:** Yes (inaudible).

20         **MR. CULLINANE:** And, in fact, I think I asked on the

21 record, I said, Judge, can we make sure it's for attorney's

22 eyes only and I think you said that's permissible, no problem,

23 that's the way we went about it.  He's had it.

24         **MR. STACHOWSKI:** Then maybe it's sitting there and I

25 didn't (inaudible) --

1        **MAGISTRATE JUDGE ROEMER:** Okay.  What about the
2    issue of the need for a hearing about --
3        **MR. CULLINANE:** Right.  Absolutely not.  The
4    information provided in the application for a search warrant
5    was reliable.  The Court reviewed it.  The Court had an
6    opportunity to review it.  It described the information
7    provided from multiple sources.
8        **MAGISTRATE JUDGE ROEMER:** Okay.  Well, specifically
9    with regard to safes?
10        **MR. CULLINANE:** Right.  The information there talked
11    about firearms and Mr. Richards' possession of these firearms.
12    The firearms were found in gun safes.
13        **MR. STACHOWSKI:** But, Your Honor, other materials
14    were found in other safes because there's photographs of the
15    safes open.
16        **MAGISTRATE JUDGE ROEMER:** Well, I think this is a
17    legal matter, not -- I don't see the need for an evidentiary
18    hearing on it.
19        **MR. CULLINANE:** I agree.
20        **MAGISTRATE JUDGE ROEMER:** And many times the search
21    warrant, I don't know in this case, I haven't gone back to
22    review it, it talks about the ability to look in any
23    containers in that and safes are considered containers that
24    you can look into.
25        But I haven't reviewed that issue, but I just don't

1  think there's a hearing needed on it, okay?  So we'll put a

2  briefing schedule in for the hearing on this matter and then

3  we'll -- at the end we'll schedule an oral argument date and

4  that will be for all the rest of the motions.

5          **MR. STACHOWSKI:** (Inaudible) and what I'll do then,

6  Your Honor, is I will -- if I have some issue on scope of the

7  warrant, I'll contain that in a separate --

8          **MAGISTRATE JUDGE ROEMER:** Sure, you can file

9  whatever additional briefing you want.

10         **MR. STACHOWSKI:** -- so I don't confuse it

11  in (inaudible) --

12         **MAGISTRATE JUDGE ROEMER:** Gotcha.  Okay, so usually

13  I give 30 days to get ahold of the transcript.

14         **MR. STACHOWSKI:** I could order it as soon as I get

15  back.

16         **MAGISTRATE JUDGE ROEMER:** Okay.

17         **THE CLERK:**  That will take us to February 27th.

18         **MAGISTRATE JUDGE ROEMER:** Mr. Stachowski, how long

19  do you think -- we're gonna file simultaneous briefs.

20         **MR. STACHOWSKI:** Yeah, I need -- I'm gonna be gone

21  the week after that, so I'll need at least maybe another four

22  weeks from the 27th only because --

23         **MAGISTRATE JUDGE ROEMER:** How about we give you 30

24  days from the 27th, okay?

25         **MR. STACHOWSKI:** That's fine.

1          **THE CLERK:**  March 27th.

2          **MAGISTRATE JUDGE ROEMER:** And then two weeks to

3   respond, again, simultaneous responses.

4          **THE CLERK:** April 10th.

5          **MAGISTRATE JUDGE ROEMER:** And an oral argument date.

6          **THE CLERK:** April 16th at 11 o'clock.

7          **MR. CULLINANE:** Thank you.

8          **MR. STACHOWSKI:** Thank you.

9          **MAGISTRATE JUDGE ROEMER:** Is that good with you,

10   Mr. Stachowski?

11          **MR. STACHOWSKI:** That's fine, Your Honor.

12          **MAGISTRATE JUDGE ROEMER:** Okay.  Anything else today

13   then, Mr. Cullinane?

14          **MR. CULLINANE:** No.  Thank you very much, Judge.

15          **MAGISTRATE JUDGE ROEMER:** Mr. Stachowski?

16          **MR. STACHOWSKI:** No, Your Honor.

17          **MAGISTRATE JUDGE ROEMER:** Have a great day.

18          **MR. CULLINANE:** You too, thank you.

19          (**WHEREUPON**, proceedings adjourned at 3:39 p.m.)

20                      *    *    *

21

22

23

24

25

1
**<u>CERTIFICATE OF TRANSCRIBER</u>**

2

3          In accordance with 28, U.S.C., 753(b), I certify that

4     this is a true and correct record of proceedings from the

5     official electronic sound recording of the proceedings in the

6     United States District Court for the Western District of New

7     York before the Honorable Michael J. Roemer on January 27th,

8     2020.

9

10    <u>S/ Christi A. Macri</u>

11    Christi A. Macri, FAPR-RMR-CRR
      Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25