UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-vs-

MEMORANDUM OF LAW
IN SUPPORT OF THE
DEFENDANT'S MOTION TO
SUPPRESS PHYSICAL
EVIDENCE
19-CR-106

JEFFREY RICHARDS,

                    Defendant.

## A. INTRODUCTION

### 1.    PROCEDURAL BACKGROUND

On January 27, 2020, an evidentiary hearing regarding Jeffrey Richard's Motion to Suppress Physical Evidence seized in the parking lot of Dave's Last Chance Saloon on Saunders Settlement Road in Niagara on or about December 14, 2018.   The evidence sought to be suppressed includes an AMT caliber .45 acp pistol, five rounds of .45 caliber ammunition, a magazine serial number da3660, $449 of US currency, an LG cell phone model number LGM3271 ID ZNFL63B6.   Hearing Exhibit 4.   This physical evidence relates to in connection with Count 12 of the Indictment at an evidentiary hearing it was contested that there was a need for the SWAT team to follow a vehicle controlled by Todd Biro from 4 Packard Road, between 4.9 miles and 5.8 miles to Dave's Last Chance Saloon on Saunders Settlement Road. See attached Google Map showing three methodologies of commuting to there.   The shortest

distance was 4.8 miles

## THE UNCONSTITUTIONAL STOP

There were no traffic violations and the procession of police, an armed SWAT team traveled that distance allowing the car to pull into Dave's Last Chance Saloon and park in a parking spot before exiting their vehicles with rifles drawn to seize the car and its occupants. On December 14th as it was getting dark, a person drove up to 4 Packard Court in a white SUV which was described in the hearing as a Dodge Durango, a large SUV.   The driver got out, went into 4 Packard Court at around 6pm Mr. Richards leaves and enters the driver's seat. Transcript pages 32-33.   Special Agent Thomas Weis, the agent who made the application for the search warrant was in the car directly behind him.   As they were driving the 4.9 to 5.8 miles to Dave's Last Chance Saloon, a Niagara County Sheriff's vehicle pulled up behind him.   The sheriff saw two people in the vehicle.   The car came to a stop within the parking lot of Dave's Last Chance.   Transcript page 35.   At that point, SWAT team conducted a traffic stop and a video of the stop was placed into evidence as Government Exhibit 2.   It appears from the videos entered into evidence, which show 45 seconds of video trailing the Durango, they skipped at least 10-11 minutes of driving.   As can be seen from the Google Maps, it takes 11 minutes to travel the 4.9 and 12 minutes to travel the 5.8 miles.   The video depicts, many SWAT officers deploy with long rifles.   Interestingly, they said "we believe he had a gun on him, a .45 caliber."   They got information from a CS.

## BIRO BRINGS CAR TO 4 PACKARD COURT

This car was driven to the scene by Todd Biro.   Todd Biro then got into the passenger

seat rather than the driver's seat.   There is no indication of any police officers that Mr. Richards

reached into his belt or any other place, bent down and placed a gun under the seat.

## THE ILLEGAL ARREST

The government claims they wanted to secure Mr. Richards because they believed he

had a .45 caliber gun on him.   The SWAT officer also took Mr. Richards cell phone.   They had

Mr. Richards kneel on the ground so he couldn't have access to anything.   At the 55 second

mark, a second individual exited the vehicle.   The driver of the vehicle to Mr. Richards

residence Todd Biro.   Agent Weis clearly says he did not see Richards enter the vehicle from

the house.   Transcript page 41, lines 8-10.   At 2 minutes and 43 seconds, Jeffrey Richards got

on his knees and was placed in handcuffs.

By Mr. Cullinane:

QUESTION:  I stopped it at the 2 minutes 43 second mark.   What did we just
watch?
ANSWER: We just watched Mr. Richards go down to his knees to be put in
handcuffs by a SWAT operator.
QUESTION: For what purpose was he placed in handcuffs at that time?
ANSWER: To - - Because he was under arrest at that point and to ensure that he
didn't reach for anything that could have been in his waistband.

Curiously, his testimony to that point was that no one had entered the apartment or found any

contraband yet and that there were no traffic violations.   Only they followed a car into Dave's

Last Chance, had Jeffrey Richards exit the car, had him on his knees and placed him under

arrest.

