IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

              v.                                   19-CR-106-V

JEFFREY RICHARDS,

                    Defendant.
_____

## GOVERNMENT'S POST-SUPPRESSION HEARING BRIEF
## IN OPPOSITION TO THE DEFENDANT'S MOTION TO SUPPRESS

**THE UNITED STATES OF AMERICA**, by and through its attorney, James P. Kennedy, Jr., United States Attorney, and Brendan T. Cullinane, Assistant United States Attorney, of counsel, hereby files its post-hearing brief in support of the government's opposition to the defendant's motion to suppress the firearm in the defendant's possession recovered by law enforcement on December 14, 2018.  See Doc. No. 35 at 4–7.

## I.      PROCEDURAL HISTORY

In 2018, law enforcement received information regarding the defendant's bomb making activities, drug distribution, and firearm possession.  In particular, law enforcement learned that the defendant manufactured and possessed an explosive formed in the shape of a ball, which was wrapped in tape, contained dangerous objects inside the ball, and had a green fuse affixed to it.  Law enforcement also learned that the defendant possessed firearms. Moreover, law enforcement received information that the defendant possessed heroin,

fentanyl, and other illegal narcotics inside his residence, which was located at 4 Packard Court, Apartment D, Niagara Falls, New York.

On December 14, 2018, law enforcement submitted a search warrant application for this Court's review.  On that same date, this Court signed the search warrant to search the defendant's residence.  Later that same date, law enforcement executed the search warrant at the defendant's residence.

Prior to the lawful entry into the defendant's residence, law enforcement stopped the defendant in his vehicle, which law enforcement observed him driving, and detained him.  At that time, law enforcement recovered a .45 caliber pistol located under the defendant's driver seat.  Subsequently, law enforcement arrested the defendant and provided him with his Miranda rights.  The defendant thereafter waived his Miranda rights and made statements regarding his criminal conduct.

During the search of the defendant's residence on December 14, 2018, law enforcement recovered the following items from the defendant's residence:

a.  Over 100 grams of a mixture and substance containing acetyl fentanyl, a Schedule I controlled substance, and an analogue of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (fentanyl);

b.  Over 40 grams of a mixture and substance containing N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (fentanyl);

c.  Cocaine, a Schedule II controlled substance;

d.  Marijuana, a Schedule I controlled substance;

e.  Alprazolam, a Schedule IV controlled substance;

  f.  Various drug packaging and processing materials, including scales, baggies, and razor blades;

  g.  Various drug paraphernalia;

  h.  Five bolt-action rifles;

  i.  Two shotguns;

  j.  One Taser;

  k.  A large amount of various ammunition;

  l.  Several commercial fireworks; and,

  m.  One suspected improvised explosive device.

On December 15, 2018, this Court signed a criminal complaint charging the defendant with violations of Title 18, United States Code, Section 924(c)(1), Title 21, United States Code, Section 841(a)(1) and 856, and Title 26, United States Code, Sections 5822, 5845(a)(8), 5845(f), 5845(i), 5861(f), and 5871.  See Doc. No. 1.

On May 17, 2019, a federal Grand Jury in the Western District of New York returned a twelve-count indictment charging the defendant with violations of Title 18, United States Code, Sections 922(j), 924(c)(1), and 2, Title 21, United States Code, Sections 841, 846, 856(a)(1), and 858, and Title 26, United States Code, Sections 5861(c), 5861(d), and 5861(f). See Doc. No. 15.

On October 23, 2019, the defendant filed various motions in compliance with the revised Scheduling Order.  See Doc. No. 35.  On December 13, 2019, the Court ordered an

3

evidentiary hearing regarding law enforcement's recovery of a firearm in the defendant's possession on December 14, 2018.  See Doc. No. 37.

## II.   **PRELIMINARY STATEMENT**

As demonstrated herein, the credible evidence presented at the evidentiary hearing held on January 27, 2020, including the testimony of Federal Bureau of Investigation Special Agents Thomas V. Weis and Mark R. Schirching, indicates that on December 14, 2018, law enforcement lawfully recovered a firearm in the defendant's possession.  The testimony of the agents demonstrated that law enforcement properly stopped the defendant's vehicle, detained the defendant, and lawfully recovered a firearm, observed by law enforcement in plain view, from the defendant's possession.

## III.   **FACTS**

On January 27, 2020, the parties examined Federal Bureau of Investigation ("FBI") Special Agents Thomas V. Weis and Mark R. Schirching.[1]  On that date, Special Agent Weis stated that he has been employed with the FBI since March of 2017 and described the training he received in order to become a special agent.  See T-1 at 5-6.  He is currently assigned to the Safe Streets Gang Task Force and conducts investigations into violent crime, violent gangs, and narcotics.  Id. at 6.