To that point, page 43 of the Transcript, they do not indicate any criminal activity afoot

or any probable cause to arrest.   They searched Mr. Richards and seized his cell phone, they

claimed it was for safety.   However, there is nothing in any application for a search warrant nor any evidence that Mr. Richards could create an electronic bomb.   The only bomb described was a primitive device wrapped in muffler tape and a green fuse from it much like a firecracker. At 3 minutes and 26 seconds, Mr. Richards has been taken into custody.   They then claim to make a search for other people in the car, including, in small spaces in the trunk yet they knew that one person drove to 4 Packard Court and two entered the vehicle upon leaving.   They performed a wholesale search of the vehicle.   At 7 minutes and 22 seconds, they claimed to have looked in to see whether anyone was in the hatch.   Transcript page 49.   At 8 minutes and 12 seconds, the SWAT members tell Agent Weis that there is a firearm under the driver's seat. Transcript page 51.   At 9 minutes and 15 seconds, Agent Weis took a photo of the firearm.   See exhibit 3.   Transcript page 53-55.

In looking at the photograph, a copy of which is annexed hereto as an exhibit, one can see that even with the flash being activated and the reflection of the flash being shown on the screen, it is so dark that a gun could hardly be seen.   One must remember in looking at this photo, the "plain view" gun was under the seat blocked by the platform that the seat rests on and the rim of a car that is at least 4 inches in any SUV above the base of the car where the carpet is located.

When Judge Roemer was questioning

JUDGE: That is, to the right that is the front of the seat?
WITNESS: Yes Judge, I'll point to it.   This is the front of the seat right here.
JUDGE: Okay, then to the left is the actual floor of the vehicle?
WITNESS: This is the floor of the vehicle your Honor.
JUDGE: And right at the top there seems to be some kind of object right there. What is that?

WITNESS: That's just part of the actual flooring.   Your Honor, I believe it's just standard in most vehicles.
JUDGE: Okay.

Transcript page 57-58

After the stop the vehicle was given back to the passenger.   The vehicle was a rental, rented in the name of the passenger's wife. Transcript page 70-71.   He was not arrested.

This is in spite of the fact that New York State Law §265.03, possession of a loaded handgun is felony in New York State and under §265.15, possession imputes to everyone in the automobile.

## NO ARREST WARRANT

Upon cross-examination, Agent Weis conceded that there was no arrest warrant. Transcript page 77.   The Niagara County Sheriff was behind the Durango for approximately one mile.   He did not weave over lanes.   He used proper signals.   He pulled into the parking lot of the saloon and into a parking spot.   Transcript page 78.

The officer was asked whether he had an arrest warrant which he replied he did not and yet they said there was an arrest.   Transcript page 79.

When Agent Weis was asked:

QUESTION: Okay, and in fact there was not a warrant?
ANSWER: No, we made a probable cause arrest.
QUESTION: And when you say "made a probable cause arrest" he wasn't violating the vehicle and traffic laws?
ANSWER: No, he was not.
QUESTION: And in your own view you could not determine that he was violating any laws of New York State or the United States of America at that time?
QUESTION (witness): During the stop?
ANSWER (examiner): Yes.
QUESTION (witness): Are you referencing?

ANSWER (examiner): Yes.
ANSWER: No.
QUESTION: And yet you placed him under arrest and ordered him out of the car?
ANSWER: Yes.

Transcript page 79.

It is clear that this individual stated that he made a probable cause arrest and yet there were not violations at the time of the stop of any New York State law or Laws of the United States of America.

Curiously, the officer said he did not know the name of the person with Richards, and yet when I asked him this question by Mr. Stachowski:

QUESTION: And Mr. Todd Biro's wife rented the vehicle?
ANSWER: I believe so, yes.
QUESTION: And that was discovered with conversations with Mr. Biro?
ANSWER: I was not speaking with him, so I am not sure if that did come up.
QUESTION: Nevertheless, during the course of this, the vehicle possession was turned over to Mr. Biro?
ANSWER: After this, yes.