Similarly, Special Agent Schirching stated that he has been employed with the FBI for over 14 years and described the training he received in order to become a special agent.  Id.

---

[1] The instant brief will refer to the January 27, 2020, evidentiary transcript as "T-1."

4

at 106.  In addition, Special Agent Schirching explained that he is the senior team leader of the SWAT Team for the Buffalo FBI Office as well as the principal firearms instructor for the Buffalo FBI Office.  Id.

Special Agent Weis is also a member of the FBI's Special Weapons and Tactics ("SWAT") Team, which is comprised of officers trained to respond and participate in arrests and search warrants "that are typically deemed high risk to law enforcement."  Id. at 9, 107. The SWAT Team responds to arrests of persons whom law enforcement believes exhibit "any sort of violent tendencies . . . for bomb making, weapons, anything like that."  Id. at 10.  These individuals may be considered "high risk."  Id. at 10-11, 108.  Further, individuals involved in gangs, including outlaw motorcycle gangs such as the Kingsmen Motorcycle Club, may be considered a high risk target.  Id. at 10-12, 108.  Both Special Agents Weis and Schirching testified that they assisted with law enforcement's 2017 investigation of a double homicide and narcotics trafficking involving the Kingsmen Motorcycle Club, a "violent outlaw motorcycle club" and therefore had familiarity with this organization.  Id. at 12-13, 108-09.

Special Agent Weis stated that that he has assisted in the planning and execution of approximately fifty search warrants.  Id. at 13.  When the SWAT Team plans for the execution of a search warrant or arrest of a person, there are a number of factors to consider, including access to weapons, risk of harm to the public, or the potential presence of "booby traps," such as bombs.  Id. at 13-15, 110-11.  As such, depending on the needs of the warrant, the SWAT Team may request the presence and assistance of different specialists, such as FBI-certified bomb technicians.  Id. at 14.  The SWAT Team may also employ specialty

equipment, such as a robot that is placed into a dangerous area, "if there is a potential threat." Id. at 15.

When planning for the execution of a search warrant, law enforcement will consider the proximity of other residences to the target residence. Id. at 15-17. Agents will also consider the presence of drugs, weapons, and the pattern of life of the target individual. Id. at 17. In particular, the presence of fentanyl in a house or by a person "could cause overdoses or seriously impair law enforcement." Id. Alternatively, a weapon such as a bomb can be detonated remotely even if the individual does not have the explosive device directly in his or her possession. Id. at 18.

Previously, Special Agent Weis was assigned to the Joint Terrorism Task Force, which is responsible for investigations involving domestic terrorism. Id. at 6-7. Special Agent Weis explained that domestic terrorism investigations may include persons who are considered "home grown extremists"; these individuals are "typically" involved with bomb making, threats of violence by use of firearms, narcotics trafficking, and/or race-based issues such as the promotion of "white supremacy." Id. at 7-8.

Special Agent Weis stated that persons involved in bomb making are able to detonate bombs "remotely via cell phone." Id. at 8. In particular, a bomb maker can manufacture the bomb in such a way that "[a] signal can be sent from the cell phone to the actual device [attached to the bomb] and then it would cause the detonation." Id. at 8.

In the fall and winter of 2018, Special Agent Weis was a member of the Joint Terrorism Task Force and became familiar with the defendant. Id. at 18. At that time, Special Agent Weis learned, through various sources, that the defendant "was a white supremacist who was a member of the Kingsmen Motorcycle Club as well as a bomb maker." Id. at 18-19. Specifically, multiple sources, each independent from each other and deemed reliable, provided corroborating information that the defendant possessed an explosive device inside his residence in Niagara Falls. Id. at 26-27.

Law enforcement learned that the defendant was a "drug distributor" and "typically carries a pistol on his person whenever he leaves he house." Id. at 18-19. Specifically, law enforcement learned from cooperating sources that the defendant carried a .45 caliber handgun. Id. at 31. Law enforcement also became aware that the defendant resided at 4 Packard Court, Apartment D in Niagara Falls; 4 Packard Court is an apartment building consisting of multiple dwellings. Id. at 19. Special Agent Weis confirmed that prior to December 14, 2018, law enforcement had received "fresh or recent" information regarding the defendant's possession of narcotics, a firearm, and bomb making materials. T-1 at 97.

In December of 2018, law enforcement learned that the defendant's residence was used by the defendant's co-conspirator to store narcotics intended for distribution. Id. at 20. During that same month, law enforcement conducted a controlled buy of fentanyl in which the defendant's co-conspirator confirmed the storing of drugs at the defendant's residence and law enforcement observed the co-conspirator enter the defendant's residence to pick-up the drugs. Id. at 20-23.