I then asked Mr. Weis:

QUESTION: Now did you pat down Mr. Richards?
ANSWER: He was pat down, yes.   I did not but law enforcement officers did.
QUESTION: And there were no weapons found on his person?
ANSWER: Not on his person, no.
QUESTION: By the way what crime was Mr. Richards committing when he walked out of the car?
QUESTION (witness): When he walked out of the car?
ANSWER (examiner): Yes.
ANSWER: None.
QUESTION: And at that point in time there was no criminal complaint that was issued was there?
ANSWER: Not for his arrest, no.
They opened all the doors and all the panels including an officer standing, looking underneath the seat. The unbelievable testimony by Officer Weis was on Transcript page 83.
QUESTION: And so, the door behind the driver's door that was the one that was

open?
ANSWER: Yes, it was.
QUESTION: And they looked inside and there was nobody in there?
ANSWER: That is correct.
QUESTION: Now when they open the door, isn't that a search?
ANSWER: No, he was not searching the vehicle.

## ILLEGAL SEARCH

If he wasn't searching the vehicle what was the person doing looking inside of it, bending down, looking underneath the seat?   Transcript page 84.

I asked him about the fellow on his knees and reaching into the car and reaching underneath the driver's seat, if that was a search.   While my question was objected to, it was said it calls for legal conclusion.   Transcript page 85.   I would point your Honor's direction to the video showing the officer bending down, looking and reaching underneath the seat like he's pushing something.   The video was shown, and he said he does not know who the person was.   This was at the 4.46 mark which was early in the process of this search.

I asked:

QUESTION: Now sir, this guy in the red he's reaching his hand into the back of
the vehicle.   Why is he doing that?
ANSWER: I can't testify what his thoughts are, but I believe he was checking to
see because he noticed that compartment there.
At page 90 of the Transcript, all the doors are open and the guy in the red is on his
knees looking in the compartment.
QUESTION: Now, what is he doing on his knees looking in the compartment?
ANSWER: I don't know what exactly where he was looking at sir.   It's unclear
and based on the video he could have been looking inside to see if there was
anything underneath the seat, I'm sure.
QUESTION: And at this point you still didn't photograph the gun?
ANSWER: By this point I have in the video, yes.
Officer Weis was told that there were two individuals entering the vehicle.

On page 92 of the Transcript, he was asked:

> QUESTION: You got dispatched that two individuals entered the vehicle?
> ANSWER: That is correct.
> QUESTION: Did the individuals say that they saw Mr. Richards with a gun.
> ANSWER: No, they did not.
> QUESTION: And now you say Mr. Richards entered the driver's seat?
> ANSWER: That's correct.
> QUESTION: Did anybody make any observations of him reaching under the seat?
> ANSWER: Nobody reported anything.
> QUESTION: And at some point, you started tailing him and the rest is was on video?   How many miles is it from Packard Road to the Last Chance Bar?
> ANSWER: I am not sure.

He was asked if Niagara County issued an appearance ticket or placed Mr. Biro under arrest for possession of a weapon in violation of §265.03 of the New York Penal Code.   The Special Agent claimed that on the onset that he was afraid there might be a bomb in the car, but candidly said that no one told him that he was carrying any objects to the car.

On re-direct Agent Weis was asked what the probable cause for the arrest was and he said probable cause was based on narcotics inside of the apartment that he had a firearm on him at the same time and that there was also bomb making materials and other guns at the residence.

The problem with that is that the search warrant was not executed until after he was under arrest.   There was at that point in time, no evidence and no probable cause.   Transcript page 97.

## AGENT MARK SCHIRCHING'S UNLIKELY PLAIN VIEW SIGHTING

The government called as a second witness FBI Agent, Mark Schirching.   Since 2011, he has been in gang crime and the safe streets task force investigating gang and violent crime in

the Western District of New York.   Transcript page 106-107.

Agent Schirching was the senior team leader of the SWAT team and has been with said team for thirteen years.   Transcript page 107.   The FBI made prior plans to take Richards into custody upon a vehicle stop.   Transcript page 114.   Agent Schirching was asked if a firearm was recovered.

> QUESTION: Alright, how did that happen?
> ANSWER: I ended up in a position after Mr. Richards and another occupant were both taken into custody and secured.   I then cleared the vehicle meaning I used the technique that I panned across the door which was left open to get a look inside and hopefully get the best look you can from a distance to make sure no one else was in the vehicle.   Vehicle poses special problems where there's hiding places people can hide in very small spaces in vehicle.   As I was panning across the vehicle, I was able to see a handle to a pistol underneath the driver's seat. Transcript page 114-115.