Following the controlled buy from the defendant's residence, Special Agent Weis began to draft an affidavit for a search warrant of the defendant's residence. Id. at 24. The affidavit included information about the possible presence of drugs (including fentanyl), weapons (including firearms), and an explosive device. Id. at 25. In addition, law enforcement began to conduct additional surveillance of the residence in order to gauge the defendant's "pattern of life" and thus have a better understanding as to the defendant's "access to the firearms and to the explosive device." Id. As a result of the information learned about the defendant, law enforcement deemed the defendant as a "high risk target." Id. at 43.

On December 14, 2018, Special Agent Weis submitted an application for a search warrant for the defendant's residence. Id. at 27. On that same date at approximately 3:02 p.m., this Court issued a search warrant for the defendant's residence. Id. at 28; see also Govt. Ex. #1. After receiving the search warrant, the FBI began preparing for the execution of the search warrant at the defendant's by alerting the SWAT Team, certified bomb technicians, and evidence technicians. See T-1 at 29. At that time, the certified bomb technicians gathered the necessary equipment, including the robots that are placed into dangerous areas, for the search warrant execution. Id. at 30.

Law enforcement also began conducting surveillance of the defendant's residence in order to determine the defendant's location. Id. At that time, law enforcement determined the defendant was inside the residence; law enforcement subsequently observed a male arrive by vehicle, exit the vehicle, and enter the defendant's residence. Id. at 31, 91-92.

8

Simultaneously, the SWAT Team set up operations in another location and waited to execute the search warrant until the defendant departed his residence.  Id. at 31.

Shortly thereafter, law enforcement observed the defendant depart his residence along with the other male who law enforcement previously observed enter the residence.  Id. at 31, 91.  At that time, law enforcement familiar with the defendant observed the defendant enter the driver's seat of a white SUV and the male enter the passenger's seat.  Id. at 32, 41.  The law enforcement personnel who observed the defendant enter the white SUV provided this information to other law enforcement personnel, including Special Agent Weis, who were at other locations at that time.  Id. at 42.  The white SUV then departed the area around approximately 6 p.m. and began to drive away from the area.  Id. at 32.

Special Agent Weis testified that as the white SUV traveled, he began to follow the white SUV in his own vehicle and observed at least two individuals (the defendant and the previously observed male) in the vehicle; the vehicle's windows were "tinted enough that [Special Agent Weis] couldn't see into" the vehicle.  Id. at 33-34.  Subsequently, a marked Niagara County Sheriff's Office vehicle began to follow the white SUV by directly following the white SUV.  Id. at 33, 77-78.

Law enforcement followed the white SUV driven by the defendant and observed the vehicle stop at Dave's Last Chance Saloon in Niagara Falls.  Id. at 34, 78.  Once the vehicle stopped, the SWAT Team converged on the defendant's white SUV.  Id. at 35.  As described by Special Agent Weis, the marked Niagara County Sherriff's Office vehicle that followed the

white SUV recorded the entire traffic stop and subsequent encounter with the defendant at Dave's Last Chance Saloon in Niagara Falls.  Id. at 35, 37-38; see also Ex. #2 at 00:05 – 00:47.[2]

Special Agent Weis explained that in anticipation of the execution of the search warrant, the SWAT Team was deployed to the location of where the defendant was located in order "to separate [the defendant and the passenger] to put them into custody" so that law enforcement could secure the "safety of law enforcement officers and potentially anybody that was back at Packard Court living in the other apartments."  See T-1 at 38-39, 101.  At that time, based on previous reporting regarding the defendant, law enforcement believed that the defendant possessed a .45 caliber firearm in the vehicle and wanted to secure him before executing the search warrant of his residence.  Id. at 39, 115.  In addition, law enforcement wanted to secure both the defendant and his cell phone "immediately" because law enforcement did not know "what the type of detonation device would have been for the . . . potential bomb, whether it was a cell phone" and therefore "wanted to secure [the defendant] as well as the cell phone."  Id. at 39.  Special Agent Weis testified that an individual could be, potentially, "miles" away from a wired bomb and use a cell phone to detonate the bomb.  Id. at 104.

As recorded by the Niagara County Sherriff's Office, once law enforcement arrived near the defendant's vehicle, law enforcement personnel began to issue commands to the defendant.  Id. at 39; see also Ex. #2 at 00:48.  Special Agent Weis stated that he was at the

---

[2] The time listed reflects the timestamp ticker located at the bottom of the recorded video.

scene the entire time and observed law enforcement's actions.  T-1 at 49.  Special Agent Weis explained that law enforcement issued commands to the occupants of the white SUV to attempt to "gain the advantage over" the defendant in order "to make sure it was safe, that [the defendant] couldn't have access and couldn't reach for a pistol."  Id. at 40.  Pursuant to law enforcement's instruction, the defendant exited via the vehicle's driver's door.  Id.; see also Ex. #2 at 01:50.