Interestingly, this is Biro's car and he's driving.   Agent Schirching was asked if he had information that Richards may be in possession of a firearm and Agent Schirching answered yes that they received information.   He claims to see a gun under the seat blocked by the sill from the car frame to passenger compartment and the ledge of the seat rail.

Curiously, he was asked:

> QUESTION: Alright, and was this information it was your understanding this information that had come from different sources?
> ANSWSER: Yes.   I know the case squad got it from a source of information.   I'm not sure who.

He expected a gun.   The guy in the red saw it under the seat in his search and Agent Schirching saw it.

Interestingly, Biro drives the car, no one sees Mr. Richards with a gun or make any

movements and from a distance in the pitch dark with a ledge of the car that comes from the bottom to nearly the bottom of the seat, blocking the footwell, Agent Schirching was able to see through that and see a handle of a gun.

Agent Schirching had watched the video where Richards was taken into custody and they were searching the car.   At 5m59s  of the video, it shows that Agent Schirching was to the left of the vehicle, the farthest one in the picture.   At 6m53s they claim to be clearing the vehicle when they are actually searching it.   The Agent describes this process on Transcript page 119 through 121.   They went about clearing the vehicle even though they received information that only Mr. Richards and another person entered.   Transcript page 121-122.

Interestingly, Agent Schirching looks at the photograph, which is very dark on a very dark night and claims that from that far distance that was exactly how he saw it on that very evening.   He was asked about the fellow kneeling down with his hand in the back under the seat. But claims that he was searching the compartment for people because it may be modified. Transcript page 123.   7m55s mark of the video.   It is submitted that the agent in red pushed the gun forward to be photographed.

This officer who was positioned approximately fifteen feet away as can be seen in the video, claims to have been able to see in the dark inside the wheel well underneath the seat in plain view even though the ledge of the car would have been blocking the "plain view" of the handle of the gun under the seat from the position he was in.   Agent Schirching's testimony is incredible.   It seems that he wants the Court to believe that they did not search the car, they cleared it and found objects in plain view under the seat.   This is a monumental leap of faith.

Agent Schirching was asked on Transcript page 135 and 136 about the rail and the interior well and the gun being below the rail and the well and about his inability to see it as he suggested in plain view.   He gave the equivocal "I don't recall" answer many times about the rail, the height of the rail and whether it was a metal rail that the seat sat on when it is obvious.   He was asked about the railing and a plastic cover:

> QUESTION: Well, can you testify whether you recollect seeing such a thing in this vehicle?
> ANSWER: I have no specific recollection other than seeing that firearm as I cleaned the passenger compartment.
> QUESTION: So, you didn't see the railing blocking it when you walked by it?
> ANSWER: Mr. Stachowski, I saw the firearm from the outside of the vehicle.   So, there was clearly nothing that blocked my view.

On redirect he claimed that he wanted the photograph because he saw it in plain view. Interestingly, he had it taken from over the top and not from where he claims he saw the gun handle as he was walking by.   He was manufacturing evidence.

An inference can be drawn by this because Agent Schirching did not photograph from outside because it would have been impossible for the gun to be seen.   More critically, there is circumstantial evidence present that the guy in the red shirt pushed it forward so that it would appear to be in plain view after he was searching the inside of the car and pushed it forward from under the seat.

**B.  ARGUMENT**

<u>POINT ONE</u>
**ALL THE FRUITS OF JEFFREY RICHARDS DECEMBER 14th 1918 ARREST SHOULD BE SUPPRESSED**

The defendant moves to suppress any and all tangible fruits of his search and seizure by

the police, including observations of the defendant's conduct on the ground that he was seized and searched in violation of his rights under the Fourth Amendment of the Constitution.   See _Dunaway v. New York_, 442 US 200 (1979); _Wong Sun v. United States_, 371 US 471 (1963).

> "Probable cause is to be assessed on an objective basis.   Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."   _Devenpack v. Alford_, 543 US 146, 152 (2004)

> "An arresting officer's state of mind (except for the facts he knows) is irrelevant to the existence of probable cause."   See _Whren v. United States_, 517 US 806, 812-13 (1996); _Arkansas v. Sulivan_, 532 US 769 (2001).   _Devenpack_ 543 at 153.