After the defendant exited the vehicle, law enforcement personnel instructed the defendant to walk backwards and place himself on his knees; he complied with the order.  T-1 at 42; see also Ex. #2 at 01:51 – 02:28.  After the defendant placed himself on his knees, law enforcement used handcuffs to restrain the defendant "to ensure that [the defendant] didn't reach for anything that could have been in his waistband."  T-1 at 42; see also Ex. #2 at 02:28. Following the placing of the defendant in handcuffs, law enforcement instructed the male passenger of the white SUV to exit the vehicle "to also ensure that that individual didn't reach for any type of weapon . . . [and] to keep his hands outside the vehicle."  T-1 at 42-43; see also Ex. #2 at 03:33 – 04:16.

After law enforcement placed the defendant in handcuffs, agents moved the defendant away from the vehicle to search him "for any weapons or anything that could be harmful," such as a firearm.  T-1 at 43; see also Ex. #2 at 03:26.  In addition, law enforcement wanted to ensure the safety of any cell phone or phones in order to prevent the detonation of any devices by the defendant's cell phone.  T-1 at 43.  Special Agent Weis confirmed that the video recording demonstrated that law enforcement treated the male passenger in the same manner

because the male passenger "might have had a firearm on him as well."  T-1 at 44; see also Ex. #2 at 03:33 – 04:26.  After law enforcement secured the male passenger, law enforcement placed the male passenger in custody.  T-1 at 45; see also Ex. #2 at 05:00.

After law enforcement placed the defendant and the male passenger in custody, law enforcement issued an additional "command for anyone else that was inside of the [white SUV] vehicle to move their hands outside of [the vehicle]."  T-1 at 46; see also Ex. #2 at 06:14.  Special Agent Weis explained that law enforcement issued this command because "[t]hey were unaware 100% if there was anyone else inside of the vehicle. . . . because we couldn't see inside of the [white SUV] vehicle."  T-1 at 46.  Special Agent Weis explained that "[b]ased off of prior experiences," law enforcement assumes that there could be other individuals in a car.  Id.  Special Agent Schirching testified that based on his training and experience, "vehicles pose a special problem where there's many hiding spaces: people can hid in very small spaces surprisingly in vehicles."  Id. at 115.

Although law enforcement did not see any hands raised following this order, law enforcement continued to "presume that there still could be someone up in that part of the vehicle" who remained hidden or did not respond to law enforcement's commands.  Id. at 47.  After law enforcement did not observe any hands raised from the vehicle, SWAT team members moved closer to the white SUV to visually inspect the car.  Id.; see also Ex. #2 at 06:45.  After approaching the white SUV, one of the officers opened the driver's side rear door while another officer inspected that area of any persons.  T-1 at 47; see also Ex. #2 at 06:49 – 07:13.  Special Agent Weis noted that while the purpose is to look for additional persons in

the vehicle, law enforcement could observe evidence in plain view in the vehicle during this protective check.  T-1 at 48.

Following the safety check of the rear passenger seats, law enforcement personnel moved to the white SUV's rear gate and opened the gate "to see if there's another in the area of the vehicle."  Id. at 49, 81-83; see also Ex. #2 at 07:13 – 07:22.  While the two law enforcement members checked the rear of the vehicle, another law enforcement member, Special Agent Schirching, while standing outside the vehicle, "was holding" the white SUV's driver's side because "I knew that firearm was there, I saw it, and I didn't want to take my eyes off it until we were sure there was no else in that vehicle."  T-1 at 49; 121; see also VIDEO at 6:49 – 07:50.  Subsequently, law enforcement cleared the white SUV's rear gate area after determining there were no individuals hidden in that area or in hidden compartments in that area.  T-1 at 50-51; see also Ex. #2 at 07:22 – 07:55.

Special Agent Schirching testified that while he stood outside the vehicle, "I was panning across to the front of the vehicle[,] I was able to see the handle to a pistol underneath the driver's seat."  T-1 at 115; see also Ex. #2 at 07:22 – 07:55.  Following Special Agent Schirching notifying the SWAT Team via radio communication that he had observed at firearm underneath the driver's seat, Special Agent Weis approached the vehicle after learning "that there was a firearm under the driver's seat of the" vehicle.  T-1 at 51, 123; see also Ex. #2 at 08:11.  Special Agent Weis testified that after he arrived at the vehicle, he "moved up to the driver's side of the vehicle" and, while remaining standing outside of the white SUV's driver's door, inserted his head into the vehicle to see the firearm.  T-1 at 51, 59-60; see also

Ex. #2 at 8:13 – 8:20.  Both Special Agents Weis and Schirching stated that part of the firearm was underneath the vehicle while the other part of the firearm was exposed in plain view.  T-1 at 57, 128.