Law enforcement did not have probable cause to arrest Jeffrey Richards on December 14, 2018. Indeed, they had nothing close to probable cause.   They arrested a man who they followed in a car, committing no offenses from his house, at least 4.9 miles to Dave's Last Chance on Saunders Settlement Road.   Upon Jeffrey Richards pulling a rental car, rented by his passenger, Todd Biro's wife, into a parking space the FBI approached the car, ordered Jeffrey Richards out of the car and on to the ground in the kneeling position with is hands over his head far from the car.   This is seen on the video and through the words of Officer Weiss who said he was placed under arrest.   When asked, he claimed a probable cause arrest, but he did not delineate any rational basis for the probable cause.   Subsequent thereto, the SWAT officers searched the vehicle but not until after Jeffrey Richards and Todd Biro were taken from the vehicle and placed in cuffs and detained.   Mr. Richards, being placed under arrest some distance from the car and cuffed.   It is blatantly clear, after Mr. Richards was placed under arrest, he was not in a position to grab anything from the car.

Moreover, the agents had information that there were only two passengers in the car. They knew that Mr. Biro came there by himself.   The vehicle was under surveillance for at least an hour and then Mr. Biro came out with Mr. Richards having him drive to Dave's Last Chance. The balance of the investigation and search of the car was clearly a wholesale search without a warrant.

## THERE WAS A WARRANTLESS SEARCH AFTER THE OCCUPANTS WERE REMOVED AND CUFFED IN VIOLATION OF *ARIZONA v. GANT*

It is uncontested that the search of the rental vehicle was conducted without a warrant and without the consent of Mr. Biro.   Moreover, the government cannot rely on the argument that it was searched incident to Mr. Richards arrest or that there were people in the vehicle hiding because the vehicle was under surveillance by law enforcement for at least an hour from the time that Mr. Biro appeared at Mr. Richards house until they left.   They were waiting in the wings and knew that there were only two people in the vehicle.   Warrantless searches are presumptively unreasonable under the Fourth Amendment of the Constitution.   See *Katz v. United States*, 389 US 347,357 (1967) "Searches conducted outside of judicial process without prior approval by a judge or magistrate are per se unreasonable under the Fourth Amendment – subject only to a few specifically delineated exceptions."

A case directly in point is *Arizona v. Gant*, 556 US 347 (2009).   Importantly, law enforcement cannot circumvent this probable cause requirement simply because someone in the car has been arrested.   "A vehicle search incident to a recent occupants arrest is not authorized after the arrestee is secured and cannot access the interior of the vehicle."

In this case, both Mr. Richards and Mr. Biro were taken from the vehicle and detained

with Mr. Richards being placed under arrest.    That is an important precedent and is controlling in this circumstance because it seems that they are trying to treat the search of the vehicle incident to the arrest of a recent occupant as a police entitlement rather an exception justified within the limitations of the *Chimel v. California*, 395 US 752 (1969) rationale.

*New York v. Belton* applied the warrant requirement to vehicle searches.    *New York v. Belton*, 453 US 454 (1981).

In *Chimel* the supreme court held that a search incident to arrest may only include "the arrestee's person and the area within his immediate control construing that phrase to mean the area within which he might gain possession of a weapon or destructible evidence."    *Chimel* 395 at 763.

In *Gant*, supreme court unequivocally limited the reach of *Chimel* to that area within the arrestee's reach.    If a person was removed from the car and therefore not in reaching distance such a search violated the Fourth Amendment.    In *Gant*, the court said,

> "Unlike in *Belton*, (*New York v. Belton*, 453 US 454), which involved a single officer confronted with four unsecured arrestees.    The five officers in this case outnumbered the three arrestees all of whom have been handcuffed and secured in separate patrol vehicles before the officers searched Grant Gant's car.    Under these circumstances, Gant clearly was not within the reaching distance of his car at the time of the search.    Evidentiary basis for the search was also lacking in this case.    *Gant supra*

In this case, Richards and Biro were exited from the vehicle and handcuffed.    They were clearly not within the reach distance of the automobile and to suggest people were hiding under the seat of a SUV or anywhere else is simply the imagination of even the most liberal construction of their activities.    This was clearly a wholesale search of the car including one of

the officers reaching under the seat in an action such as pushing what he found there forward.