At this time, before any law enforcement officer touched or moved the firearm or caused the firearm to be moved, Special Agent Schirching requested someone to take a photo of the firearm.  Id. at 124.  Subsequently, Special Agent Weis photographed the firearm observed by law enforcement under the driver's seat of the vehicle in which the defendant drove.  Id. at 53, 60-61; see also Ex. #2 at 08:20 – 09:15.  Special Agent Weis testified that the photo submitted into evidence is the photograph he took on December 14, 2018, of the firearm underneath the driver's seat of the defendant's vehicle which law enforcement observed in plain view.  T-1 at 54; see also Ex. 3.  Indeed, Special Agent Schirching stated that the photograph of the firearm in the defendant's vehicle is how the firearm appeared to him on December 14, 2018, when he saw it in plain view while clearing the vehicle for any persons.  Id. at 128.

Special Agent Weis testified that only authorized persons can touch, or "clear," a firearm observed by law enforcement.  Id. at 61.  Following Special Agent Weis's photographing of the firearm, Special Agent Schirching, who is a certified firearms instructor, recovered the firearm from the vehicle, which included a magazine with ammunition, from the defendant's driver's seat.  Id. at 62-63, 124-25; see also Ex. #2 at 09:15 – 10:20.  Immediately following Special Agent Schirching's recovery of the firearm, Special Agent

14

Schirching stated to fellow law enforcement officers that he "did not search the vehicle" and had observed the firearm in plain view.  T-1 at 66, 126; see also Ex. #2 at 10:20 – 11:16.

Following the recovery of the firearm, law enforcement did not conduct a search of the vehicle.  T-1 at 67, 76.  Law enforcement personnel at the scene placed the firearm into an evidence recovery bag.  Id. at 67; see also Ex. #2 at 15:10.  After law enforcement placed the firearm in the evidence recovery bag, law enforcement took the defendant, who was in custody, to the Niagara County Sherriff's Office and turned over the vehicle to the passenger; law enforcement learned that the passenger's wife had rented the vehicle.  T-1 at 70-71, 80.

Special Agent Weis stated that law enforcement also recovered the defendant's cellular phone and U.S. currency, both of which law enforcement recovered from the defendant's person.  Id. at 71.   Special Agent Weis confirmed that a completed FD-886, which is an evidence recovery log document, memorialized the items recovered from the defendant, including a .45 caliber firearm.  Id. at 72; see also Ex. 4.  Law enforcement recovered items 1 and 2 from the vehicle; law enforcement recovered items 3 and 4 from the defendant.  Id. at 75; see also Ex. 4.  Special Agent Weis explained that following the recovery of the firearm, law enforcement arrested the defendant and took him into custody.  T-1 at 76.  The following day (December 15, 2018), this Court signed a criminal complaint and arrest warrant for the defendant.  Id.; see also Doc. No. 1.

# IV.   ARGUMENT

## A.   The Defendant's Motion to Suppress Evidence Should be Denied.

The defendant's motion to suppress the firearm recovered from his possession on December 14, 2018, following the detention of the defendant and the protective sweep of the vehicle should be denied.  See Doc. No. 35.


As described herein, on December 14, 2018, law enforcement did not conduct a search of the vehicle, but observed the firearm in plain view underneath the driver's seat in which the defendant had just exited.  Furthermore, as the testimony demonstrates, law enforcement had articulable information that the defendant possessed a firearm and had access to homemade manufactured bombs; thus law enforcement, while remaining outside the vehicle, performed a protective sweep of the vehicle to ensure the safety of all officers and the public. Finally, given the actions of law enforcement, which included an investigation regarding the defendant's criminal activity, an application for a search warrant of the defendant's residence, and a plain view observation of a firearm possessed by the defendant, who was engaged in drug trafficking and bomb making, the application of the exclusionary rule would have no deterrent effect and thus should not be applied here.  See United States v. Julius, 610 F.3d 60 (2d Cir. 2010).