Accordingly, under _Gant_, Mr. Richards had "access [to] the interior of the vehicle" at the time the vehicle was searched, _Gant_ 550 US at 347.

The government cannot argue that any of the other occupants posed a threat to officers as each was removed, searched and either secured or guarded by armed officers at least 25 feet from the vehicle and then placed into a FBI vehicle.   They were moved from the truck.   The gun was under the seat.   Given the supreme court directive in Gant this warrantless automobile search cannot stand as a search incident to the arrest.

## NOT AN INVENTORY SEARCH

Under the certain circumstance a vehicle may be subject to an "inventory search" which served to "protect the owners property while it is in the custody of the police to ensure against claims of loss, stolen or vandalized property and to guard the police from danger." _Colorado v. Bestine_, 479 US 367, 372 (1987).   In order to be valid, an inventory search must be conducted to, and consistent with, "established inventory procedures" _Illinois v. Lafayette_, 462 US 640, 648 (1983).   The United States Supreme Court has warned that "an inventory search must not be a ruse for general rummaging through in order to discover incriminating evidence."   _Florida v. Wells_, 495 US 1, 4 (1990).

In this case, there was no inventory search, the police never claimed there was, but incase they were lying an inventory search or inevitable discovery that shows that it was not an inventory.   Most critically, the body camera footage that was used in this case undercuts any argument that this was anything other than a wholesale search.

One can see from a distance that there are no people in the SUV.   The doors were ajar so that the officers could get close enough to look.   We see a man kneeling down with his hand going under the seat.   It seems that he is pushing something forward, which miraculously is seen in plain view from 15 feet away through the car's rim/ledge inside the driver's footwell, under the seat.   Moreover, they turn the automobile over to Todd Biro after the search was made and after taking Jeffrey Richards into custody.   The search of the car was not a protective sweep.

In examining the totality of the circumstances surrounding the search of the vehicle, the FBI agents sought to call this operation planned and carried out by them to be a protective sweep.   In looking at the search warrant application, it is clear just from reading same, and since the commencement of the investigation, it is confirmed that Biro was an informant for the FBI.

In fact, he may have been working as an agent for the FBI to set up this seizure of Richards at the Last Chance Bar.   The FBI agents claimed to have been clearing the car when they were doing a wholesale search, opening the hatchback, looking inside compartments, under seats, claiming to have been looking for people.   You can clearly see there was no one else in the car since the doors were open.   In fact, because this was probably orchestrated between the FBI Agent Weiss and Todd Biro, they knew there were only two occupants of the car.   The balance of this examination that they claim to be a protective sweep was nothing other than an illegal search.

In _United States v. Hassock_, 631 F3d 79 (2nd Cir., 2011), the Second Circuit noted that

physical entry of a premises and under what circumstances a protected sweep might be made.

The *Hassock* court found that:

Where officers cannot supply specific and articulable facts warranting a prudent officer to believe that an individual posing a danger is lurking in an area to be swept, we have found lacking an essential element necessary to justify a search under the protective sweep doctrine as defined in *Buie* citations omitted.

*Maryland v. Buie*, 94 US 325 (1990) set up the protective sweep doctrine drawing upon a search incident to arrest exception to a warrant requirement that permits "as a precautionary matter and without probable cause or reasonable suspicion, to look into closets or other spaces adjoining the place of arrest from which an attack could be immediately launched." *Buie* at 334.

In this particular instance, the discovery of the gun was the fruit of the "so called protective search."   Not one FBI or SWAT team member was called by the government to provide the essential testimony that there were specific articulable facts warranting prudent officers to believe that an individual posing danger is lurking in the area to be swept.   In fact, in this particular case, we have the SWAT team with long guns taking them out of the car and placing them into custody.   They then conducted a wholesale search including a man in a red shirt reaching under the seat and moving something.   The area they allegedly looked at and into were not area that a person could physically fit in.   Moreover, it is clear that at this point Biro was an agent of the FBI working for them and taking a rental vehicle that they knew about since he worked with Agent Weiss and getting Richards to drive away from the house so that the search warrant could be executed.