1.     **On December 14, 2018, Law Enforcement Observed the Defendant's Firearm in Plain View in the Defendant's Vehicle and Therefore the Defendant's Motion to Suppress Should be Denied.**

a.     **Case Law**

In general, law enforcement officers first must "obtain advance judicial approval of . . . seizures through the warrant procedure[.]"   Terry v. Ohio, 392 U.S. 1 (1968) (citations omitted).   A well-recognized exception to this warrant process for seizures is the so-called "plain view" doctrine.   "Under the plain view doctrine, a law enforcement officer may seize evidence without a warrant if (1) the officer is lawfully in a position from which the officer views an object, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object." United States v. Babilonia, 854 F.3d 163, 179–80 (2d Cir. 2017) (quoting internal quotation marks and alterations omitted). As the Supreme Court has explained, "[t]he rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment – or at least no search independent of the initial intrusion that gave the officers their vantage point." Minnesota v. Dickerson, 508 U.S. 366, 375 (1993); see also United States v. Delva, 858 F.3d 135, 149 (2d Cir. 2017) ("If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy.") (internal quotation marks omitted), cert. denied, 138 S. Ct. 1309 (2018).

The general premise of the plain view exception is that "police are free to observe whatever may be seen from a place where they are entitled to be."   United States v. Fields, 113 F.3d 313, 321 (2d Cir. 1997) (citing Florida v. Riley, 488 U.S. 445, 449 (1989)).   The

Second Circuit has made clear that the exception does not require that the observation of the object in plain view must be inadvertent.  See United States v. Reyes, 283 F.3d 446, 470 (2d Cir. 2002) (stating that the plain view exception operates even if law enforcement officials have a suspicion that the defendant has contraband).

With regard to the first requirement of the plain view exception, "[t]he determination of lawful vantage point must focus on the activity which brought the object into plain view." United States v. $557,933.89, More or Less, in United States Funds, 287 F.3d 66, 81 (2d Cir. 2002).

Additionally, regarding the second requirement of the plain view exception, law enforcement must have probable cause to believe that an object in plain view is contraband without conducting some further search of the object.  See Minnesota v. Dickerson, 508 U.S. 366, 375 (1993).  It "merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief[ ]' that certain items may be contraband or stolen property or useful as evidence of a crime; . . . [a] 'practical, nontechnical' probability that incriminating evidence is involved is all that is required."  Texas v. Brown, 460 U.S. 730, 742 (1983) (internal citation omitted).  In making this determination, a court should consider the experience and judgment of the officer.  Id. 746 ("[W]e have recognized that a law enforcement officer may rely on his training and experience to draw inferences and make deductions that might well elude an untrained person."). The purpose of the "immediately apparent" requirement is to ensure that the plain view doctrine is not "used to extend a general

exploratory search from one object to another until something incriminating at last emerges." Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971).

The Court of Appeals has stated that "[p]atently incriminating evidence that is in plain view during a proper security check may be seized without a warrant." United States v. Kiyuyung, 171 F.3d 78, 83 (2d Cir. 1999). Once an item of an incriminating nature is observed in plain view, police officers have probable cause to arrest a suspect. See Savino v. City of New York, 331 F.3d 63, 76 (2d Cir.2003) (stating that "[p]robable cause exists when an officer has 'knowledge . . . sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'") (citation omitted).

### b. **Application**

In this case, on December 14, 2018, law enforcement lawfully secured a search warrant to execute at the defendant's residence. Moreover, during the course of the investigation into the defendant, law enforcement received information that the defendant possessed drugs, a firearm on his person, and bombs. Finally, law enforcement had previously conducted a controlled purchase of drugs that involved the defendant's residence.

Thus, the record demonstrates that on December 14, 2018, law enforcement had probable cause to encounter the defendant in anticipation of the execution of the search warrant of his residence. At that time, after the defendant's car came to a complete stop and ordered the defendant out of the vehicle, law enforcement encountered the vehicle in the parking lot of a bar; therefore, law enforcement was lawfully in a position to observe the inside

of the defendant's vehicle.  See Horton v. California, 496 U.S. 128, 136 (1990) (stating that an "essential predicate" to the plain view exception is that the law enforcement officer was not in violation of the Fourth Amendment in being in a position to see the evidence in plain view).

While law enforcement remained in a position that did not violate the defendant's rights, law enforcement conducted a protective sweep of the vehicle in order to ensure there were no other persons hiding in the vehicle.  At that time, Special Agent Schirching observed a firearm underneath the driver's seat of the vehicle in which the defendant had just departed. Notwithstanding this protective sweep to ensure officer safety, particularly in light of credible evidence that the defendant possessed both firearms and bombs, law enforcement observed the firearm on the floor of the driver's side via the door left open by the defendant after the defendant exited the vehicle.  Following the recovery of the firearm, law enforcement properly placed the defendant in custody and executed the search warrant at his residence.