Looking at a protective search, the law is clear.   When looking at a protective sweep

doctrine drawing upon "the search incident to arrest" exception to the warrant requirement permits arresting officers "as a precautionary matter and without probable cause or reasonable suspicion, [to look] in closets and other spaces immediately adjoining a place of arrest from which an attack could be immediately launched. _Maryland v. Buie_, 494 US 325, 334.   This exception reflects the officer's need to ensure the arrestee not have access to a weapon or destructible evidence.   See _United States v. Barea_, 486 F2d 633, 643 (2nd Cir.) That concern is absent when the area to be searched is not in the arrestee's reasonably immediate "grab area", _United States v. Blue_, 78 F3d 56, 60 (2nd Cir. 1993). See, _Arizona v. Gant_, 556 US 347 (2009).

There is nothing in this case that shows that a protective sweep is necessary.   The government will be arguing that this was some sort of protective sweep.   The Second Circuit has said that one can perform a protective sweep in a house even when a defendant is arrested outside the home.   _United States v. Oguns_, 921 F2d 442, 447 (2nd Cir. 1990).   However, "such and entry is [permissible] if the arresting officers (1) had a reasonable belief that third persons [were] inside and (2) a reasonable belief that third persons [were] aware of the arrest outside of the premises so that they might destroy evidence, escape or jeopardize the safety of the officers or the public.   _United States v. Vasquez_, 638 F2d 507, 531 (2nd Cir. 1980); _Oguns_ supra at 446.

The Court of Appeals has made clear that mere lack of information as to the presence of others on the scene cannot amount to reasonable suspicion.   Indeed, when there is "nothing in the record from which a reasonable... officer could have inferred that there was a specific danger of unknown third parties hiding in [the arrestees] residence, a protective sweep of the home will be deemed unlawful.   See, _United States v. Gandia_, 424 F3d 255, 264 (2nd Cir 2005);

_United States v. Moran-Vargas_, 376 F3d 112, 116-117 (2nd Cir. 2004).   In _Gandia_, the Second Circuit found a protective sweep unlawful because the only articulable facts offered in support of the search were (1) officers knowledge that the defendant had recently immerged from a heated argument, (2) a police radio call informed them that the defendant might have a gun, (3) the fact that the defendant stated that he did not have a gun prior to being questioned about it, and (4) the fact that the officers did not recover a gun during their pat down and frisk of the defendant.

This is an important factual pattern in _Gandia_ because the Second Circuit found in that case the protective sweep to be repugnant.   In this particular case, we have nearly identical facts.   Moreover, in _Gandia_, the Court of Appeals found nothing in these facts or elsewhere in the record from which a reasonable officer could infer "a specific danger of unknown third parties hiding in [the apartment]", _Gandia_ supra 424 F3d at 264.

In this case, like _Gandia_, the court has not even made a modest showing that third parties might be present.   _Gandia_ is an important case in looking at and comparing the woefully deficient evidence of third-party presence in this "protective search."

Because the protective search was unlawful that mean that even if the court believes that the officer saw the handle of the gun the search must be illegal as the fruits of the poisonous tree because if there was no ongoing protective search there would not be any plain view.   See, _Wong Sun v. United States_, 371 US 471.

## CONCLUSION

For the forgoing reasons, conduct of the police violated the defendant's Fourth

Amendment right and the various cases surrounding the interpretation of warrantless seizures and therefore must be suppressed.

DATED:      June 3, 2020
              Buffalo, New York

                                Respectfully submitted,

                                /s/ Michael J. Stachowski

                                MICHAEL J. STACHOWSKI, PC
                                Attorney for the Defendant
                                2025 Clinton Street
                                Buffalo NY 14206
                                (716) 824-5353



## Google Maps　4 Packard Ct, Niagara Falls, NY to dave's last chance saloon　Drive 4.9 miles, 11 min

Map data ©2020 Google　2000 ft

|  | via Packard Rd and NY-265 N | 11 min |
|---|---|---|
| | Fastest route, the usual traffic | 4.9 miles |

|  | via NY-61 N/Hyde Park Blvd and NY-31 E | 11 min |
|---|---|---|
| | | 5.3 miles |

|  | via Packard Rd and I-190 N | 12 min |
|---|---|---|
| | | 5.8 miles |

## Explore Daves Last Chance Saloon



Restaurants　　Hotels　　Gas stations　Parking Lots　　More



GOVERNMENT
EXHIBIT
3