As a result, law enforcement lawfully observed the firearm in plain view and recovered the firearm from the defendant, who unlawfully possessed the firearm in furtherance of drug trafficking activities.

2.    **Alternatively, if the Court Finds that Law Enforcement Conducted a Search, on December 14, 2018, Law Enforcement Permissibly Recovered the Defendant's Firearm.**

a.    **Case Law**

A search incident to a lawful arrest is one of the exceptions to the search warrant requirement.  See Weeks v. United States, 232 U.S. 383, 392 (1914). "Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search *or* it is reasonable to believe the vehicle contains evidence of the offense of arrest." Arizona v. Gant, 556 U.S. 332, 351 (2009) (emphasis added). Without one of these two justifications present, a search of an arrestee's vehicle is not permitted without a search warrant unless law enforcement shows that another exception to the search warrant requirement applies.  Id.

The second prong in the Gant analysis authorizes warrantless searches of a vehicle incident to arrest when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.  Gant, 556 U.S. at 343, quoting Thornton v. United States, 541 U.S. 615, 632 (2004).  The Supreme Court in Gant did not state whether the "reasonable to believe" standard is equivalent to probable cause, reasonable suspicion, or some level of certainty between these two levels.  Also, the second prong of the Gant analysis does not directly say whether a court should employ a categorical approach in which reasonableness of the belief is based upon the offense of arrest rather than the facts known to the officer.  See Arizona v. Gant, 556 U.S. 332 (2009).

However, the <u>Gant</u> Court appears to say that the second prong of the analysis does suggest that the justification for a vehicle search incident to arrest comes automatically from the crime of arrest provided that the crime of arrest is the type for which relevant evidence might be found in the vehicle.

The <u>Gant</u> Court emphasized the difference between traffic offenses and drug offenses in stating, "In many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence." <u>Gant</u>, 556 U.S. at 343, <u>citing</u> <u>Atwater v. Lago Vista</u>, 532 U.S. 318, 324 (2001); <u>Knowles v. Iowa</u>, 525 U.S. 113, 118 (1998). The Supreme Court, in <u>Gant</u>, also stated, "But in others . . . the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein." <u>Id.</u> at 344. The <u>Gant</u> Court specifically referred to <u>Thornton v. United States</u>, 541 U.S. 615, 632 (2004), and <u>New York v. Belton</u>, 453 U.S. 454 (1981). Both cases concerned drug offenses. Finally, law enforcement may conduct an area search of the passenger compartment to uncover weapons, as long as law enforcement possess an articulable and objectively reasonable belief that the suspect is potentially dangerous. <u>See</u> <u>Michigan v. Long</u>, 463 U.S. 1032, 1051 (1983).

**b.** **Application**

In this case, the government contends that law enforcement's plain view observation of the firearm on December 14, 2018, resulted in the recovery of the firearm from the defendant. However, if the Court finds that law enforcement, in fact, conducted a search of

the vehicle on that date, then the legal framework, as provided herein, demonstrates that law enforcement lawfully recovered the firearm pursuant to warrantless search.

As the record demonstrates, law enforcement received credible information regarding the defendant's drug distribution, firearm, and bomb making activities.  As such, on December 14, 2018, law enforcement acquired a search warrant to execute at the defendant's residence.  However, in anticipation of the execution of the search warrant, law enforcement stopped the defendant, ordered him to exit from the driver's seat, and placed him in custody in order to ensure safety for officers and the public.

After the defendant exited the vehicle, law enforcement made a protective sweep of the vehicle in order to determine if any other individuals were in the vehicle.  At that time, Special Agent Schirching observed a firearm protruding from underneath the driver's seat. After securing the vehicle, Special Agent Weis took a picture of the firearm and Special Agent Schirching reached into the vehicle for the sole purpose of recovering the firearm for evidence. In light of information gathered from credible sources about the defendant, law enforcement has articulable reasons to believe that the defendant possessed the firearm in furtherance of drug trafficking activities and thus was related to law enforcement's investigation of the defendant's unlawful criminal conduct.  Arizona v. Gant, 556 U.S. at 351.

As such, the defendant's motion to suppress should be denied.

3.    **The Costs of Applying the Exclusionary Rule in this Case Far Outweigh the Benefits**

a.    **Case Law**

In <u>United States v. Julius</u>, 610 F.3d 60 (2d Cir. 2010), the Second Circuit held that in cases in which the exclusionary rule is implicated, the Court must, before suppressing evidence, conduct a cost/benefit analysis to consider whether the deterrent effect of applying the exclusionary rule outweighs the cost of the rule's application.  <u>Id.</u> at 66.

The Court's decision in <u>Julius</u> relied on the Supreme Court's pronouncement in <u>Herring v. United States</u>, 129 S. Ct. 695 (2009).  The Second Circuit stated that "<u>Herring</u> makes plain that a search that is found to be violative of the Fourth Amendment does not trigger automatic application of the exclusionary rule." <u>Id.</u> at 66.  In <u>Herring</u>, the Supreme Court reiterated that application of the exclusionary rule was a "'last resort,' not our first impulse." <u>Herring</u>, 129 S. Ct. at 700 (quoting <u>Hudson v. Michigan</u>, 547 U.S. 586, 591 (2006)). The exclusionary rule is not an individual right and is applicable only where it results in "'appreciable deterrence'" and the benefits of deterrence must outweigh the costs, specifically the cost of letting a guilty defendant go free. <u>Id.</u> at 700-701 (internal citation omitted).  The Court stated:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the judicial system.  As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless or grossly negligent conduct, or in some circumstances, recurring or systemic negligence.

<u>Id.</u> at 702.

b.   __Application__

In the present case, law enforcement officers did not blatantly overstep the bounds of appropriate conduct.   Rather, law enforcement conducted an investigation to include surveillance, prepared a search warrant application, submitted a search warrant application to this Court, and requested a search warrant under oath.  Special Agents Weis and Schirching both testified that the defendant, based on his interest in bombs and membership in the Kingsmen Motorcycle Club, was a "high risk" individual who could be dangerous based on his possession of narcotics, firearms, and bombs.  As such, law enforcement wanted to ensure the safety of all law enforcement personnel as well as the public, particularly those who lived within proximity of the defendant's residence.

Further, law enforcement had information that the defendant carried a firearm on his person and were unaware if the defendant had utilized technology to permit him to detonate a bomb from afar via cell phone.

On December 14, 2018, law enforcement stopped the defendant in order to effectively execute the search warrant.  After stopping the defendant, law enforcement observed a firearm directly underneath the driver's seat from where the law enforcement ordered the defendant to depart.  Subsequently, law enforcement recovered the firearm, which ensured that no other person could cause any danger with the firearm at that time.

Simply stated, the law enforcement agents in this case did precisely what is constitutionally appropriate.  In short, the conduct here demonstrates that, even if a Fourth

Amendment violation occurred, no deliberate misconduct occurred.   Accordingly, application of the exclusionary rule here would have little, if any, deterrent effect, and certainly none sufficient to outweigh the compelling government interest in using evidence that is highly probative of the defendant's guilt, including a firearm and ammunition.

**4.**      **The Government Renews its Argument that the Defendant Does Not Have Standing to Contest the Recovery of the Firearm.**

On January 3, 2020, the defendant filed an affidavit in support of his motion to suppress.  See Doc. No. 38.   However, the defendant's affidavit fails to establish his standing in this matter.  See Doc. No. 38.  As set forth below, the defendant's motion to suppress physical evidence should be denied.  See Doc. No. 35 at ¶¶ 6-23.

The Fourth Amendment guarantees citizens the "right . . . to be secure in their . . . effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. To prove that a search violated the Fourth Amendment, "an accused must show that he had a legitimate expectation of privacy in a searched place or item." United States v. Rahme, 813 F.2d 31, 34 (2d Cir. 1987) (citing Rawlings v. Kentucky, 448 U.S. 98, 104 (1980)).  The person challenging the search must demonstrate a subjective expectation of privacy in the place searched, and that expectation must be objectively reasonable. United States v. Paulino, 850 F.2d 93, 97 (2d Cir. 1988).

In United States v. Lyle, the Second Circuit Court of Appeals held that an unauthorized and unlawful driver of a rental vehicle lacks standing. 919 F.3d 716, 729 (2d

Cir. 2019). The factors of <u>Lyle</u> dictated a specific finding, as the driver of the vehicle in that case "was not only the driver of the vehicle but the sole occupant." <u>Id.</u>

In this instance, the defendant has put forth an affidavit admitting that he drove a vehicle, but has put forward no information, in the form of an affidavit, that the person who rented the vehicle authorized the defendant to drive the vehicle. <u>See</u> Doc. No. 38. Rather, at that time, law enforcement learned that the defendant was not, in fact, an authorized driver of the rental vehicle. Thus regardless of whether the defendant drove with a valid driver's license or not, the defendant was not an authorized driver who at had "a reasonable expectation of privacy."

## **CONCLUSION**

For all of the foregoing reasons, the defendant's motion to suppress should be denied.

DATED: Buffalo, New York, June 3, 2020.

JAMES P. KENNEDY, JR.
United States Attorney

BY:   s/BRENDAN T. CULLINANE
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York  14202
716/843-5875
Brendan.Cullinane@usdoj.gov